UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| CONCEPTS NREC, LLC | ) | Case No. 5:20-cv-00133-gwc |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| XUWEN QIU, TURBOTIDES, INC AND HONG | ) | |
| YING ZHANG | ) | |
| | ) | |
| Defendants. | ) | |

**CONCEPTS' STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO
DEFENDANTS' XUWEN QIU AND TURBOTIDES, INC'S MOTION FOR SUMMARY
JUDGMENT**

Pursuant to L.R. 56(b), Plaintiff Concepts NREC, LLC ("Concepts") submits the

following statement of disputed material facts in opposition to the Defendants' Xuwen Qiu and

TurboTides, Inc. ("TurboTides") Motion For Summary Judgment (Doc. 241). Concepts'

statement of disputed material facts will respond by paragraph number to the Defendants'

purported "Statement of Undisputed Facts" (Doc. 241-3).

**Defendants' ¶3.**      If Defendants' reference to "a single, unified software tool for

designing turbomachinery" is meant to refer to the TurboTides Software, Concepts disputes the

statement that Dr. Qiu's experiences at GE before joining Concepts "gave rise" to his vision of

the TurboTides Software. After working for GE, Dr. Qiu signed Concepts' "EMPLOYEE

CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT" that called for him to disclose

any "existing work or work in progress in which he/she claims ownership rights and which is or

may be related to CETI's business, business plans, or research and development efforts." Doc.

52-21 at p. 3, General Agreement paragraph 6. Dr. Qiu listed nothing he "envisioned" while at

1

GE. Indeed, he left the form requiring him to list "EXISTING WORK OR WORK IN PROGRESS IN WHICH I CLAIM OWNERSHIP RIGHTS," blank.  Doc. 52-21 at p. 4.

Since Dr. Qiu did not disclose any purported "vision" of the TurboTides Software prior to joining Concepts and seeing these facts in the light most favorable to Concepts, a jury can reasonably conclude that Dr. Qiu's "vision" of the TurboTides software came *after* he began working for Concepts, not while he worked for GE.

**Defendants' ¶4.**        Concepts disputes that Defendants' purported statement of "facts" in their paragraph 4 are material. Whether the TurboTides Software became "available on the market" in 2017 is not material to the summary judgment motion.  Rather, the material issue is whether the TurboTides Software was created and developed by Dr. Qui while he worked for Concepts prior to December 2015 or from information derived from Concepts while Dr. Qiu worked for Concepts prior to December 2015.  Thus, Concepts disputes that Defendants' paragraph 4 states an undisputed *material* fact, as required by Local Rule 56(a) ("Any motion for summary judgment . . . must be accompanied by a separate and concise statement of undisputed material facts.") (emphasis added).

**Defendants' ¶9.**        Concepts disputes the statement in Defendants' paragraph 9 that "Dr. Qiu did not enter a non-compete agreement with Concepts."  Indeed, the very document referenced by Defendants in support of their statement states that Dr. Qiu agreed that he "will not" "at anytime . . . subsequent to [his] employment" "disclose *or use*" "nor solicit nor assist another *to use* or disclose" any "Confidential Technology and Information" of Concepts "of which you become informed during your employment."  Doc. 52-21 at p. 2, General Agreement paragraph 2 (emphasis added).  These prohibitions against *use* extend to "any and all ideas, inventions, discoveries, developments or improvements conceived or made by you during the

2

period of employment and related to the business or activities of" Concepts "*beyond the termination of your employment*." *Id.* at paragraph 3 (emphasis added). Further, in paragraph 8 of the General Agreement, Dr. Qui acknowledged that the Agreement prohibiting *use* remained in full force and effect even after he left Concepts' employment. Seeing these facts in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu did enter into a non-compete agreement with Concepts.

Concepts also disputes whether the Defendants' interpretation of the Agreement is a statement of *fact*. Rather, the interpretation and construction of a contract is a matter of law for the Court to determine, not a question of fact for the jury.

**Defendants' ¶10.**    Concepts disputes Defendants' claim in their paragraph 10 that "the *only* effort made by Concepts to protect its 'trade secrets' while Dr. Qiu worked for Concepts was to have its employees sign an NDA and its customers sign an end user license for the software." First, the Employment Agreement signed by Dr. Qui when he joined Concepts is much more than only a prohibition against disclosure. Rather, it prohibits employees from *claiming and using* a wide range of confidential and proprietary information. Doc. 52-21 at p. 1 under "Ownership of Work Products, Inventions, and Patents." Further, Dr. Qui is and was prohibited from "*use*" and nor was he allowed to "solicit [or] assist another *to use*" any Confidential Technology and Information" of Concepts "of which you become informed during your employment." Doc. 52-21 at p. 2, General Agreement paragraph 2 (emphasis added). The same document in paragraphs 4 and 5 also prohibits "use."

In addition, Concepts also protected its trade secrets in many other ways as described in EXHIBIT 3, Declaration of Bradley C. Leiser at ¶¶3-12.

3

Seeing these facts in the light most favorable to Concepts, a jury could conclude that efforts were made by Concepts to protect its 'trade secrets' while Dr. Qiu worked for Concepts beyond simply having its employees sign an NDA and its customers sign an end user license for the software.

**Defendants' ¶11.**    Concepts disputes Defendants' statement that Concepts does not have a "record of Dr. Qiu taking any trade secrets from Concepts [sic] computers." From the following facts seen in the light most favorable to Concepts, a jury could reasonably conclude that the trade secret taken from Concepts' computers is the TurboTides Software and/or critical portions of that Software developed by Dr. Qiu while employed by Concepts or from information derived from Concepts while he worked there. The record evidence of that taking is:

1.    Concepts' develops and licenses a complementary suite of programs that delivers proprietary Computer-Aided Engineering (CAE) and Computer-Aided Manufacturing (CAM) software (collectively, the "Concepts Software") for turbomachinery. Declaration of Bradley C. Leiser, Doc. 215-2.

2.    Defendant Qiu was employed by Concepts ETI, Inc. (a/k/a "CETI") as a turbomachinery software engineer for more than fourteen years during the period July 2, 2001 to December 7, 2015. *Id.*

3.    Concepts ETI, Inc. was merged into CN Holdings, Inc. ("CN Holdings"). Employees of CN Holdings and former employees of CETI, including Defendant Qiu, worked for and at Concepts. *Id.*

4.    CN Holdings owns Concepts and, as the former employer of Qiu, assigned to Concepts its contracts with Qiu and all rights it has as Qiu's employer. *Id.*

4

5.      In 2001, as a condition and in consideration of his employment by CETI, Mr. Qiu executed an Employee Confidentiality and Nondisclosure Agreement (the "Employment Agreement").  A copy of the Employment Agreement between CETI and Mr. Qiu is attached as Exhibit U to the Second Amended Complaint.  *Id.* and *see* Doc. 52-21.

6.      Pursuant to the Employment Agreement, Defendant Qiu agreed that CETI is the owner of all Confidential Technology and Information as defined in the Employment Agreement and that he would not make claim to, use or disclose the Confidential Technology and Information except in accordance with the terms of the Employment Agreement. *Id.*

7.      Pursuant to General Agreement Paragraph 2 of the Employment Agreement, Mr. Qiu agreed that

> "any and all Confidential Technology and Information, whether now known by you or CETI, including any ideas, inventions, discoveries, developments, or improvements made or discovered by you or other CETI employees during your or their employment at CETI, was and will be obtained at the expense and for the benefit of CETI.  Except as may be required by your employment at CETI, you will not, without CETI's written consent, disclose or use, nor solicit nor assist another to use or disclose, at any time either during or subsequent to your employment by CETI, any Confidential Technology and Information of CETI."

*Id.*

8.      Pursuant to General Agreement Paragraph 3 of the Employment Agreement, Mr. Qiu agreed to promptly disclose to CETI "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by you during the period of employment and related to the business or activities of CETI.  You will assign and hereby agree to assign all your interests therein to CETI or its nominee." *Id.*

5

9.      Pursuant to General Agreement Paragraph 4 of the Employment Agreement, Mr. Qiu agreed "that any computer software and documentation made by you during the period of your employment and related to the business, operation, or activities of CETI shall be considered 'works made for hire' under the copyright laws of the United States." *Id.*

10.     Qiu knows the overall structure of the Concepts' Software. Qiu Trans. Doc. 170 at 62.

11.     Qiu is familiar with and gives training to customers on the TurboTides' program. Doc.170 at 62-63.

12.     Qiu admitted, "In terms of functionality" the TurboTides' Software and the Concepts' Software are "trying to solve the same issues." Qiu Trans. Doc. 171 at 26.

13.     The two softwares are so similar, that even Dr. Qiu would find it difficult explain his understanding of the differences between the TurboTides' and Concepts' softwares. Doc. 170 at 63.

14.     Qiu agrees that Concepts' Software has four or five functionalities they call the Agile Design Systems, which are comparable to what TurboTides has.  Doc. 170 at 63.

15.     Qiu's special area of expertise while employed at Concepts was meanline modeling. Doc. 171 at 27-28.

16.     Qiu was responsible for and very familiar with Concepts' meanline program. Doc.170 at 62.

17.     Meanline is one piece of turbomachinery software. Doc. 171 at 27.

18.     Qiu worked on meanline modeling for 15 years at Concepts. Doc. 171 at 28.

19.     Meanline is the first step in the design of turbomachinery.  Doc. 171 at 28.

20.     Meanline comprises about 10% of the TurboTides software. Doc. 171 at 27.

21.    Mathematical formulae are developed by software engineers to try to predict the meanline that will result from a turbomachinery design.  Doc. 171 at 28.

22.    In 2007, while at Concepts, Qiu wrote a technical memorandum for internal review entitled "Alternative Meanline Modeling for Axial and Radial Impellers." (the "2007 Memorandum")  Doc. 171 at 28-29. Exh. 350 filed with the court at the July 6, 2022 Hearing, *see* Doc. 174-1.

23.    That 2007 Memorandum has not been released to the public by Concepts and has been maintained as a confidential trade secret by Concepts. EXHIBIT 3, Declaration of Bradley C. Leiser at ¶¶15-18.

24.    Dr. Qiu wrote software code for Concepts based on the ideas and formulae in the 2007 Memorandum. EXHIBIT 3, Declaration of Bradley C. Leiser at ¶17.

25.    The internal 2007 Memorandum written by Dr. Qui while at Concepts and the code he wrote based on that paper have never been published or disseminated to the public. EXHIBIT 3, Declaration of Bradley C. Leiser at ¶18.

26.    The alternative meanline modeling approach described in the internal 2007 Memorandum was something Qiu developed for Concepts while he was at Concepts.  Doc. 171 at 29.

27.    In the internal 2007 Memorandum Qiu admitted that "The slip factor calculation is based on the new unified slip model developed here at Concepts NREC"  Doc. 171 at 29. Exh. 350, p. 7, Section 5.0 "Deviation Modeling."

28.    The 2007 Memorandum Qiu wrote for internal review at Concepts described a new model developed by him at Concepts.  Doc. 171 at 30.

29.    Qiu presented the model in its final form as a calculation.  Doc. 171 at 30.

30.     The final form of the slip factor model Qiu developed for Concepts while at Concepts was presented as the formula on page 8 of Exh. 350 as (30). Doc. 171 at 30.

31.     Slip factor is an important part of the mean line. Doc. 171 at 30.

32.     Qiu proposed to Concepts in his internal 2007 Memorandum that this slip factor model would be beneficial to Concepts' customers. Doc. 171 at 31.

33.     This precise slip factor model and the formula that expressed it that Qiu developed for Concepts while at Concepts is implemented in the TurboTides Software. Doc. 171 at 31. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

34.     Exhibit 165 filed with the court at the July 6, 2022 Hearing (see Doc. 174-1) is a TurboTides Software User Guide.

35.     It is a guide that purchasers of licensees of the TurboTides software use to learn how to operate the software. Doc. 171 at p. 32.

36.     Starting at page 110 of Exhibit 165 (page 109 of the User Guide), the User Guide concerns the meanline module of the TurboTides software. Doc. 171 at 32.

37.     At Section 3.11, there is an introduction of the models used in the TurboTides meanline. Doc. 171 at 32.

38.     Under "QiuDev" there are formulae listed. Doc. 171 at 32.

39.     "QiuDev" identifies who "came up with the model." Doc. 171 at 33.

40.     The exact slip factor formula that Qiu reported in the confidential 2007 Memorandum he prepared for Concepts and proposed would be of beneficial use to Concept's customers, shows up in the TurboTides Software as formula 3.3 in the User's Manual. *Compare*

8

Exh. 165 at p. 110 with Exh. 350 at p. 8. Doc. 171 at p. 33, line 18-21. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

41.    That is not the only formula that was developed by Qiu at Concepts that found its way into the TurboTides software. "F-factor" 3.1 is also in the TurboTides User Manual. The same formula is reported in another Concepts' paper called "A New Slip Factor Model for Axial and Radial Impellers." Exh. 249 filed with the court as evidence at the July 6, 2022 Hearing, see Doc. 174-1.

42.    The formula (14) on page 3 of Exh. 249 is the same "Qiu Dev" formula in the TurboTides User Manual at Section 3.3 on p. 110. Doc. 171 at 35.

43.    Qiu wrote Exh. 249 while at Concepts along with two Concepts co-authors. Doc. 171 at 34.

44.    It was published in 2007 and copyrighted by Concepts. *See* lower right hand corner of Exh. 249.

45.    And another QiuDev formula at Section 3.3 in the TurboTides Software shows up in Qiu's 2007 paper as formula (15). Doc. 171 at 35.

46.    To make these formulae work in the TurboTides software, they had to be written into computer code. "Yes." Doc. 171 at 35.

47.    While he was working for Concepts, Qiu wrote turbomachinery computer code for use by Concepts that incorporated precisely these same formulae. "I did." Doc. 171 at 35-36.

48.    So when Qiu worked on the mean line portion of the TurboTides software, he already knew how to convert the QiuDev formulae into code. "Correct." Doc. 171 at 36.

49.     Qiu took at least the three described complicated formulae developed by him while at Concepts, for Concepts, and he incorporated them into his work at TurboTides as "QiuDev" formulae.  Doc. 171 at 35 ("yeah, they are the same.")  From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

50.     Seeing the facts in the light most favorable to Concepts, it is reasonably likely that a jury will conclude that Qiu's use of the three QiuDev formulae developed by him at Concepts and his preparation of code for Concepts and TurboTides to make those formulae work in the two softwares based on his work at Concepts was comprised of, in part, Concepts' "Confidential Technology and Information" as defined under the Employment Agreement.

51.     According to TurboTides' Hefei Taize website on its "About Us" page, "[t]he key technology and basic source code of TurboTides originated from the accumulation of decades of core team in the United States. After many years of preparation, in 2016, with the help of the Hefei Municipal Government [in China] he [Defendant Qiu] went to the China University of Science and Technology Association Industrial Park and registered the copyright of its core product TurboTides in China, with complete source code."  See Fawley Declaration (Doc. 215-1 at p. 18) (emphasis added).  Since Mr. Qiu only worked at Concepts during the 15 years immediately before starting Hefei Taize and disclosed no prior inventions in accordance with the Employment Agreement, seen in the light most favorable to Concepts, the referenced "accumulation of decades of core team in the United States" is a reference to the accumulation by Defendant Qiu of CETI's and Concepts' core team's decades of technology and source code for turbomachinery.

From these facts alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

52.     Mr. Qiu gave notice to Concepts that he was leaving in November 2015 and his last day at Concepts was December 7, 2015.  Doc. 171 at 40.

53.     One of the reasons Qiu left Concepts was to care for his ill mother in China. Doc. 171 at 40.

54.     Qiu left the United States at the end of December, 2015 to be with his mother in China. Doc. 171 at 40.

55.     Qiu sat with his mother for three months. His mother passed in March, 2016. Doc. 171 at 41.

56.     About 30 days after she died, on April 22, 2016, Qiu helped formally register Hefei Taize as a business in China. 171 at 41.

57.     Qiu is "one of the founders of Hefei Taize."  Doc. 171 at 17.

58.     The other founders are Qiu's high school classmates, Yu Quing, Shi Xiaowen and Li Wende and a college friend and Defendant Zhang's brother Zhang Hong Bing. Doc. 170 at p. 46.

59.     At the time it was founded in 2016, the official records in China showed Qiu owned 97 percent of the stock of Hefei Taize.  Doc. 171 at 17.

60.     The other investors would not put money in the company until a copyright for the software code had been registered in China. Doc. 171 at p. 76.

61.     The copyright to the code for the first version, V 1.0, of the TurboTides software was registered in China on May 25, 2016.  Doc. 171 at 42.

11

62.     It took at least two years to "write Version 1.0 of the TurboTides software." Doc. 171 at 40 (Tr. at 116). Thus, at a minimum, seeing the evidence in the light most favorable to Concepts, the jury can reasonably conclude that work began on the TurboTides Software on or about May 25, 2014 – two years before registration of Version 1.0 with the Chinese copyright office and long before Dr. Qiu left Concepts in December 2015. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

63.     Despite being able to obtain a copy of its copyrighted code for Version 1.0 (or any of the other 27 versions it has copyrighted) from the Copyright Protection Center of China *(See* Eric Liu Declaration at Doc. 207-2), Qiu, TurboTides, Inc. and Hefei Taize all refused to do so or produce it in response to the court's orders that they comply with the Hefei Taize subpoena and party discovery. If the code exonerated them from this lawsuit, one would assume they would produce it. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

64.     Mr. Qiu was heavily involved in the first copyright filing for the TurboTides software. Doc. 171 at 76.

65.     That was almost exactly 30 days after Hefei Taize was registered as a business in China. Doc. 171 at 42 – 43.

66.     As of at least June 26, 2016 (30 days after copyright registration), the software was sufficiently developed that Qiu included a screenshot of it in the TurboTides User Manual. *See* Exh. 165 filed with the court at the July 6, 2022 Hearing per Doc. 174-1, at p. 261 (p. 162 of

the Exhibit), figure 8.4 of the command window. Doc. 171 at 43-44. Exhibit 165 is a screenshot

from TurboTides Software version 1.7.3 with a build date of June 26, 2016.  Doc. 171 at 44-45.

67.    Qiu agrees that Concepts' belief that one could not develop the TurboTides

software in such a short time is valid.  Doc. 170 at 59. From this fact alone, seen in the light most

favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking

[ ] trade secrets from Concepts [sic] computers."

68.    Qiu agrees that it would take more than two or three years to develop a software

like TurboTides.  Doc. 170 at 59.  Given that the software was registered in China "with

complete source code" on May 25, 2016, seen in the light most favorable to Concepts, a jury

could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from

Concepts [sic] computers."

69.    Qiu claims he is the "overall designer of the TurboTides system and led an

international team of experts in the development of the CAE design system for integrated

turbomachinery."  Doc. 96-1 and 93-11.

70.    Qiu agrees that Concepts' suspicion that he must have stolen "stuff" from

Concepts is true.  Doc. 170 at 59.  From this fact alone, seen in the light most favorable to

Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade

secrets from Concepts [sic] computers."

71.    Defendant Zhang is Dr. Qiu's wife and a computer software engineer with a

Master's Degree.  She works as an engineer that builds and releases computer software by

compiling and writing source code and building it to an executable program.  Zhang Depo

attached as Exhibit to Doc. 215-1 at 34, 39, 40, 81, 86.

72.     Defendant Zhang formed TurboTides LLC as a New Hampshire Corporation with its offices in the Qiu/Zhang home at 21 Pinneo Hill Road, Hanover, NH that listed its primary business or purpose as being "Software Development," on November 3, 2011 – five years before Dr. Qiu left Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶4 and EXHIBIT 5.

73.     Qiu held himself out as the "Founder and President" of TurboTides LLC.  Doc. 164-11.

74.     On March 11, 2018, Qiu wrote an email to himself that admitted in part, "In 2012, [Qiu] began to develop Turbotides with a team of international experts in the field."  Doc. 95-1 and 93-11. From this fact alone and given the provisions of his Employment Agreement with Concepts assigning to Concepts all rights to intellectual property developed by Dr. Qiu on Concepts' watch, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

75.     Schedule C – Profit and Loss from a Business - on Qiu's and Zhang's personal federal joint tax return for the years 2011-2017 lists the business as TurboTides LLC and describes it as a "software development" company.  Qiu Dep. Doc. 124-8 at 39 and Fawley Declaration, Doc. 215-1 at ¶9.

76.     For 2011, Qiu's name is listed on the joint tax return as the proprietor of TurboTides LLC.  Qiu Dep. Doc. 124-8 at 39 and Fawley Declaration, Doc. 215-1 at ¶9.

77.     In 2011 Qiu was working for Concepts, doing software development for Concepts.  Declaration of Bradley C. Leiser. Doc. 215-2 at ¶6.

78.     From 2012 to 2017, Defendant Zhang is listed as the proprietor of TurboTides LLC in the couple's joint tax returns.  Fawley Declaration, Doc. 215-1 at ¶9.

14

79.     In 2013, Qiu and Defendant Zhang made a claim to the IRS and got a tax benefit for a computer they claimed was used by TurboTides LLC.  Qiu Dep. Doc. 124-8 at 36, lines 14-17.

80.     Qiu was working for Concepts in 2013 doing software development for Concepts. Declaration of Bradley C. Leiser, Doc. 215-2 at ¶6.

81.     Qiu and Defendant Zhang made a claim to the IRS and got a tax benefit for a computer they claimed was purchased and used by TurboTides LLC in 2015.  Qiu Dep. Doc. 124-8 at 36- 37.

82.     Qiu worked for Concepts until December 7, 2015.  Declaration of Bradley C. Leiser, Doc. 215-2 at ¶6.

83.     Dr. Qiu and Ms. Zhang's personal tax return for 2011 shows that Xuwen Qiu was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with $1202 in expenses while Dr. Qiu was simultaneously working at Concepts.  EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(f).

84.     Dr. Qiu and Ms. Zhang's personal tax return for 2012 that shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with $3490 in expenses while Dr. Qiu was simultaneously working at Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(g).

85.     Dr. Qiu and Ms. Zhang's personal tax return for 2013 that shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with gross sales of $10,000 and  $11,628 in expenses while Dr. Qiu was simultaneously working at Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(h).

86.    Dr. Qiu and Ms. Zhang's personal tax return for 2014 that shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with gross sales of $28,000 and $24,846 in expenses while Dr. Qiu was simultaneously working at Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(i).

87.    Dr. Qiu and Ms. Zhang's personal tax return for 2015 that shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with $14,037 in expenses while Dr. Qiu was simultaneously working at Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(j).

88.    Dr. Qiu's position was "President" of TurboTides LLC.  EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶4  and EXHIBIT 5 at Bates CONCEPTS022; and Doc. 164-11.

89.    Dr. Qiu published a paper entitled "Designing Turbochargers With an Integrated Design System" in June 2013 as "Xuwen Qiu TurboTides LLC."  EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶7 and EXHIBIT 7 at Bates No. CONCEPTS043.

90.    TurboTides' identifies Dr. Qiu as the "chief software architect for the TurboTides software."  EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶8  and EXHIBIT 8 at Bates No. CONCEPTS091.

91.    TurboTides's stated in 2020 that "the TurboTides product was born because of the hard work of Dr. Qiu in the turbomachinery industry for more than 20 years."  EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶9  and EXHIBIT 9 at CONCEPTS0260.  Dr. Qiu worked for Concepts for 15 of those 20 years prior to 2020. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

16

92.    Third-Party witness Nick Dorsi of TurboSolutions, Inc. testified that in discussions with Dr. Qiu about the process of the development of the TurboTides Software, Dr. Qiu said "he was largely in charge of writing the software." EXHIBIT 10 Dorsi Deposition at p. 21, lines 13-20. Dorsi also testified that Dr. Qiu told him that he recalled Dr. Qiu telling him that while Dr. Qiu was in the United States he was doing some of the software development by "developing algorithms" and "some coding." EXHIBIT 10 Dorsi Dep. at p. 22, lines 9-23. Since Dr. Qiu did not leave to live in China until after he left Concepts in December 2015, seeing the evidence in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu was doing software development work by developing algorithms and coding for the TurboTides Software while he was working for Concepts in the United States. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

93.    Dr. Qiu's claim promoting the narrative that only 33 days passed between the beginning of work on the TurboTides software code and its registration with the Chinese copyright office "with complete source code" is false. In his attached Declaration (EXHIBIT 2, ¶¶90-96), Concepts' Expert Dr. Peter A. Seitz opines to a reasonable degree of professional certainty that:

a.  The TurboTides Software registered by Hefei Taize with the Copyright Protection Center of China on May 25, 2016 could not have been written and developed with "complete source code" within 33 days. To write even the most rudimentary turbomachinery software with "complete source code" and using even a team of 30 code writers would require at least two to five years.

b.  Further, since Dr. Qiu disclosed no inventions of his own prior to working for Concepts, and then worked *only* for Concepts for almost 15 years developing software code immediately prior to the registration for copyright of the TurboTides Software code, and because he claims to have been the chief architect of the TurboTides software, it is my opinion that the vast majority of the first version of the TurboTides

Software that was registered with the Chinese government must have been written by Dr. Qiu or by third-parties under his direction over several years during the time he worked at Concepts. This is supported by Dr. Qiu's training and experience writing turbomachinery software code and the creation of TurboTides LLC while working for Concepts and whose only identified business purpose was "software development." There is no other rational explanation for the sudden appearance of a complex turbomachinery software code in China within months after Dr. Qiu left Concepts that incorporates complex formulae developed by Dr. Qiu. As I said above, the software was not created from scratch in a span of 33 days.

c.   Further support for my opinion is that engineers and scientists who make claims of invention are trained to support those claims in professional publications by submitting documentary proof. In this case, I understand that the court has ordered both Hefei Taize and TurboTides, Inc. to produce the actual copyright registration documents submitted to the Chinese government on May 25, 2016 that would include the alleged "complete source code." I understand from reading the Declaration of Erica Liu (Doc. 207-2) that Hefei Taize has the ability to obtain those records as the registrant of the software code. Their refusal to produce those documents even after being ordered to do so by the court suggests that the documents would show that the maturity and extent of work necessary to generate the "complete source code" would have taken many years of work. Otherwise, as a scientist who understands and has been trained how to prove his claims, why would Dr. Qiu not provide them for inspection?

d.   Further rationale supporting my opinions include the fact that the more persons that are added to a software writing team, the effort to coordinate their efforts to ensure that the final product is error free and works seamlessly increases. An analogy can be found in imagining a team of 30 authors attempting to write a novel. Making sure that the tenses, story line narrative, spelling, character traits, dialog and so on all make sense, are consistent and error free becomes more and more difficult as more writers are added to the project. There is an optimal number of code writers for any software development effort. As some point simply throwing more bodies towards a project has diminishing returns and, at some level can cause more problems than it solves. Thus, it is my opinion that even a large number of code writers could not have created the TurboTides Software in 33 days.

e.   Further, based on my experience and training in the field of turbomachinery engineering and software development for turbomachinery engineering, it would have been impossible for anyone who simply read Dr. Qiu's papers on the Concepts' Slip Factor formula, and numerous other such modeling functions, to suddenly develop turbomachinery software from scratch that incorporated such formulae into operable code such that it would function in a working turbomachinery software within 33 days. To transform those formulae into functioning operable code in software would require logic software to consider various modeling modes (analysis, design point, data reduction, etc.); actual programming; testing for stability, convergence and uniqueness; setting appropriate input functionality; setting appropriate output functionality

including detailed plotting capability; and allowing multiple types of units for both the input and output functions per the users' choice.

f.   Further supporting my opinion is that converting the QiuDev publicly available formulae into useable code for a software program is a far cry from simply being aware of the formula from published papers.  A simple analogy may help explain what I mean. Everyone knows Einstein's famous formula "$e=mc^2$" that dates from the early 1900's. School children recite the formula in response to tests in high school physics. But those same children cannot build an atomic bomb using the formula. It took the brilliant minds on the Manhattan Project team working 24/7 for several years to use that formula to create an atomic bomb.  Knowing a formula exists does not, in and of itself, mean that a person can then utilize it in functioning software without spending the time to reduce the theory to practical, application suitable terms.

g.   I have reviewed a 271 page version 5.2.1 of the TurboTides Software Users Guide. It still uses at least one screenshot of a June, 2016 version of the TurboTides software. Thus, the source code program submitted for registration with the Chinese government on May 25, 2016 must have been very mature at that time in order to have generated a screenshot that is still used – too mature to have been created in 33 days.

*See Druzba v. Am. Honda Motor Co.*, 2:22-cv-00019 (D. Vt. May 15, 2024)(expert opinon testimony used to raise issues of material fact and defeat summary judgment).

From the foregoing 93 numbered facts, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

In addition, Defendants are precluded from introducing evidence to support their defense that Dr. Qiu did not take trade secrets from Concepts' computers because they failed to produce the following discovery materials sought by Concepts' document subpoena on Hefei Taize and in discovery requests to Defendants.  Defendants refused to produce the following information in discovery: Items 1, 3, 8, 9, 10, 11, 14, 19, 20 and 33 in Compliance Chart for Document Subpoena to Hefei Taize, Doc. 201-1, pp. 6-15. These materials include the development documentation for the TurboTides Software, the original TurboTides software and code, and the registrations for copyright of the TurboTides software with the Chinese Government.

19

The Courts' sanction order precludes "Defendants' use of the [foregoing] evidence that neither Defendants nor Hefei produced in response to the Rule 45 Subpoena." Doc. 245 at 38; and Doc. 258 at 16. As the Court observed, "[i]t would simply be inequitable for Hefei to not produce this information in discovery, but then permit Defendants to rely on it at trial or summary judgment, given that Concepts had no opportunity to examine such evidence and probe its relevance in discovery." Doc. 245 at 36-37. In particular, the Court pointed out that a preclusion order "should preclude Defendants from introducing evidence related to software source code or software versions that have not been produced." Doc. 245 at 36. Not only should Defendants be precluded from defending themselves based on a claim that "Dr. Qiu did not take trade secrets from Concepts' computers" but Concepts requests that the Court also adversely infer that in fact Dr. Qiu did take trade secrets from Concepts' computers.

> [W]here, as here, an adverse inference instruction is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

*Residential Funding Corp. v. Degeorge Financial*, 306 F.3d 99, 107 (2d Cir. 2002). Here, the Court's various sanctions decisions already expressly found that the three criteria in *Residential Funding* have been satisfied. Besides the non-compliance and relevance factors, as to "a culpable state of mind" the Court specifically found that "Hefei's failure to comply with the Subpoena appears willful based on its failure to adequately justify its noncompliance." Doc. 245 at 26. And, after citing two cases from the Southern District of New York holding that preclusion sanctions should only be justified "in 'rare situations' evincing culpable conduct" (Doc. 245 at 35 *citing Liebowitz & Latman, P.C.*, No. 06 Civ. 1202(LGS)(HBP), 2013 WL

20

3718071, at *13 (S.D.N.Y. July 15, 2013) and where there is "willfulness or bad faith, or [a

party] is otherwise culpable" (Doc. 245 at 36 *citing Daval Steel Products v. M/V Fakredine,* 951

F.2d 1357 at 1367 (2d Cir. 1991)), this Court held "[i]t appears that Hefei's noncompliance with

the Subpoena has been willful and not an inadvertent oversight." Doc. 245 at 36. *See also* that

the Court noted "Hefei's longstanding resistance to discovery in this case, observing that 'Dr.

Qiu and Hefei have obstructed the discovery process for years. They have behaved like an

individual and an organization with something to hide." Doc. 223 at 5, cited in Doc. 245 at 26.

And, as the court found, "Hefei has not denied that it possesses relevant documents. It simply has

not produced documents in response to certain categories of requests and has not explained the

reason for its non-production." Doc. 245 at 16, n. 5. And, the Court found that Hefei's

"production appears to be 'a grudging, half-hearted or foot dragging attempt at compliance' . . .

rather than a good-faith effort to comply with the Subpoena." *Id*. at 17. And, the Court found

that "Concepts has demonstrated that Hefei has not diligently attempted to comply in a

reasonable manner." *Id.* at 22. As a further demonstration of culpable conduct, "Hefei

represented that 'there is absolutely no evidence in the record suggesting that Hefei will not

abide if the Court orders it to comply with the subpoena" (Doc. 183, at 50), yet as the Court

found it "has now ordered Hefei to comply with the Subpoena on several occasions, and its

production remains inadequate, incomplete, and in some cases nonexistent." Doc. 245 at 25.

And, as the Court observed,

> Defendants Qiu and TurboTides, Inc. both engaged in significant motion practice
> to defend Hefei Taize's refusal to comply with the Subpoena and Defendant Qiu
> voluntarily served as the only live witness at the [July 2022] evidentiary hearing
> seeking sanctions against Hefei Taize, *all in an effort to block Concepts' access* to
> materials they claimed were only available from Hefei Taize.

Doc. 201 at 2 (emphasis added). In short, findings of willful culpability abound.

Since all three criteria for an adverse inference have been satisfied with respect to the discovery demands for evidence of the taking of trade secrets from Concepts computers, the Court should issue an adverse inference instruction to the jury that they should find that in fact Dr. Qiu did take trade secrets from Concepts' computers.

Based on the overwhelming evidence outlined above, evidence preclusion rulings, and the requested adverse instruction, seeing all the facts in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu did take trade secrets from Concepts computers and used them to create the TurboTides Software.

**Defendants' ¶12.**    Concepts disputes Defendants' statement that "Concepts did no investigations prior to the filing [sic] suit as to whether Dr. Qiu took any trade secrets." Whether Concepts "did investigations" is not material to the determination of summary judgment. Moreover, the citation provided by Defendants to Mr. Japikse's testimony says nothing of the kind. Mr. Japikse said *he* did not do a *personal* investigation and he was not aware of anyone else doing such an investigation. That does not mean no investigation by Concepts was performed. Moreover, Concepts performed a Fed. R. Civ. P. 11 investigation prior to filing suit as to whether Dr. Qiu took any trade secrets from Concepts.  EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶3.

**Defendants' ¶13.**    Concepts disputes Defendants' statement that "[t]he only perceived wrongdoing by Dr. Qiu that Concepts is aware of its [sic] speculation that Defendants had purchased a pirated copy of Concepts software in China that was publicly available on the internet." The statement is not true and it is not material to the determination of summary judgment.  The Second Amended Complaint (Doc. 52) outlines 11 counts and over 186

paragraphs against Dr. Qiu all of which detail and articulate multiple acts of "perceived wrongdoing" by Dr. Qiu.

**Defendants' ¶14.**    Concepts disputes Defendants' statement that "access by Defendants to [Concepts'] publicly available software occurred in Hefei, after Hefei Taize completed the development of the TurboTides software."  The cited reference to Mr. Japikse's testimony says nothing of the kind. Moreover, the legitimate purchase of the Concepts' software is available at anytime to verified buyers.  Concepts has no record of a legitimate purchase of the Concepts' software by Hefei Taize, TurboTides, Inc. or TurboTides LLC. EXHIBIT 3, Declaration of Bradley C. Leiser ¶¶13-14.  Thus, seeing the facts in the light most favorable to Concepts, a jury could reasonably conclude that Defendants' admission it possesses the Concepts' Software is an admission that it illegally obtained the Concepts' Software.

**Defendants' ¶15.**    Concepts disputes Defendants' statement that "Mr. Japikse testified that Concepts software at the time it claims Defendants accessed it was readily available on the internet." This was not Mr. Japikse's testimony as is evident from reading the transcript cited by Defendants.

Moreover, while legitimate purchase of the Concepts software is available at anytime to verified buyers, Concepts has no record of a legitimate purchase of the Concepts' software by Hefei Taize, TurboTides, Inc. or TurboTides LLC. EXHIBIT 3, Declaration of Bradley C. Leiser ¶¶13-14.  Thus, seeing the facts in the light most favorable to Concepts, a jury could reasonably conclude that Defendants' admission it possesses the Concepts' Software is an admission that it illegally obtained the Concepts' Software.

**Defendants' ¶16.**    Concepts disputes Defendants' statement that "[a]ccording to Mr. Japikse it was a standard supplier that was stealing Concepts' software, not Defendants." This statement was not Mr. Japikse's testimony as is evident from reading the transcript cited by Defendants.

**Defendants' ¶17.**    Concepts disputes Defendants' statement that. "Mr. Japikse could not recall what if any effort was made to determine if the TurboTides software infringed on Concepts software" as immaterial. Mr. Japikse's ability to recall facts goes to his credibility which is to be construed in the light most favorable to Concepts, and thus is immaterial to the summary judgment motion and Defendants' burden. And, since Defendants have never produced the basic information, or code, that would allow a full investigation of the TurboTides Software, Defendants should be precluded Defendants from relying on non-infringement claims and the Court should draw an adverse inference that infringement did occur.

**Defendants' ¶18-35 Generally.**    Concepts disputes Defendants' story recited in paragraphs 18-35. It is a far cry from a "concise statement of material facts" (L.R. 56(a)). Rather, Defendants propose a revisionist story about a confidential memorandum Dr. Qiu wrote in 2007 that conflates that paper with other another 2007 paper presented at conferences. As a result, Defendants' story is misleading and conflicts greatly with the facts. A more specific response to each paragraph is below.

**Defendants' ¶19.** For example, Plaintiff disputes Defendants' claim in their paragraph 19, that "based on the publicly and well known-known single-zone model, mathematical equations formulated by Mr. Aungier, Dr. Qiu prepared the 2007 paper." But, there is nothing in the citation provided by Defendants at Docket 171, p. 104-105 that says anything about "well known-known single-zone model, mathematical equations formulated by Mr. Aungier." Nor is

24

there mention of "well known-known single-zone model, mathematical equations formulated by Mr. Aungier" in Doc. 220-1 also cited by Defendants.

Moreover, while there is mention in both sources of a "2007 paper," one is a highly confidential paper written at Concepts for Concepts entitled "Alternative Meanline Modeling for Axial and Radial Impellers" (See Doc. 171, at 104-105) and the other is a public paper presented by Dr. Qiu at a conference called "A New Slip Factor Model for Axial and Radial Impellers." Doc. 220-1 at 8. They are *not* the same paper, nor do they even have the same title. And, as Dr. Qiu admitted it was he who first developed the "QiuDev" formulae when working on the confidential Concepts' 2007 Memorandum, not Dr. Aungier. Doc. 171, p. 32-33 (Tr. pg. 108-109). Seen in the light most favorable to Concepts, a jury could reasonably conclude that the confidential Concepts internal "2007 paper" was not "based on the publicly and well known-known single-zone model, mathematical equations formulated by Mr. Aungier."

**Defendants' ¶21**  Concepts disputes the statement that "This published paper contained a set of Ron Aungier's public equations that were called a slip factor mode. [Docket 171, P. 149]." There is nothing at page 149 of the transcript of Doc. 171 (at 73) that says that. If anything, the cited testimony by Dr. Qiu references the "set of equations that *I* developed, which is called a slip factor model." *Id.* (emphasis added). Thus, seen in the light most favorable to Concepts, the jury can reasonably conclude that the published paper contained *Dr. Qiu's* formulations called the "slip factor model," not Dr. Aungier's model.

**Defendants' ¶36.**     Concepts disputes Defendants' statement that "[a]t all times the lines of code Dr. Qiu wrote while at Concepts remained with Concepts and Dr. Qui did not take them." *See* Concepts' dispute of facts set forth above in response to Defendants' ¶11. From this and

seen in the light most favorable to Concepts, a jury could reasonably conclude that the lines of code Dr. Qiu wrote while at Concepts were taken by Dr. Qiu when he left Concepts and were used by him in the TurboTides Software.

**Defendants' ¶37.**    Concepts disputes Defendants' statement that "the code that Dr. Qiu wrote while at Concepts would have been useless to Hefei Taize because the TurboTides software code was written in Qt a completely different data structure than Concepts code." As Dr. Bonhaus has confirmed, this statement is "entirely incorrect." Bonhaus Declaration at Doc. 222-1, esp. ¶6. From these facts and seen in the light most favorable to Concepts, a jury could reasonably conclude that the code written by Dr. Qui while at Concepts would not have been "useless" to Hefei Taize.

**Defendants' ¶38**    Concepts disputes that any of Defendants' statements in ¶38 are material to any issue presented by the summary judgment motion.

**Defendants' ¶43**    Concepts disputes that any of Defendants' statements in ¶43 are material to any issue presented by the summary judgment motion.

**Defendants' ¶44.**    To the extent Defendants' paragraph 44 can be construed to stand for the proposition that when Dr. Qiu joined Hefei Taize, *Dr. Qiu* had developed no software that he brought with him to Hefei Taize, Concepts disputes Defendants' statement. *See* Concepts' statement of disputed facts set forth above in response to Defendants' ¶11. From this and seen in the light most favorable to Concepts, a jury could reasonably conclude that, when Dr. Qiu joined Hefei Taize, *Dr. Qiu* had already developed the TurboTides Software that he brought with him to Hefei Taize.

26

**Defendants' ¶45.**    Concepts disputes the entirety of Defendants' statement.  *See* Concepts' disputed statement of facts set forth above in response to Defendants' ¶11.  From this and seen in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu brought the TurboTides software with him to Hefei Taize and that he developed that software while at Concepts.

**Defendants' ¶46.**    Concepts disputes Defendants' statement that "Dr. Qiu is not a software developer" and that Dr. Qiu "does not know how to write complicated software programs, such as the TurboTides software."  *See* EXHIIBT 4, Declaration of Mark Anderson**.**  In addition, both the TurboTides LLC tax returns and registration with the NH Secretary of State and the TurboTides, Inc. tax returns state that TurboTides LLC's and TurboTides, Inc.'s business is and was "software development." Qiu Dep. Doc. 124-8 at 39 and Fawley Declaration, Doc. 215-1, ¶9. From these facts and seen in the light most favorable to Concepts, a jury could reasonably conclude that, Dr. Qiu is a software developer and that Dr. Qiu does know how to write complicated software programs, such as the TurboTides software.

**Defendants' ¶47.**    Concepts disputes Defendants' statements that "Dr. Qiu had a very limited role in the actual development of the 'TurboTides' software" and that "the software was developed by a team of professional developers at Hefei Taize, selected by Mr. Zhang, Mr. Yu and Dr. Qiu."  *See* Concepts' disputed statement of facts set forth above in response to Defendants' ¶11, and the Court's preclusion order prohibiting Defendants from relying on non-produced evidence that was the subject of discovery and the Hefei Taize Subpoena.

Defendants are precluded from introducing evidence to support their defense that "Dr. Qiu had a very limited role in the actual development of the 'TurboTides' software" and that "the software was developed by a team of professional developers at Hefei Taize, selected by Mr.

Zhang, Mr. Yu and Dr. Qiu." because they failed to produce the following discovery materials sought by Concepts' document subpoena on Hefei Taize and in discovery requests to Defendants. Defendants refused to produce the following information in discovery that would permit an investigation as to the development of the TurboTides Software: Items 1, 3, 8, 9, 10, 11, 14, 19, 20 and 33 in Compliance Chart for Document Subpoena to Hefei Taize, Doc. 201-1, pp. 6-15. These materials include the development documentation for the TurboTides Software, the original TurboTides software and code, and the registrations for copyright of the TurboTides software with the Chinese Government.

The Courts' sanction order precludes "Defendants' use of the [foregoing] evidence that neither Defendants nor Hefei produced in response to the Rule 45 Subpoena." Doc. 245 at 38; and Doc. 258 at 16. As the Court observed, "[i]t would simply be inequitable for Hefei to not produce this information in discovery, but then permit Defendants to rely on it at trial or summary judgment, given that Concepts had no opportunity to examine such evidence and probe its relevance in discovery." Doc. 245 at 36-37. In particular, the Court pointed out that a preclusion order "should preclude Defendants from introducing evidence related to software source code or software versions that have not been produced." Doc. 245 at 36. Not only should Defendants be precluded from defending themselves based on a claim that "Dr. Qiu had a very limited role in the actual development of the 'TurboTides' software" and that "the software was developed by a team of professional developers at Hefei Taize, selected by Mr. Zhang, Mr. Yu and Dr. Qiu" but Concepts requests that the Court also adversely infer that in fact Dr. Qiu did the TurboTides Software during the time he worked at Concepts and/or from Concepts' trade secrets Dr. Qiu took from Concepts while he worked there.

> [W]here, as here, an adverse inference instruction is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

*Residential Funding Corp. v. Degeorge Financial*, 306 F.3d 99, 107 (2d Cir. 2002). Here, the Court's various sanctions decisions already expressly found that the three criteria in *Residential Funding* have been satisfied. Besides the non-compliance and relevance factors, as to "a culpable state of mind" the Court specifically found that "Hefei's failure to comply with the Subpoena appears willful based on its failure to adequately justify its noncompliance." Doc. 245 at 26. And, after citing two cases from the Southern District of New York holding that preclusion sanctions should only be justified "in 'rare situations' evincing culpable conduct" (Doc. 245 at 35 *citing Liebowitz & Latman, P.C.*, No. 06 Civ. 1202(LGS)(HBP), 2013 WL 3718071, at *13 (S.D.N.Y. July 15, 2013) and where there is "willfulness or bad faith, or [a party] is otherwise culpable" (Doc. 245 at 36 *citing Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357 at 1367 (2d Cir. 1991)), this Court held "[i]t appears that Hefei's noncompliance with the Subpoena has been willful and not an inadvertent oversight." Doc. 245 at 36. *See also* that the Court's noted "Hefei's longstanding resistance to discovery in this case, observing that 'Dr. Qiu and Hefei have obstructed the discovery process for years. They have behaved like an individual and an organization with something to hide.'" Doc. 223 at 5, cited in Doc. 245 at 26. And, as the court found, "Hefei has not denied that it possesses relevant documents. It simply has not produced documents in response to certain categories of requests and has not explained the reason for its non-production." Doc. 245 at 16, n. 5. And, the Court found that Hefei's "production appears to be 'a grudging, half-hearted or foot dragging attempt at compliance' . . .

29

rather than a good-faith effort to comply with the Subpoena." *Id*. at 17.  And, the Court found

that "Concepts has demonstrated that Hefei has not diligently attempted to comply in a

reasonable manner." *Id.* at 22.  As a further demonstration of culpable conduct, "Hefei

represented that 'there is absolutely no evidence in the record suggesting that Hefei will not

abide if the Court orders it to comply with the subpoena" (Doc. 183, at 50), yet as the Court

found it "has now ordered Hefei to comply with the Subpoena on several occasions, and its

production remains inadequate, incomplete, and in some cases nonexistent."  Doc. 245 at 25.

And, as the Court observed,

> Defendants Qiu and TurboTides, Inc. both engaged in significant motion practice
> to defend Hefei Taize's refusal to comply with the Subpoena and Defendant Qiu
> voluntarily served as the only live witness at the [July 2022] evidentiary hearing
> seeking sanctions against Hefei Taize, *all in an effort to block Concepts' access* to
> materials they claimed were only available from Hefei Taize.

Doc. 201 at 2 (emphasis added).  In short, findings of willful culpability abound.

Since all three criteria for an adverse inference have been satisfied with respect to the

discovery demands for evidence of the taking of trade secrets from Concepts computers, the

Court should issue an adverse inference instruction to the jury that they should find that in fact

Dr. Qiu did not have a "very limited role" in the actual development of the 'TurboTides'

software and that the software was not developed by a team of professional developers at Hefei

Taize, selected by Mr. Zhang, Mr. Yu and Dr. Qiu, but instead was developed by Dr. Qiu.

Based on the overwhelming evidence outlined above, evidence preclusion rulings, and

the requested adverse instruction, seeing all the facts in the light most favorable to Concepts, a

jury could reasonably conclude that Dr. Qiu did not have a "very limited" role in the actual

development of the 'TurboTides' software and that the software was not developed by a team of

professional developers at Hefei Taize, selected by Mr. Zhang, Mr. Yu and Dr. Qiu, but instead was developed by Dr. Qiu.

**Defendants' ¶48.**    Concepts disputes Defendants' statement that "[a]ll that was required by Hefei Taize to register a copyright was the application of a few pages of source code" and that "the first copyright submission submitted by Hefei Taize consisted of an idea and a vision on a few PowerPoint slides."   This statement is entirely false, as detailed by Concepts' expert on software copyright registration in China, Attorney Erica Liu**.**  Doc. 207-2.  From this and seen in the light most favorable to Concepts, a jury could reasonably conclude that much more was required by Hefei Taize to register a copyright beyond "a few pages of source code" and that "the first copyright submission submitted by Hefei Taize" did not consist of "an idea and a vision on a few PowerPoint slides."  Indeed, Hefei Taize publicly claimed that the TurboTides Software copyright registration was made with "complete source code." <u>See</u> EXHIBIT 1, Fawley September 3, 2024 Declaration at ¶11 and EXHIBIT 11.

Moreover, the Court's preclusion order prohibits Defendants from relying on non-produced evidence that was the subject of discovery and the Hefei Taize Subpoena. That discovery and the Subpoena sought the following copyright registration materials that were never produced:

1.  The copyright application and registration of the TurboTides Software in China.


2.  Any reports, correspondence, written communications, or filings with the Chinese Government concerning any turbomachinery software claimed to be authored or owned by Hefei, TTI, TTLC or Qiu.

Items 8 and 33 in Compliance Chart for Document Subpoena to Hefei Taize, Doc. 201-1, pp. 8 and 14.

**Defendants' ¶49.**    Concepts disputes Defendants' statement that "Hefei Taize did not use any code developed or belonging to Concepts. Dr. Qiu did not develop any software with TurboTides, Inc." *See* Concepts' statement of disputed facts, preclusion arguments, and request for adverse inferences set forth above in response to Defendants' ¶11.  From this and seen in the light most favorable to Concepts, a jury could reasonably conclude that Hefei Taize *did* use code developed by or belonging to Concepts and Dr. Qiu did develop software with TurboTides, Inc.

**Defendants' ¶50.**    Concepts disputes Defendants' statement that "[t]he TurboTides software was written in entirely different framework and data structure than was the Concepts' software" because the Court's preclusion order prohibits Defendants from relying on non-produced evidence that was the subject of discovery and the Hefei Taize Subpoena. That discovery and the Subpoena sought the TurboTides Software development materials that were never produced. See preclusion and adverse inference arguments in response to Defendants' ¶11.  Thus, Defendants should be precluded from offering evidence to support the claim that "[t]he TurboTides software was written in entirely different framework and data structure than was the Concepts' software" and the Court should adversely infer that the TurboTides software was written in the same framework and data structure as was the Concepts' software.

**Defendants' ¶¶51, 57-58.**    Concepts disputes the materiality of Defendants' ¶51 and ¶57-¶58 to this summary judgment motion. When the first sale of TurboTides Software occurred,

whatever agreements the two alter egos reached, and whether Mr. Thibault exaggerated and engaged in "puffery" is not material to the summary judgment motion.

**Defendants' ¶60.**     Concepts disputes Defendants' statement that "TurboTides, Inc. had no software developers and developed no software." *See* Concepts' statement of disputed facts set forth above in response to Defendants' ¶11 and multiple representations that TurboTides, Inc. was the TurboTides Software developer. *See* Doc. 45-2 and its many exhibits and Doc. 145-2 at 2. From these facts and seen in the light most favorable to Concepts, a jury could reasonably conclude that TurboTides, Inc. had software developers and developed the TurboTides software.

Moreover, the Court's preclusion order prohibits Defendants from relying on non-produced evidence that was the subject of discovery and the Hefei Taize Subpoena. That discovery and the Subpoena sought the TurboTides Software development materials that were never produced as detailed in Concepts' response to Defendants' ¶11.

**Defendants' ¶61.**     Concepts disputes Defendants' statement that "Dr. Qiu developed no software for TurboTides, Inc." *See* Concepts' statement of disputed facts set forth above in response to Defendants' ¶11 and ¶60 including their multiple references to representations that TurboTides, Inc. was the TurboTides Software developer and Dr. Qiu was the Software's chief architect.  From these facts and seen in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu developed the TurboTides Software for and with TurboTides, Inc.

Moreover, the Court's preclusion order prohibits Defendants from relying on non-produced evidence that was the subject of discovery and the Hefei Taize Subpoena. That

33

discovery and the Subpoena sought the TurboTides Software development materials that were never produced as detailed in Concepts' response to Defendants' ¶11.

**Defendants' ¶¶62-70.** Concepts disputes the materiality of Defendants' ¶62-¶70 to this summary judgment motion. Concepts' concerns about TurboTides and the extent of its investigation of the TurboTides software is not material to whether Defendants are liable. To the extent that the statements are submitted to impugn credibility, they are improper support for summary judgment that views all facts in the light most favorable to Concepts.

**Defendants' ¶71.**    Concepts disputes the materiality and truth of Defendants' statement that "in an apparent effort to stifle competition, Concepts filed the present action with the trumped-up claims of copyright infringement and misappropriation of trade secrets." Concepts filed the present action to protect its intellectual property, its trade secrets, and enforce its employment agreement with Dr. Qiu.  EXHIBIT 3, Declaration of Bradley C. Leiser at ¶12. Whether the claims have merit or are "trumped-up" will be determined when this litigation concludes.

**Defendants' ¶72.** Concepts disputes Defendants' statement that Concepts "moved on" from its claims of misappropriation/infringement of its software. There has been no "moving on." All of Concepts' original claims and causes of action are still in play. *See* Second Amended Complaint, Doc. 52. Concepts also disputes the Defendants' assertion that the paper written by Dr. Qiu and any code related to that paper were "publicly disseminated or presented."[1] The internal paper written by Dr. Qui while at Concepts and the code he wrote related to that paper have never been published or disseminated to the public. EXHIBIT 3, Declaration of Bradley C. Leiser at ¶18.

---

[1] Defendants' general reference to an eighteen page declaration without pinpoint citations unfairly burdens both Concepts and the Court with having to read the entire exhibit and guess at where the reference may be found.

**Defendants' ¶73.**  Concepts disputes that it "confirmed in open court on May 17, 2022 that the TurboTides software is a different program from the Concepts software. [Docket # 159-1]." There is nothing in the referenced transcript[2] where this occurred. In fact, it is Concepts' claim that the TurboTides Software is the property of Concepts.  *See* response to Defendants' ¶11. Moreover, since neither the Defendants nor Hefei Taize ever produced the original "TurboTides software" and Defendants' statement of alleged material fact does not designate what "the Concepts software" is to which they reference, it would be impossible for Concepts to make such a "confirmation."

**Defendants' ¶74.**  Concepts disputes the materiality of the claim that "Dr. Qiu testified before the court" much less the single-spaced half page blocked quote of his testimony that is untethered to any material fact.  This purported "statement of material fact" should be stricken. It is not concise, and one is required to guess at how it relates to any defense or claim at issue in the summary judgment motion.  To the extent that it may be interpreted to be comparing the TurboTides Software with some version of a Concepts' software, the evidence is precluded by the Court's sanction order because Hefei Taize and Defendants refused to produce the information about the TurboTides Software in discovery as detailed in Concepts' response to Defendants' ¶11 that would permit such a comparison to be made.

**Defendants' ¶75.**  If Defendants' statement that "Concepts acknowledged that is was not interested in the new software configuration proposed by Dr. Qiu" is meant to reference software developed by Dr. Qiu while working for Concepts and meant to imply that Concepts somehow relinquished its rights and ownership to that software under the Qiu Employment Agreement

---

[2] Defendants' general reference to a 40 page transcript without pinpoint cites unfairly burdens both Concepts and the Court with having to read the entire transcript and guess at where the reference may be found.

with Concepts, Concepts disputes the statement. Expressing disinterest in software developed by an employee does not relinquish rights to such software and Defendants fail to point to any evidence of such relinquishment.  Thus, in light of the Concepts' Employment Agreement with Qiu, and seeing all facts in the light most favorable to Concepts, a jury could reasonably conclude that Concepts relinquished no rights in software developed by Qiu during his employment with Concepts or thereafter from confidential information derived from Concepts.

**Defendants' ¶76.**  Concepts disputes the materiality of the partial quotation of statements made by Concepts' counsel to the court. At no time has Concepts relinquished any legal or factual claim against Defendants, nor do the cited statements suggest it did.

**Defendants' ¶77.**  Concepts disputes the materiality of the Defendants' statement. At no time has Concepts relinquished any legal or factual claim against Defendants, nor do the Defendants' spin on statements of counsel suggest it did.

**Defendants' ¶78.**  Concepts disputes the materiality of the Defendants' statement. At no time has Concepts relinquished any legal or factual claim against Defendants.

**Defendants' ¶79.**  Concepts disputes the materiality of whatever Mr. Japikse could nor could not remember about Defendants' wrongdoings and Defendants' characterization of the Japikse deposition as being "on whether Defendants interfered with Plaintiff's business relationships." Mr. Japikse was not deposed as a designated corporate witness pursuant to Fed. R. Civ. P. 30(b)(6) whose testimony might be binding on the corporation, but rather in his individual capacity. Nor was there ever a Rule 30(b)(6) deposition of Concepts. Moreover, as Mr. Japikse made clear in the portion of the deposition cited by Defendants, he was not personally aware of the facts inquired of. Thus, seen in the light most favorable to Concepts, the jury could both

credit Mr. Japikse's testimony *and* conclude that his cited testimony established nothing about the extent of any wrongdoings of the Defendants.

**Defendants' ¶80.**  Concepts disputes the materiality of the Defendants' rambling and disjointed purported "statement of fact" to the pending summary judgment motion.

**Defendants' ¶81.**   Concepts disputes the materiality of whether Mr. Japikse was or was not personally aware of losses of Concepts' contracts with customers. Mr. Japikse was not deposed as a designated corporate witness pursuant to Fed. R. Civ. P. 30(b)(6) whose testimony might be binding on the corporation, but rather in his individual capacity. Nor was there ever a Rule 30(b)(6) deposition of Concepts. Moreover, as Mr. Japikse made clear in the portion of the deposition cited by Defendants, he was not personally aware of the facts inquired of. Nor do the Defendants' citations to Plaintiff's Responses to Interrogatories have any reference to Mr. Japikse and what he knows or does not know. Thus, seen in the light most favorable to Concepts, the jury could credit Mr. Japikse's testimony and conclude that his cited testimony established nothing about his awareness of losses of contracts or the extent of Defendants' wrongdoings.

**Defendants' ¶82.**   Concepts disputes the materiality of whether the "single-zone code was less than ten (10%) percent of the FANPAL program" and whether "FANPAL is a small part of Concepts' meanline module."  If it is material to the summary judgment motion, its materiality is clouded beyond recognition by Defendants' general non-pinpoint reference to a highly technical 18 page Declaration by Dr. Qiu at Doc. 220-1.

**Defendants' ¶83.**   Concepts disputes Defendants' statement that "[t]his small piece of demonstrative code was written in entirely different code structure and framework then [sic] used by Hefei Taize making it useless to Hefei Taize."  As Dr. Bonhaus has confirmed, this statement is "entirely incorrect." Bonhaus Declaration at Doc. 222-1, esp. ¶6.  From these facts

and seen in the light most favorable to Concepts, a jury could reasonably conclude that the code written by Dr. Qui while at Concepts would not have been "useless" to Hefei Taize.

Further, the Court's sanction of evidentiary preclusion bars Defendants from offering evidence of the "usefulness" of code to Hefei Taize because Defendants and Hefei Taize refused to produce all versions, including the first version of the TurboTides code and the development documents for that code. *See* Concepts' preclusion arguments in response to Defendants' ¶11. Accordingly, seen in the light most favorable to Concepts, the jury could reasonably conclude that the referenced "demonstrative code" would not be useless to Hefei Taize and Defendants.

**Defendants' ¶84.**  Concepts disputes Defendants' statement that Concepts "has not specifically identified that in fact it copyrighted the demonstrative code" because Defendants have not identified "the demonstrative code" to which they refer. Moreover, any source code written is, as a matter of law, immediately protected by copyright at the moment it is created and fixed in a tangible form.  17 U.S. Code § 102. If, on the other hand, Defendants are referring to the *registration* of copyright for code described in their ¶82 that is "less than ten (10%) of the FANPAL program," all of the code in the FANPAL program has been registered for copyright. EXHIBIT 3, Declaration of Bradley C. Leiser at ¶7.

**Defendants' ¶85.**  Concepts disputes Defendants' statement that "Concepts' trade secret claim has been that Dr. Qiu relied on information contained in a paper he published in 2010 titled <u>An Integrated Design System For Turbomachinery</u>, [Docket 220-10], to create the Hefei Taize software."  Concepts trade secret claim is articulated in its Second Amended Complaint at Doc. 52, pp. 28-30.   In that claim, there is no reference to the aforementioned paper.   And, Defendants' reference to the paper itself at Doc. 210-10 says nothing about what Concepts' trade secret claim is or is not. Further, Concepts disclosed the basis for its Trade Secret's claim in

38

response to discovery.  *See* Concepts' response to Defendants' Interrogatory No. 1 at Doc. 220-4, pp. 12-19 and its Supplement at Doc. 220-5, p. 2-3.

**Defendants' ¶86.**  Defendants' statement is unintelligible and, thus, disputed.  If it is meant to assert that Concepts' 7 page single spaced response to Defendants' Interrogatory 1 is summarized in the five lines quoted in the statement, Concepts responds that Defendants' statement is false. The entirety of Concepts' response to Interrogatory 1, including all of its objections, comprise the full response. *See* Doc. 220-4 at 12-19 and 220-5 at 2-3. Moreover, because Defendants and Hefei Taize failed to comply with discovery orders, they have been sanctioned and should be precluded from contesting Concepts' identification of infringed trade secrets.  In particular, Hefei Taize and Defendants refused to produce the following information in discovery concerning the TurboTides code and the code itself that would permit an analysis of theft of trade secrets to be made: Items 1, 3, 8, 9,10, 11, 14, 19, 20 and 33 in Compliance Chart for Document Subpoena to Hefei Taize, Doc. 201-1, pp. 6-15.

**Defendants' ¶87.**  Concepts disputes Defendants' statement that "Concepts identified the same paper and premises its [sic] claim of the trade secrets on information and belief. [Docket #220-5]" as unintelligible. And, if the statement is somehow meant to be claiming that "the same paper" referenced in Defendants' ¶87 is a 2013 paper titled "Designing Turbocharges [sic] With An Integrated Design System," the statement is false. There is no such titled paper in "Docket #220-5."

**Defendants' ¶88.**  Concepts disputes Defendants' statement that "This paper was presented" because there is no identification of "this paper."  If "this paper" is meant to refer to the paper cited in Defendants' ¶85, Concepts incorporates its response to Defendants ¶85 as its response to this statement.

**<u>Defendants' ¶89.</u>**  Concepts disputes Defendants' statement that "Concepts argues . . . ."  If the use of the word "argues" means that Defendants are referring to Concepts' responses to discovery, those responses are not "argument" nor do they anywhere assert that "the trade secret was Defendants' use of Dr. Aungier's formulas for solving engineering problems."

**<u>Defendants' ¶90.</u>**  Concepts disputes Defendants' statement as immaterial since whether "the paper sets forth a number of public formulas for solving engineering problems" is unrelated to Concepts' claims.

**<u>Defendants' ¶91.</u>**  Concepts disputes Defendants' statement as not a statement of fact, but instead a flawed attempted statement of law interpreting a contract. Moreover, the Agreement signed by Dr. Qui when he joined Concepts is much more than a "NDA" in an employment context." And, it does much more than "simply" prohibit against disclosure or "taking."  Rather, it prohibits employees from *<u>claiming and using</u>* a wide range of confidential and proprietary information.  Doc. 52-21 at p. 1 under "Ownership of Work Products, Inventions, and Patents." Further, Dr. Qui is and was prohibited from "*<u>use</u>*" and prohibited to "solicit [or] assist another *<u>to use</u>*" any Confidential  Technology and Information" of Concepts "of which you become informed during your employment."  Doc. 52-21 at p. 2, General Agreement paragraph 2 (emphasis added).  The same document in paragraphs 4 and 5 also prohibits "use."

**<u>Defendants' ¶92.</u>**  Concepts disputes Defendants' statement as not a statement of fact, but instead a flawed attempted statement of law interpreting a contract. Moreover, the Agreement does "grant" Concepts many rights concerning ownership of "knowledge, skills, methodologies and ideas" that Dr. Qiu and Concepts' employees acquire during the course of their employment. Specifically, it prohibits employees from *<u>claiming and using</u>* a wide range of confidential and proprietary information.  Doc. 52-21 at p. 1 under "Ownership of Work Products, Inventions,

and Patents."  Further, Dr. Qui is and was prohibited from "*use*" and prohibited to "solicit [or] assist another *to use*" any Confidential  Technology and Information" of Concepts "of which you become informed during your employment."  Doc. 52-21 at p. 2, General Agreement paragraph 2 (emphasis added).  The same document in paragraphs 4 and 5 also prohibits "use."

It also grants to Concepts ownership of "all the Confidential Technology and Information existing now and throughout the term of this Agreement, to which you make, and will make." Doc. 52-21 at 2.  And, it required Dr. Qiu to disclose and assign to Concepts "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by him during the period of employment and related to the business or activities" of Concepts. And those obligations continued past the period of employment.  *Id.* at 3.  In addition, "any computer software and documentation made by" Dr. Qiu "during the period of [his] employment" was considered "works for hire" and vested ownership in Concepts.  *Id.* at 3-4.

**Defendants' ¶93.**  Concepts disputes Defendants' statement as random, disjoint, incapable of interpretation, and immaterial.

**Defendants' ¶94.**  Concepts has no idea what "this code" refers to and thus disputes Defendants' statement. Moreover, if it is mean to refer to code written by Dr. Qiu for "FANPAL" referenced in the prior statement, Concepts responds that because Defendants and Hefei Taize failed to respond to discovery regarding the development of the TurboTides Software and the TurboTides original code, Concepts would have no ability to "identify" that code in response to discovery. Pursuant to the Court's sanctions ruling, Defendant should not be permitted to rely on lack of information on Concepts' part that stems from Defendants' discovery abuses in order to seek summary judgment.

September 3, 2024                         FAWLEY PLLC


                                    By   */s/ R. Bradford Fawley*
                                         R. Bradford Fawley
                                         166 Sugar House Hill Road
                                         Guilford, VT 05301
                                         Telephone:  802-380-4735
                                         fawleybrad@gmail.com
                                         ATTORNEY FOR PLAINTIFF



<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2024, I electronically served the foregoing on all counsel of record.

September 3, 2024                         FAWLEY PLLC


                                    By   */s/ R. Bradford Fawley*
                                         R. Bradford Fawley
                                         166 Sugar House Hill Road
                                         Guilford, VT 05301
                                         Telephone:  802-380-4735
                                         fawleybrad@gmail.com
                                         ATTORNEY FOR PLAINTIFF