UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

CONCEPTS NREC, LLC          )      Case No. 5:20-cv-00133-gwc
        Plaintiff,       )
                    )
       v.             )
                    )
XUWEN QIU, TURBOTIDES, INC. AND   )
HONG YING ZHANG          )
                    )
       Defendants.     )

## CONCEPTS' STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANT HONG YING ZHANG'S MOTION FOR SUMMARY JUDGMENT

Pursuant to L.R. 56(b), Plaintiff Concepts NREC, LLC ("Concepts") submits the following statement of disputed material facts in opposition to the Defendants Hong Ying Zhang's ("Zhang") Motion For Summary Judgment (Doc. 240).   Concepts' statement of disputed material facts will respond by paragraph number to the Defendants' purported "Statement of Undisputed Facts" (Doc. 240-4).

**Zhang's ¶2.**   Concepts disputes Zhang's statement that she "is not a software developer." Defendant Zhang is a computer software engineer with a Masters Degree.   She works as an engineer that builds and releases computer software by compiling and writing source code and building it to an executable program.   Zhang Depo attached as Exhibit to Doc. 215-1 at 34, 39, 40, 81, 86. Defendant Zhang formed Turbotides LLC as a New Hampshire Corporation with its offices in the Qiu and Zhang home at 21 Pinneo Hill Road, Hanover, NH that listed its primary business or purpose as being "Software Development" on November 3, 2011. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶4 and EXHIBIT 5.   Zhang registered TurboTides LLC in 2011 declaring its

1

"primary business" to be "Software Development" and then served as "Registered Agent" and "Manager" of TurboTides LLC by filing Annual Reports in 2012-2017 as a New Hampshire Corporation with its offices in the home she shared with her husband Dr. Qiu at 21 Pinneo Hill Road, Hanover, NH (Doc. 58-5).   See also Doc. 58-5 at 6, 2017 NH Annual Report listing TurboTides LLC "NAICS CODE" as "OTHER/software development). While Ms. Zhang was serving as Manager of TurboTides, LLC, she also transferred a trademark with the US Patent and Trademark Office for the mark TURBOTIDES, describing the goods and services as "Providing temporary use of on-line non-downloadable software for Computer Aided Engineering" and TurboTides LLC as a "Software provider" and declaring that she was the "Owner." Doc. 58-6. And Dr. Qui served as the "President of TurboTides LLC." Doc. 164-11.

Schedule C – Profit and Loss from a Business - on Qiu's and Zhang's personal federal joint tax return for the years 2011-2017 lists the business as TurboTides LLC and describes it as a "software development" company.   Qiu Dep. Doc. 124-8 at 39 and Fawley Declaration, Doc. 215-1, ¶9.   From 2012 to 2017, Defendant Zhang is listed as the proprietor of TurboTides LLC in the couple's joint tax returns. Fawley Declaration, Doc. 215-1¶9.

On May 1, 2018, Ms. Zhang filed a Consent to Name Use of TurboTides, Inc. as the "Manager of TurboTides LLC" authorizing and permitting "the use and incorporation of [Defendant] TurboTides, Inc." Doc. 58-2, p. 3.   TurboTides, Inc. claims to have developed the TurboTides Software. *See* Doc. 45-2 and its many exhibits and Doc. 145-2 at 2.

Accordingly, seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang is a software developer.

**Zhang's ¶4.**   Concepts disputes Zhang's statement that in 2011 she "formed an LLC, with the intention of obtaining work to create websites."   *See* response to Zhang's ¶2.   Accordingly, seeing

2

the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang did not start TurboTides LLC "with the intention of obtaining work to create websites" but instead started TurboTides LLC to develop software.

Concepts also disputes Zhang's statement that "she was not aware of [TurboTides] LLC doing business with anyone." Dr. Qiu and Ms. Zhang's personal tax return for 2011 shows that TurboTides LLC, whose principal business is "SOFTWARE DEVELOPMENT," with $1202 in deductible expenses.   EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(f).   Dr. Qiu and Ms. Zhang's personal tax return for 2012 shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with $3490 in expenses. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(g).   Dr. Qiu and Ms. Zhang's personal tax return for 2013 that shows HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with gross sales of $10,000 and $11,628 in expenses. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(h).   Dr. Qiu and Ms. Zhang's personal tax return for 2014 shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with gross sales of $28,000 and $24,846 in expenses. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(i).   Dr. Qiu and Ms. Zhang's personal tax return for 2015 shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with $14,037 in expenses. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(j). Thus, seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang was aware that TurboTides LLC was doing business with *someone* in the years 2011-2015.

**Zhang's ¶6.**   Concepts disputes Zhang's statement that TurboTides LLC did not "have any customers."   In the 2013 and 2014 tax returns for TurboTides LLC detailed in response to Zhang ¶4,

TurboTides LLC reported income of $10,000 and $28,000 in 2013 and 2014 respectively.   Thus, seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that TurboTides LLC did have customers.

**Zhang's ¶7.**   Concepts disputes Zhang's statement that she "could not recall TurboTides LLC having any income" The extent of Zhang's memory is immaterial, except as to credibility. And, in light of the fact that TurboTides LLC did have reported income totaling $48,000 in 2013 and 2014 (see response to Zhang's ¶4), seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang is not telling the truth with respect to her memory of TurboTides LLC having income.

**Zhang's ¶8.**   Concepts disputes Zhang's statement that Ms. Zhang "never used" TurboTides LLC. As detailed in response to Zhang's ¶2 and ¶4, Ms. Zhang claimed to be the owner, registered agent, manager and sole proprietor of TurboTides LLC that was run out of her home and provided her with substantial income and tax deduction benefits. Thus, seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang "used" TurboTides LLC.

   For the same reasons, Concepts further disputes Zhang's statement that Ms. Zhang "simply kept [TurboTides, LLC] going because her position at TomTom remained unstable and it cost her very little to keep it active." Seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang kept TurboTides LLC going because it was a viable business that provided income and valuable tax deductions.

**Zhang's ¶9.**   Concepts disputes Zhang's statement that "[t]o Ms. Zhang's knowledge, TurboTides LLC did not function." As detailed in response to Zhang's ¶2 and ¶4, Ms. Zhang claimed to be the sole proprietor, manager, registered agent and owner of TurboTides LLC that was run out of her home and provided her with substantial income and tax deduction benefits. Thus, seeing the

evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang knew that TurboTides LLC did "function."

**Zhang's ¶10.**   Concepts disputes Zhang's statement that "Ms. Zhang had no knowledge that her husband, Dr. Qiu, [was] using TurboTides LLC." As detailed in response to Zhang's ¶2 and ¶4, Ms. Zhang claimed to be the sole proprietor, owner, manager and registered agent of TurboTides LLC that was run out of the home she shared with her husband, Dr. Qiu, and provided her with substantial income and tax deduction benefits she reported to the Internal Revenue Service. And, Dr. Qiu served as President of her TurboTides LLC business. Doc. 164-11.Thus, seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang had knowledge that her husband, Dr. Qiu, was "using TurboTides LLC."

 **Zhang's ¶11.**   Concepts disputes Zhang's statement that "she had no role in the development of the TurboTides software." First as detailed in response to Zhang's ¶2 and ¶4, Ms. Zhang claimed to be the sole proprietor, owner, registered agent and manager of TurboTides LLC whose only business claim was "SOFTWARE DEVELOPMENT," that was run out of her home and provided her with substantial income and tax deduction benefits.

And, Dr. Qiu was Ms. Zhang's husband, who lived in the same house, and they were both employed in the field of software development and both enjoyed the income and tax deduction benefits from 2011 to 2015. *See* Response to Zhang's ¶2 and ¶4. And, Dr. Qiu was the "overall designer" of the TurboTides Software (Qiu claimed he is the "overall designer of the TurboTides system and led an international team of experts in the development of the CAE design system for integrated turbomachinery." Doc. 96-1 and 93-11).   And, TurboTides' also identifies Dr. Qiu as the "chief software architect for the TurboTides software."   EXHIBIT 1, Fawley September 3, 2024 Declaration at ¶8 and EXHIBIT 8 at Bates No. CONCEPTS091. Further, TurboTides' stated in 2020

that "the TurboTides product was born because of the hard work of Dr. Qiu in the turbomachinery industry for more than 20 years."    EXHIBIT 1, Fawley September 3, 2024 Declaration at ¶9 and EXHIBIT 9 at CONCEPTS0260. This declaration overlaps the 15 year time span he worked for Concepts. And Dr. Qiu even admits he began working on the TurboTides Software in 2012 (On March 11, 2018, Qiu wrote an email to himself that admitted in part, "In 2012, [Qiu] began to develop Turbotides with a team of international experts in the field." Doc. 45-2 at 21, Doc. 95-1, and Doc 93-11). Further, according to TurboTides' Hefei Taize website on its "About Us" page, "[t]he key technology and basic source code of TurboTides originated from the accumulation of decades of core team in the United States. After many years of preparation, in 2016, with the help of the Hefei Municipal Government [in China] he [Defendant Qiu] went to the China University of Science and Technology Association Industrial Park and registered the copyright of its core product TurboTides in China, with complete source code."    See EXHIBIT 1, Fawley September 3, 2024 Declaration at ¶11 and EXHIBIT 11 (Emphasis added).    Since Mr. Qiu only worked at Concepts during the 15 years immediately before starting Hefei Taize, seen in the light most favorable to Concepts, the referenced "accumulation of decades of core team in the United States" is a reference to the accumulation by Defendant Qiu of CETI's and Concepts' decades of technology and source code for turbomachinery. Further, the copyright to the code for the first version, V 1.0, of the TurboTides software was registered in China on May 25, 2016 (Doc. 171 at 42) and Dr. Qiu testified that it took at least two years to "write Version 1.0 of the TurboTides software."    Doc. 171 at 40 (Tr. at 116).

Thus, given the foregoing, at a minimum, seeing the facts in the light most favorable to Concepts, the jury can reasonably conclude that work began on the TurboTides Software at least on or about May 25, 2014 – two years before registration of V 1.0 with the Chinese copyright office and

during the time TurboTides LLC was operated by Ms. Zhang as its owner, proprietor and registered agent for service.

Further, Third-Party witness Nick Dorsi of TurboSolutions, Inc. testified that in discussions with Dr. Qiu about the process of the development of the TurboTides Software, Dr. Qiu said "he was largely in charge of writing the software." EXHIBIT 10, Dorsi Deposition at p. 21, lines 13-20. Dorsi also recalled Dr. Qiu telling him that he was doing some of the software development by "developing algorithms" and "some coding" while in the United States. EXHIBIT 10, Dorsi Dep. at p. 22, lines 9-23.   Since Dr. Qiu did not leave to live in China until after he left Concepts in December 2015 (Doc. 41-2, at 2 ¶10), seeing the evidence in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu was doing software development work for the TurboTides Software while he was working for Concepts in the United States and during the time Ms. Zhang was running TurboTides LLC.

Thus, seeing all of the foregoing facts in the light most favorable to Concepts, a reasonable jury could conclude that Dr. Qiu was developing the TurboTides Software during the time he was working for Concepts, which coincided with the period Ms. Zhang was running TurboTides LLC's Software Development business out of their joint home and claiming income and tax benefits from that business. Thus, seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Ms. Zhang "had a role" in the development of the TurboTides software.

**Zhang's ¶12.**     Concepts disputes Zhang's statement that "Ms. Zhang's LLC developed no software." As detailed in response to Zhang's ¶11, and seeing the facts in the light most favorable to Concepts, a reasonable jury could conclude that "Ms. Zhang's LLC did develop software."

**Zhang's ¶14.**     Concepts disputes Zhang's statement that "[b]efore 2016, there were no . . . discussions with Dr. Qiu about his concept of the TurboTides Software."

Seeing the evidence outlined in response to Zhang's ¶¶2, 4, and 11 in the light most favorable to Concepts, a reasonable jury could conclude that before 2016, Ms. Zhang did have discussions with her husband Dr. Qiu about his concept of the TurboTides Software.

**Zhang's ¶15.**    Concepts disputes Zhang's statement that "Dr. Qiu did not share any details about starting a company in China with Ms. Zhang." As early as 2009, Dr. Qiu began planning to start a company in China. EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶12 and 13, and EXHIBITS 12 AND 13, previously marked as Plaintiff's Exhibits 224 and 227. Ms. Zhang and Dr. Qiu are husband and wife and lived in the same home while Dr. Qiu worked at Concepts until December, 2015. Ms. Zhang has a master's degree and is employed by software companies. Together, they operated the TurboTides LLC Software Development company from their home (her as manager, registered agent, proprietor, and owner; and him as President and proprietor) and jointly declared tax reported income and deductions from that company. *See* Response to Zhang's ¶¶2, 4, and 11. The notion that Dr. Qiu did not tell his wife his plans to quit his job of 15 years with Concepts, return to China after living in the United States for nearly 20 years and her grant of citizenship (Doc. 215-1, at 33-35) to start a company in the country where they were born with Ms. Zhang's brother serving as an investor and manager (Doc. 170, at 50) and what that move across the world may do to their lifestyle, income, connections with two children who are US citizens and live in the United States (Doc. 215-1, at 37-38), all seen in the light most favorable to Concepts, compels the conclusion that Dr. Qiu did share details about starting a company in China with Ms. Zhang.

**Zhang's ¶16.**    Concepts disputes Zhang's statement that "[t]he Confidential and Non-Disclosure Agreement (Docket #52-21) is not an employment agreement, but an NDA in an employment contest." And Concepts disputes that "[i]t simply prohibits Dr. Qiu from taking Concepts' sensitive and commercially valuable technical formation [sic] which is confidential."

8

Defendants' statement is not a statement of fact, but instead a flawed attempted statement of law interpreting a contract. Moreover, the Agreement signed by Dr. Qui when he joined Concepts is much more than an "NDA" in an employment context." And, it does much more than "simply" prohibit against disclosure or "taking."   Rather, it prohibits employees from *claiming and using* a wide range of confidential and proprietary information.   Doc. 52-21 at p. 1 under "Ownership of Work Products, Inventions, and Patents."   Further, Dr. Qui is and was prohibited from "*use*" and prohibited to "solicit [or] assist another *to use*" any Confidential   Technology and Information" of Concepts "of which you become informed during your employment." Doc. 52-21 at p. 2, General Agreement paragraph 2 (emphasis added).   The same document in paragraphs 4 and 5 also prohibits "use."   Moreover, the Agreement grants Concepts many rights concerning ownership of "knowledge, skills, methodologies and ideas" that Dr. Qiu and Concepts' employees acquire during the course of their employment. Specifically, it prohibits employees from *claiming and using* a wide range of confidential and proprietary information.   Doc. 52-21 at p. 1 under "Ownership of Work Products, Inventions, and Patents."

It also grants ownership of "all the Confidential Technology and Information existing now and throughout the term of this Agreement, to which you make, and will make." Doc. 52-21 at 2. And, it required Dr. Qiu to disclose and assign to Concepts "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by him during the period of employment and related to the business or activities" of Concepts. And those obligations continued past the period of employment.   *Id.* at 3.   In addition, "any computer software and documentation made by" Dr. Qiu "during the period of [his] employment" was considered "works for hire" and vested ownership in Concepts.   *Id.* at 3-4.

9

Thus, seen in the light most favorable to Concepts, a jury could reasonably conclude that the Confidential and Non-Disclosure Agreement (Docket #52-21) is an employment agreement, and not simply an NDA in an employment context. Nor does it simply prohibit Dr. Qiu from taking Concepts' sensitive and commercially valuable technical information which is confidential.

**Zhang's ¶17.**    Concepts disputes Zhang's statement that "[t]he NDA does not grant Concepts the ownership over the knowledge, skills, methodologies or ideas that Dr. Qiu or any of Concepts' employees acquire during the courts of their employment. [Docket #52-21]." Defendants' statement is not a statement of fact, but instead a flawed attempted statement of law interpreting a contract.

Further, the Agreement grants to Concepts ownership of "all the Confidential Technology and Information existing now and throughout the term of this Agreement, to which you make, and will make."   Doc. 52-21 at 2.   And, it required Dr. Qiu to disclose and assign to Concepts "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by him during the period of employment and related to the business or activities" of Concepts. And those obligations continued past the period of employment.   *Id.* at 3.   In addition, "any computer software and documentation made by" Dr. Qiu "during the period of [his] employment" was considered "works for hire" and vested ownership in Concepts.   *Id.* at 3-4.

Thus, seen in the light most favorable to Concepts, the Agreement does grant Concepts the ownership over the knowledge, skills, methodologies or ideas that Dr. Qiu or any of Concepts' employees acquire during their employment.

Nor does Ms. Zhang's claim "she had no agreement with Dr. Qiu" to engage in "wrongdoing" (Doc. 241-1 at 20-21) insulate her from liability for conspiracy because the material facts about that conspiracy are in dispute.

> Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. *The*

10

> *agreement need not be expressed in words and may be implied and understood to*
> *exist from the conduct itself.*

Restatement (Second) of Torts § 876 (1979)(emphasis added).

*Wei Wang v. Shen Jianming*, No. 2:17-cv-00153, at *12 (D. Vt. July 19, 2019). Seen in the light most favorable to Concepts, a reasonable jury can find that, through her conduct, Ms. Zhang impliedly "cooperated in a particular line of conduct" with Dr. Qiu because she repeatedly, year after year, managed the TurboTides LLC Dr. Qiu used as a software development business in New Hampshire to develop the TurboTides Software while he simultaneously worked for Concepts in violation of his employment agreement, and that she benefited from that "line of conduct" for several years as demonstrated by the income and deductions she declared on her personal tax returns.

**Zhang's ¶18.**    Concepts disputes Zhang's statement that "[t]here is no non-compete agreement between Dr. Qiu and Concepts."

Defendants' statement is not a statement of fact, but instead a flawed attempted statement of law interpreting a contract. Moreover, the Agreement prohibits employees from *claiming and using* a wide range of confidential and proprietary information.   Doc. 52-21 at p. 1 under "Ownership of Work Products, Inventions, and Patents."   Further, Dr. Qui is and was prohibited from "*use*" and prohibited to "solicit [or] assist another *to use*" any Confidential Technology and Information" of Concepts "of which you become informed during your employment."   Doc. 52-21 at p. 2, General Agreement paragraph 2 (emphasis added).   The same document in paragraphs 4 and 5 also prohibits "use."   Moreover, the Agreement grants Concepts many rights concerning ownership of "knowledge, skills, methodologies and ideas" that Dr. Qiu and Concepts' employees acquire during the course of their employment. Specifically, it prohibits employees from *claiming and using* a wide range of confidential and proprietary information.   Doc. 52-21 at p. 1 under "Ownership of Work Products, Inventions, and Patents."

It also grants ownership of "all the Confidential Technology and Information existing now and throughout the term of this Agreement, to which you make, and will make."   Doc. 52-21 at 2. And, it required Dr. Qiu to disclose and assign to Concepts "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by him during the period of employment and related to the business or activities" of Concepts. And those obligations continued past the period of employment.   *Id.* at 3.   In addition, "any computer software and documentation made by" Dr. Qiu "during the period of [his] employment" was considered "works for hire" and vested ownership in Concepts.   *Id.* at 3-4.

Thus, seen in the light most favorable to Concepts, a jury could reasonably conclude that the Confidential and Non-Disclosure Agreement (Docket #52-21) is a non-compete agreement between Dr. Qiu and Concepts.

**Zhang's ¶19.**   Concepts disputes that Zhang's statement that "Ms. Zhang was not a party to Dr. Qiu's employment agreement with Concepts and was not aware of the agreement," is material to the claim against Ms. Zhang. The claim against Ms. Zhang is for Civil Conspiracy. Doc. 52 at 37-38 which does not require that Concepts prove that Ms. Zhang was a party to or aware of the agreement.

This Court has already denied Ms. Zhang's motion to dismiss that claim, stating that "Ms. Zhang "can still be liable if Concepts was damaged by *any* illegal acts by Mr. Qiu that furthered the alleged conspiracy."   Doc. 90 at 15(emphasis added).   It is not necessary that conspirators be involved in all stages of planning or be aware of all details. "The defendant need not know "all of the details of the conspiracy," nor [even] the "identities of all of the other conspirators," so long as they

agreed on the essential nature of the plan. *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir.

2008). " *United States v. Lopez*, No. 20-3996, at *7 (2d Cir. Jan. 27, 2022).

> All we need to do, then, is to determine "whether it reasonably could be inferred that
> [Rooney] participated in the alleged enterprise with a consciousness of its general nature and
> extent." *United States v. Alessi,* 638 F.2d 466, 473 (2d Cir. 1980). There is no requirement
> that each member of a conspiracy conspire directly with every other member of
> it, *Friedman,* 854 F.2d at 562, or be aware of all acts committed in furtherance of the
> conspiracy, or even know every other member, *Alessi,* 638 F.2d at 473. The jury could decide
> that there was a single conspiracy even though the same people were not involved throughout
> the entire period, *United States v. Nersesian,* 824 F.2d 1294, 1303 (2d Cir.), *cert. denied,* ___
> U.S. ___, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

*U.S. v. Rooney*, 866 F.2d 28, 32-33 (2d Cir. 1989).   Thus, whether Ms. Zhang knew or did not know

of Dr. Qiu's Employment Agreement with Concepts or whether she was a party to it is immaterial to

the conspiracy claim against her.

**Zhang's ¶20.**    Concepts disputes that whether there was an "agreement between Ms. Zhang and

Dr. Qiu or TurboTides, Inc. to breach the employment agreement" is material to the claim of Civil

Conspiracy against Ms. Zhang.   *See* response to Zhang's ¶19.

**Zhang's ¶21.**    Concepts disputes the materiality of the statement that "Ms. Zhang entered into no

agreement with Dr. Qiu or TurboTides, Inc. to use, copy or misappropriate the Concepts' software

and nor did she herself use, copy or misappropriate any software belonging to Concepts."   To

establish civil conspiracy, Concepts need only show that Ms. Zhang "participated in the alleged

enterprise with a consciousness of its general nature and extent." *United States v. Alessi,* 638 F.2d

466, 473 (2d Cir. 1980). Seeing all the evidence in the light most favorable to Concepts and given

Ms. Zhang's role as proprietor, owner, registered agent and manager of the TurboTides LLC

software development company during the time Dr. Qiu was working at Concepts and the evidence

that, as president of TurboTides LLC, Dr. Qiu was developing the TurboTides Software and her tax

returns showing she received income and took beneficial tax deductions from the TurboTides LLC

business, a jury could reasonably conclude that Ms. Zhang was part of the civil conspiracy to misappropriate Concepts' software. Whether Ms. Zhang entered into an agreement with Dr. Qiu or TurboTides, Inc. to use, copy or misappropriate the Concepts' software and whether she herself used, copied or misappropriated any software belonging to Concepts is immaterial to the Civil Conspiracy claim against Ms. Zhang.

**Zhang's ¶22.** Concepts disputes whether Mr. Japikse's alleged "belief" about whether "Defendants purchased Concepts' software from a third-party" is material to the Civil Conspiracy claim against Ms. Zhang. To establish civil conspiracy, Concepts need only show that Ms. Zhang "participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Alessi,* 638 F.2d 466, 473 (2d Cir. 1980). Further, unless offered as an expert opinion, Mr. Japikse's "beliefs" are inadmissible evidence in any event. Moreover, the statement is immaterial since legitimate purchase of the Concepts' software is available at any time to verified buyers. Concepts has no record of a legitimate purchase of the Concepts' software by Hefei Taize, TurboTides, Inc. or TurboTides LLC. EXHIBIT 3, Declaration of Bradley C. Leiser ¶¶13-14. Thus, even if Mr. Japikse's belief constitutes admissible evidence, seeing the facts in the light most favorable to Concepts, a jury could reasonably conclude that Defendants' illegally possess the Concepts' Software.

**Zhang's ¶23.** Concepts disputes Zhang's rambling multi sentence statement. First, Concepts disputes the statement that it "has provided no evidence that Hefei Taize or the Defendants actually purchased copies of Concepts' software" as both untrue and immaterial to the Conspiracy Claim against Ms. Zhang or her summary judgment motion. To establish civil conspiracy, Concepts need only show that Ms. Zhang "participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Alessi,* 638 F.2d 466, 473 (2d Cir. 1980). Moreover, Zhang's

statement in Zhang ¶22 references testimony by Dr. Japikse that states evidence that "TurboTides" purchased a copy of Concepts' software.  Thus, seen in the light most favorable to Concepts, Concepts has provided evidence that Hefei Taize or the Defendants actually purchased copies of Concepts' software.   Further, in discovery, Concepts provided evidence of Defendants' acquisition of Concepts's software through pirating. *See* Doc. 220-4 at 27-28 responding to Defendants' Interrogatory No. 14 and 15 and 29.  Concepts also disputes Ms. Zhang's statement that "Ms. Zhang knows nothing of the operations of Hefei Taize or TurboTides, Inc. as well as Concepts" as immaterial to Concepts' Conspiracy Claim against her. To establish civil conspiracy, Concepts need only show that Ms. Zhang "participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Alessi,* 638 F.2d 466, 473 (2d Cir. 1980).

Concepts also disputes Ms. Zhang's statement that "Ms. Zhang did not purchase a copy of Concepts software or conspired with others to purchase the software or download the software and Ms. Zhang did not conspire to or in fact purchase or download Concepts software." This statement is not material to Ms. Zhang's role in the Civil Conspiracy. To establish civil conspiracy, Concepts need only show that Ms. Zhang "participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Alessi,* 638 F.2d 466, 473 (2d Cir. 1980).

**Zhang's ¶24.**    Concepts does not understand and therefore disputes whatever Ms. Zhang is referring to when she references "Concepts other contention." "Other" than what? Concepts further disputes the materiality of Ms. Zhang's statement. At no time has Concepts "pivoted from this [undefined] claim."   Nor has Concepts withdrawn or relinquished any legal or factual claims asserted in its Second Amended Complaint (Doc. 52) against Defendants, nor do the Defendants' spin on statements of counsel suggest it did.

**Zhang's ¶25.**   Concepts disputes the materiality of whether the "single-zone code was less than ten (10%) percent of the FANPAL program" and whether "FANPAL is a small part of Concepts' meanline module."   If these statements are material to Ms. Zhang's summary judgment motion, their materiality is clouded beyond recognition by Defendants' general non-pinpoint reference to a highly technical 18 page declaration by Dr. Qiu at Doc. 220-1. Moreover, the statements are not material to the Conspiracy Claim against Ms. Zhang. To establish civil conspiracy, Concepts need only show that Ms. Zhang "participated in the alleged enterprise with a consciousness of its general nature and extent." *United States v. Alessi,* 638 F.2d 466, 473 (2d Cir. 1980).

Concepts also disputes Ms. Zhang's random statement that "[c]ode was written by Dr. Qiu to demonstrate the implementation of Dr. Augier's engineering formulas" as free floating, meaningless, and immaterial to any summary judgement issue.

**Zhang's ¶26.**   Concepts disputes Ms. Zhang's statement that "[t]he evidentiary record is extensive that Dr. Qiu did not take Concepts [sic] software code." The *extent* of whatever she claims is the "evidentiary record" is immaterial to summary judgment which does not assess the extent of evidence but whether the material facts are undisputed when seen in the light most favorable to the non-movant. However, if, Ms. Zhang's attempted "concise statement of material fact" is that "Dr. Qiu did not take Concepts' software code," the statement is disputed.

From the following evidence seen in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu did take Concepts' software code. The record evidence of that taking is:

1.    Concepts' develops and licenses a complementary suite of programs that delivers proprietary Computer-Aided Engineering (CAE) and Computer-Aided Manufacturing

(CAM) software (collectively, the "Concepts Software") for turbomachinery. Declaration of Bradley C. Leiser, Doc. 215-2.

2.      Defendant Qiu was employed by Concepts ETI, Inc. (a/k/a "CETI") as a turbomachinery software engineer for more than fourteen years during the period July 2, 2001 to December 7, 2015.  *Id.*

3.      Concepts ETI, Inc. was merged into CN Holdings, Inc. ("CN Holdings"). Employees of CN Holdings and former employees of CETI, including Defendant Qiu, worked for and at Concepts.  *Id.*

4.      CN Holdings owns Concepts and, as the former employer of Qiu, assigned to Concepts its contracts with Qiu and all rights it has as Qiu's employer. *Id.*

5.      In 2001, as a condition and in consideration of his employment by CETI, Mr. Qiu executed an Employee Confidentiality and Nondisclosure Agreement (the "Employment Agreement").   A copy of the Employment Agreement between CETI and Mr. Qiu is attached as Exhibit U to the Second Amended Complaint.  *Id.* and *see* Doc. 52-21.

6.      Pursuant to the Employment Agreement, Defendant Qiu agreed that CETI is the owner of all Confidential Technology and Information as defined in the Employment Agreement and that he would not make claim to, use or disclose the Confidential Technology and Information except in accordance with the terms of the Employment Agreement. *Id.*

7.      Pursuant to General Agreement Paragraph 2 of the Employment Agreement, Mr. Qiu agreed that

> "any and all Confidential Technology and Information, whether now known by you or CETI, including any ideas, inventions, discoveries, developments, or improvements made or discovered by you or other CETI employees during your or their employment at CETI, was and will be obtained at the expense and for the benefit of CETI.   Except as may be required by your employment at CETI, you will not, without CETI's written consent, disclose or use,

nor solicit nor assist another to use or disclose, at any time either during or subsequent to your employment by CETI, any Confidential Technology and Information of CETI."

*Id.*

8.      Pursuant to General Agreement Paragraph 3 of the Employment Agreement, Mr. Qiu agreed to promptly disclose to CETI "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by you during the period of employment and related to the business or activities of CETI.   You will assign and hereby agree to assign all your interests therein to CETI or its nominee."   *Id.*

9.      Pursuant to General Agreement Paragraph 4 of the Employment Agreement, Mr. Qiu agreed "that any computer software and documentation made by you during the period of your employment and related to the business, operation, or activities of CETI shall be considered 'works made for hire' under the copyright laws of the United States."   *Id.*

10.      Qiu knows the overall structure of the Concepts' Software. Qiu Trans. Doc. 170 at 62.

11.      Qiu is familiar with and gives training to customers on the TurboTides' program. Doc.170 at 62-63.

12.      Qiu admitted, "In terms of functionality" the TurboTides' Software and the Concepts' Software are "trying to solve the same issues." Qiu Trans. Doc. 171 at 26.

13.      The two softwares are so similar, that even Dr. Qiu would find it difficult explain his understanding of the differences between the TurboTides' and Concepts' softwares. Doc. 170 at 63.

14.      Qiu agrees that Concepts' Software has four or five functionalities they call the Agile Design Systems, which are comparable to what TurboTides has.   Doc. 170 at 63.

15.      Qiu's special area of expertise while employed at Concepts was meanline modeling. Doc. 171 at 27-28.

18

16.     Qiu was responsible for and very familiar with Concepts' meanline program. Doc.170 at 62.

17.     Meanline is one piece of turbomachinery software. Doc. 171 at 27.

18.     Qiu worked on meanline modeling for 15 years at Concepts. Doc. 171 at 28.

19.     Meanline is the first step in the design of turbomachinery.   Doc. 171 at 28.

20.     Meanline comprises about 10% of the TurboTides software. Doc. 171 at 27.

21.     Mathematical formulae are developed by software engineers to try to predict the meanline that will result from a turbomachinery design.   Doc. 171 at 28.

22.     In 2007, while at Concepts, Qiu wrote a technical memorandum for internal review entitled "Alternative Meanline Modeling for Axial and Radial Impellers." (the "2007 Memorandum")   Doc. 171 at 28-29. Exh. 350 filed with the court at the July 6, 2022 Hearing, *see* Doc. 174-1.

23.     That 2007 Memorandum has not been released to the public by Concepts and has been maintained as a confidential trade secret by Concepts. EXHIBIT 3, Declaration of Bradley C. Leiser at ¶¶15-18.

24.     Dr. Qiu wrote software code for Concepts based on the ideas and formulae in the 2007 Memorandum. EXHIBIT 3, Declaration of Bradley C. Leiser at ¶17.

25.     The internal 2007 Memorandum written by Dr. Qui while at Concepts and the code he wrote based on that paper have never been published or disseminated to the public. EXHIBIT 3, Declaration of Bradley C. Leiser at ¶18.

26.     The alternative meanline modeling approach described in the internal 2007 Memorandum was something Qiu developed for Concepts while he was at Concepts.   Doc. 171 at 29.

27.    In the internal 2007 Memorandum Qiu admitted that "The slip factor calculation is based on the new unified slip model developed here at Concepts NREC"  Doc. 171 at 29. Exh. 350, p. 7, Section 5.0 "Deviation Modeling."

28.    The 2007 Memorandum Qiu wrote for internal review at Concepts described a new model developed by him at Concepts.   Doc. 171 at 30.

29.    Qiu presented the model in its final form as a calculation.   Doc. 171 at 30.

30.    The final form of the slip factor model Qiu developed for Concepts while at Concepts was presented as the formula on page 8 of Exh. 350 as (30).   Doc. 171 at 30.

31.    Slip factor is an important part of the mean line. Doc. 171 at 30.

32.    Qiu proposed to Concepts in his internal 2007 Memorandum that this slip factor model would be beneficial to Concepts' customers.   Doc. 171 at 31.

33.    This precise slip factor model and the formula that expressed it that Qiu developed for Concepts while at Concepts is implemented in the TurboTides Software.   Doc. 171 at 31. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

34.    Exhibit 165 filed with the court at the July 6, 2022 Hearing (see Doc. 174-1) is a TurboTides Software User Guide.

35.    It is a guide that purchasers of licensees of the TurboTides software use to learn how to operate the software. Doc. 171 at p. 32.

36.    Starting at page 110 of Exhibit 165 (page 109 of the User Guide), the User Guide concerns the meanline module of the TurboTides software.   Doc. 171 at 32.

37.    At Section 3.11, there is an introduction of the models used in the TurboTides meanline.   Doc. 171 at 32.

38.     Under "QiuDev" there are formulae listed.   Doc. 171 at 32.

39.     "QiuDev" identifies who "came up with the model."   Doc. 171 at 33.

40.     The exact slip factor formula that Qiu reported in the confidential 2007 Memorandum he prepared for Concepts and proposed would be of beneficial use to Concept's customers, shows up in the TurboTides Software as formula 3.3 in the User's Manual.   *Compare* Exh. 165 at p. 110 with Exh. 350 at p. 8.   Doc. 171 at p. 33, line 18-21.   From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

41.     That is not the only formula that was developed by Qiu at Concepts that found its way into the TurboTides software. "F-factor" 3.1 is also in the TurboTides User Manual. The same formula is reported in another Concepts' paper called "A New Slip Factor Model for Axial and Radial Impellers." Exh. 249 filed with the court as evidence at the July 6, 2022 Hearing, see Doc. 174-1.

42.     The formula (14) on page 3 of Exh. 249 is the same "Qiu Dev" formula in the TurboTides User Manual at Section 3.3 on p. 110.   Doc. 171 at 35.

43.     Qiu wrote Exh. 249 while at Concepts along with two Concepts co-authors. Doc. 171 at 34.

44.     It was published in 2007 and copyrighted by Concepts. *See* lower right hand corner of Exh. 249.

45.     And another QiuDev formula at Section 3.3 in the TurboTides Software shows up in Qiu's 2007 paper as formula (15).   Doc. 171 at 35.

46.     To make these formulae work in the TurboTides software, they had to be written into computer code.   "Yes."   Doc. 171 at 35.

47.    While he was working for Concepts, Qiu wrote turbomachinery computer code for use by Concepts that incorporated precisely these same formulae.   "I did."   Doc. 171 at 35-36.

48.    So when Qiu worked on the mean line portion of the TurboTides software, he already knew how to convert the QiuDev formulae into code.   "Correct."   Doc. 171 at 36.

49.    Qiu took at least the three described complicated formulae developed by him while at Concepts, for Concepts, and he incorporated them into his work at TurboTides as "QiuDev" formulae.   Doc. 171 at 35 ("yeah, they are the same.")   From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

50.    Seeing the facts in the light most favorable to Concepts, it is reasonably likely that a jury will conclude that Qiu's use of the three QiuDev formulae developed by him at Concepts and his preparation of code for Concepts and TurboTides to make those formulae work in the two softwares based on his work at Concepts was comprised of, in part, Concepts' "Confidential Technology and Information" as defined under the Employment Agreement.

51.    According to TurboTides' Hefei Taize website on its "About Us" page, "[t]he key technology and basic source code of TurboTides originated from the accumulation of decades of core team in the United States. After many years of preparation, in 2016, with the help of the Hefei Municipal Government [in China] he [Defendant Qiu] went to the China University of Science and Technology Association Industrial Park and registered the copyright of its core product TurboTides in China, with complete source code."   See Fawley Declaration (Doc. 215-1 at p. 18) (emphasis added).   Since Mr. Qiu only worked at Concepts during the 15 years immediately before starting Hefei Taize and disclosed no prior inventions in accordance with the Employment Agreement, seen in the light most favorable to Concepts, the referenced "accumulation of decades of core team in the

22

United States" is a reference to the accumulation by Defendant Qiu of CETI's and Concepts' core team's decades of technology and source code for turbomachinery.

From these facts alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

52.  Mr. Qiu gave notice to Concepts that he was leaving in November 2015 and his last day at Concepts was December 7, 2015.   Doc. 171 at 40.

53.  One of the reasons Qiu left Concepts was to care for his ill mother in China. Doc. 171 at 40.

54.  Qiu left the United States at the end of December, 2015 to be with his mother in China. Doc. 171 at 40.

55.  Qiu sat with his mother for three months. His mother passed in March, 2016. Doc. 171 at 41.

56.  About 30 days after she died, on April 22, 2016, Qiu helped formally register Hefei Taize as a business in China. 171 at 41.

57.  Qiu is "one of the founders of Hefei Taize."   Doc. 171 at 17.

58.  The other founders are Qiu's high school classmates, Yu Quing, Shi Xiaowen and Li Wende and a college friend and Ms. Zhang's brother Zhang Hong Bing. Doc. 170 at p. 46.

59.  At the time it was founded in 2016, the official records in China showed Qiu owned 97 percent of the stock of Hefei Taize.   Doc. 171 at 17.

60.  The other investors would not put money in the company until a copyright for the software code had been registered in China. Doc. 171 at p. 76.

61.  The copyright to the code for the first version, V 1.0, of the TurboTides software was registered in China on May 25, 2016.   Doc. 171 at 42.

62.    It took at least two years to "write Version 1.0 of the TurboTides software."   Doc. 171 at 40 (Tr. at 116).   Thus, at a minimum, seeing the evidence in the light most favorable to Concepts, the jury can reasonably conclude that work began on the TurboTides Software on or about May 25, 2014 – two years before registration of Version 1.0 with the Chinese copyright office and long before Dr. Qiu left Concepts in December 2015.   From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

63.    Despite being able to obtain a copy of its copyrighted code for Version 1.0 (or any of the other 27 versions it has copyrighted) from the Copyright Protection Center of China *(See* Eric Liu Declaration at Doc. 207-2), Qiu, TurboTides, Inc. and Hefei Taize all refused to do so or produce it in response to the court's orders that they comply with the Hefei Taize subpoena and party discovery.   If the code exonerated them from this lawsuit, one would assume they would produce it. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

64.    Mr. Qiu was heavily involved in the first copyright filing for the TurboTides software.   Doc. 171 at 76.

65.    That was almost exactly 30 days after Hefei Taize was registered as a business in China.   Doc. 171 at 42 – 43.

66.    As of at least June 26, 2016 (30 days after copyright registration), the software was sufficiently developed that Qiu included a screenshot of it in the TurboTides User Manual. *See* Exh. 165 filed with the court at the July 6, 2022 Hearing per Doc. 174-1, at p. 261 (p. 162 of the Exhibit), figure 8.4 of the command window. Doc. 171 at 43-44. Exhibit 165 is a screenshot from TurboTides Software version 1.7.3 with a build date of June 26, 2016.   Doc. 171 at 44-45.

67.     Qiu agrees that Concepts' belief that one could not develop the TurboTides software in such a short time is valid.   Doc. 170 at 59. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

68.     Qiu agrees that it would take more than two or three years to develop a software like TurboTides.   Doc. 170 at 59.   Given that the software was registered in China "with complete source code" on May 25, 2016, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

69.     Qiu claims he is the "overall designer of the TurboTides system and led an international team of experts in the development of the CAE design system for integrated turbomachinery."   Doc. 96-1 and 93-11.

70.     Qiu agrees that Concepts' suspicion that he must have stolen "stuff" from Concepts is true.   Doc. 170 at 59.   From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

71.     Defendant Zhang is Dr. Qiu's wife and a computer software engineer with a Master's Degree.   She works as an engineer that builds and releases computer software by compiling and writing source code and building it to an executable program.   Zhang Depo attached as Exhibit to Doc. 215-1 at 34, 39, 40, 81, 86.

72.     Defendant Zhang formed Turbotides LLC as a New Hampshire Corporation with its offices in the Qiu/Zhang home at 21 Pinneo Hill Road, Hanover, NH that listed its primary business or purpose as being "Software Development," on November 3, 2011 – five years before Dr. Qiu left Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶4, and EXHIBIT 5.

25

73.    Qiu held himself out as the "Founder and President" of TurboTides LLC.   Doc. 164-11.

74.    On March 11, 2018, Qiu wrote an email to himself that admitted in part, "In 2012, [Qiu] began to develop Turbotides with a team of international experts in the field."   Doc. 95-1 and 93-11. From this fact alone and given the provisions of his Employment Agreement with Concepts assigning to Concepts all rights to intellectual property developed by Dr. Qiu on Concepts' watch, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

75.    Schedule C – Profit and Loss from a Business - on Qiu's and Zhang's personal federal joint tax return for the years 2011-2017 lists the business as TurboTides LLC and describes it as a "software development" company.   Qiu Dep. Doc. 124-8 at 39 and EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(a).

76.    For 2011, Qiu's name is listed on the joint tax return as the proprietor of TurboTides LLC.   Qiu Dep. Doc. 124-8 at 39 and EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(b).

77.    In 2011 Qiu was working for Concepts, doing software development as a turbomachinery software engineer for Concepts.   Declaration of Bradley C. Leiser. Doc. 215-2 at ¶6.

78.    From 2012 to 2017, Defendant Zhang is listed as the proprietor of TurboTides LLC in the couple's joint tax returns.   EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(c).

79.    In 2013, Qiu and Defendant Zhang made a claim to the IRS and got a tax benefit for a computer they claimed was used by TurboTides LLC.   Qiu Dep. Doc. 124-8 at 36, lines 14-17.

80.    In 2013, Qiu was working for Concepts, doing software development as a turbomachinery software engineer for Concepts.    Declaration of Bradley C. Leiser. Doc. 215-2 at ¶6.

81.    Qiu and Defendant Zhang made a claim to the IRS and got a tax benefit for a computer they claimed was purchased and used by TurboTides LLC in 2015.    Qiu Dep. Doc. 124-8 at 36- 37.

82.    Qiu worked for Concepts until December 7, 2015.    Declaration of Bradley C. Leiser. Doc. 215-2 at ¶6.

83.    Dr. Qiu and Ms. Zhang's personal tax return for 2011 shows that Xuwen Qiu was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with $1202 in expenses while Dr. Qiu was simultaneously working at Concepts.    EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(f).

84.    Dr. Qiu and Ms. Zhang's personal tax return for 2012 that shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with $3490 in expenses while Dr. Qiu was simultaneously working at Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(g).

85.    Dr. Qiu and Ms. Zhang's personal tax return for 2013 that shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with gross sales of $10,000 and   $11,628 in expenses while Dr. Qiu was simultaneously working at Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(h).

86.    Dr. Qiu and Ms. Zhang's personal tax return for 2014 that shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE

DEVELOPMENT" with gross sales of $28,000 and $24,846 in expenses while Dr. Qiu was simultaneously working at Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(i).

87.     Dr. Qiu and Ms. Zhang's personal tax return for 2015 that shows that HongYing Zhang was the "proprietor" of TurboTides LLC whose principal business is "SOFTWARE DEVELOPMENT" with $14,037 in expenses while Dr. Qiu was simultaneously working at Concepts. EXHIBIT 1, Fawley 9/3/24 Declaration at ¶5(j).

88.     Dr. Qiu's position was "President" of TurboTides LLC.   EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶6 and EXHIBIT 6 at Bates CONCEPTS022.

89.     Dr. Qiu published a paper entitled "Designing Turbochargers With an Integrated Design System" in June 2013 as "Xuwen Qiu TurboTides LLC." EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶7 and EXHIBIT 7 at Bates No. CONCEPTS043.

90.     TurboTides' identifies Dr. Qiu as the "chief software architect for the TurboTides software."   EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶8 and EXHIBIT 8 at Bates No. CONCEPTS091.

91.     TurboTides's stated in 2020 that "the TurboTides product was born because of the hard work of Dr. Qiu in the turbomachinery industry for more than 20 years."   EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶9 and EXHIBIT 9 at CONCEPTS0260. Dr. Qiu worked for Concepts for 15 of the 20 years prior to 2020.   From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

92.     Third-Party witness Nick Dorsi of TurboSolutions, Inc. testified that in discussions with Dr. Qiu about the process of the development of the TurboTides Software, Dr. Qiu said "he was largely in charge of writing the software." EXHIBIT 10, Dorsi Deposition at p. 21, lines 13-20.

Dorsi also testified that Dr. Qiu told him that he recalled Dr. Qiu telling him that while Dr. Qiu was in the United States he was doing some of the software development by "developing algorithms" and "some coding."   EXHIBIT 10, Dorsi Dep. at p. 22, lines 9-23.   Since Dr. Qiu did not leave to live in China until after he left Concepts in December 2015, seeing the evidence in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu was doing software development work by developing algorithms and coding for the TurboTides Software while he was working for Concepts in the United States. From this fact alone, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

93.    Dr. Qiu's claim promoting the narrative that only 33 days passed between the beginning of work on the TurboTides software code and its registration with the Chinese copyright office "with complete source code" is false.   In his attached Declaration (EXHIBIT 2, ¶¶90-96), Concepts' Expert Dr. Peter A. Seitz opines to a reasonable degree of professional certainty that:

a.  The TurboTides Software registered by Hefei Taize with the Copyright Protection Center of China on May 25, 2016 could not have been written and developed with "complete source code" within 33 days.   To write even the most rudimentary turbomachinery software with "complete source code" and using even a team of 30 code writers would require at least two to five years.

b.  Further, since Dr. Qiu disclosed no inventions of his own prior to working for Concepts, and then worked *only* for Concepts for almost 15 years developing software code immediately prior to the registration for copyright of the TurboTides Software code, and because he claims to have been the chief architect of the TurboTides software, it is my opinion that the vast majority of the first version of the TurboTides Software that was registered with the Chinese government must have been written by Dr. Qiu or by third-parties under his direction over several years during the time he worked at Concepts. This is supported by Dr. Qiu's training and experience writing turbomachinery software code and the creation of TurboTides LLC while working for Concepts and whose only identified business purpose was "software development." There is no other rational explanation for the sudden appearance of a complex turbomachinery software code in China within months after Dr. Qiu left Concepts that incorporates complex formulae developed by Dr. Qiu.   As I said above, the software was not created from scratch in a span of 33 days.

29

c.  Further support for my opinion is that engineers and scientists who make claims of invention are trained to support those claims in professional publications by submitting documentary proof. In this case, I understand that the court has ordered both Hefei Taize and TurboTides, Inc. to produce the actual copyright registration documents submitted to the Chinese government on May 25, 2016 that would include the alleged "complete source code."   I understand from reading the Declaration of Erica Liu (Doc. 207-2) that Hefei Taize has the ability to obtain those records as the registrant of the software code. Their refusal to produce those documents even after being ordered to do so by the court suggests that the documents would show that the maturity and extent of work necessary to generate the "complete source code" would have taken many years of work. Otherwise, as a scientist who understands and has been trained how to prove his claims, why would Dr. Qiu not provide them for inspection?

d.  Further rationale supporting my opinions include the fact that the more persons that are added to a software writing team, the effort to coordinate their efforts to ensure that the final product is error free and works seamlessly increases.   An analogy can be found in imagining a team of 30 authors attempting to write a novel.   Making sure that the tenses, story line narrative, spelling, character traits, dialog and so on all make sense, are consistent and error free becomes more and more difficult as more writers are added to the project. There is an optimal number of code writers for any software development effort. As some point simply throwing more bodies towards a project has diminishing returns and, at some level can cause more problems than it solves.   Thus, it is my opinion that even a large number of code writers could not have created the TurboTides Software in 33 days.

e.  Further, based on my experience and training in the field of turbomachinery engineering and software development for turbomachinery engineering, it would have been impossible for anyone who simply read Dr. Qiu's papers on the Concepts' Slip Factor formula, and numerous other such modeling functions, to suddenly develop turbomachinery software from scratch that incorporated such formulae into operable code such that it would function in a working turbomachinery software within 33 days.   To transform those formulae into functioning operable code in software would require logic software to consider various modeling modes (analysis, design point, data reduction, etc.); actual programming; testing for stability, convergence and uniqueness; setting appropriate input functionality; setting appropriate output functionality including detailed plotting capability; and allowing multiple types of units for both the input and output functions per the users' choice.

f.  Further supporting my opinion is that converting the QiuDev publicly available formulae into useable code for a software program is a far cry from simply being aware of the formula from published papers.   A simple analogy may help explain what I mean. Everyone knows Einstein's famous formula "$e=mc^2$" that dates from the early 1900's. School children recite the formula in response to tests in high school physics. But those same children cannot build an atomic bomb using the formula. It took the brilliant minds on the Manhattan Project team working 24/7 for several years to use that formula to create an atomic bomb.   Knowing a formula exists does not, in and of itself, mean that a person can then utilize it in functioning software without spending the time to reduce the theory to practical, application suitable terms.

30

g.  I have reviewed a 271 page version 5.2.1 of the TurboTides Software Users Guide. It still uses at least one screenshot of a June, 2016 version of the TurboTides software. Thus, the source code program submitted for registration with the Chinese government on May 25, 2016 must have been very mature at that time in order to have generated a screenshot that is still used – too mature to have been created in 33 days.

*See Druzba v. Am. Honda Motor Co.*, 2:22-cv-00019 (D. Vt. May 15, 2024)(expert opinion testimony used to raise issues of material fact and defeat summary judgment).

From the foregoing 93 numbered facts, seen in the light most favorable to Concepts, a jury could conclude that Concepts does have a "record of Dr. Qiu taking [ ] trade secrets from Concepts [sic] computers."

In addition, Defendants are precluded from introducing evidence to support their defense that Dr. Qiu did not take trade secrets from Concepts' computers because they failed to produce the following discovery materials sought by Concepts' document subpoena on Hefei Taize and in discovery requests to Defendants.   Defendants refused to produce the following information in discovery: Items 1, 3, 8, 9, 10, 11, 14, 19, 20 and 33 in Compliance Chart for Document Subpoena to Hefei Taize, Doc. 201-1, pp. 6-15. These materials include the development documentation for the TurboTides Software, the original TurboTides software and code, and the registrations for copyright of the TurboTides software with the Chinese Government.

The Courts' sanction order precludes "Defendants' use of the [foregoing] evidence that neither Defendants nor Hefei produced in response to the Rule 45 Subpoena."   Doc. 245 at 38; and Doc. 258 at 16.   As the Court observed, "[i]t would simply be inequitable for Hefei to not produce this information in discovery, but then permit Defendants to rely on it at trial or summary judgment, given that Concepts had no opportunity to examine such evidence and probe its relevance in discovery."   Doc. 245 at 36-37.   In particular, the Court pointed out that a preclusion order "should preclude Defendants from introducing evidence related to software source code or

31

software versions that have not been produced." Doc. 245 at 36. Not only should Defendants be precluded from defending themselves based on a claim that "Dr. Qiu did not take trade secrets from Concepts' computers" but Concepts requests that the Court also adversely infer that in fact Dr. Qiu did take trade secrets from Concepts' computers.

> [W]here, as here, an adverse inference instruction is sought on the basis that the evidence was not produced in time for use at trial, the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

*Residential Funding Corp. v. Degeorge Financial*, 306 F.3d 99, 107 (2d Cir. 2002). Here, the Court's various sanctions decisions already expressly found that the three criteria in *Residential Funding* have been satisfied. Besides the non-compliance and relevance factors, as to "a culpable state of mind" the Court specifically found that "Hefei's failure to comply with the Subpoena appears willful based on its failure to adequately justify its noncompliance." Doc. 245 at 26. And, after citing two cases from the Southern District of New York holding that preclusion sanctions should only be justified "in 'rare situations' evincing culpable conduct" (Doc. 245 at 35 *citing Liebowitz & Latman, P.C.*, No. 06 Civ. 1202(LGS)(HBP), 2013 WL 3718071, at *13 (S.D.N.Y. July 15, 2013) and where there is "willfulness or bad faith, or [a party] is otherwise culpable" (Doc. 245 at 36 *citing Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357 at 1367 (2d Cir. 1991)), this Court held "[i]t appears that Hefei's noncompliance with the Subpoena has been willful and not an inadvertent oversight." Doc. 245 at 36. *See also* that the Court noted "Hefei's longstanding resistance to discovery in this case, observing that 'Dr. Qiu and Hefei have obstructed the discovery process for years. They have behaved like an individual and an organization with something to hide." Doc. 223 at 5, cited in Doc. 245 at 26. And, as the court

32

found, "Hefei has not denied that it possesses relevant documents. It simply has not produced documents in response to certain categories of requests and has not explained the reason for its non-production." Doc. 245 at 16, n. 5. And, the Court found that Hefei's "production appears to be 'a grudging, half-hearted or foot dragging attempt at compliance' . . . rather than a good-faith effort to comply with the Subpoena." *Id.* at 17. And, the Court found that "Concepts has demonstrated that Hefei has not diligently attempted to comply in a reasonable manner." *Id.* at 22. As a further demonstration of culpable conduct, "Hefei represented that 'there is absolutely no evidence in the record suggesting that Hefei will not abide if the Court orders it to comply with the subpoena" (Doc. 183, at 50), yet as the Court found it "has now ordered Hefei to comply with the Subpoena on several occasions, and its production remains inadequate, incomplete, and in some cases nonexistent." Doc. 245 at 25. And, as the Court observed,

> Defendants Qiu and TurboTides, Inc. both engaged in significant motion practice to defend Hefei Taize's refusal to comply with the Subpoena and Defendant Qiu voluntarily served as the only live witness at the [July 2022] evidentiary hearing seeking sanctions against Hefei Taize, *all in an effort to block Concepts' access* to materials they claimed were only available from Hefei Taize.

Doc. 201 at 2 (emphasis added). In short, findings of willful culpability abound.

Since all three criteria for an adverse inference have been satisfied with respect to the discovery demands for evidence of the taking of trade secrets from Concepts computers, the Court should issue an adverse inference instruction to the jury that they should find that in fact Dr. Qiu did take trade secrets from Concepts' computers.

Based on the overwhelming evidence outlined above, evidence preclusion rulings, and the requested adverse instruction, seeing all the facts in the light most favorable to Concepts, a jury could reasonably conclude that Dr. Qiu did take trade secrets from Concepts computers and used them to create the TurboTides Software.

33

Concepts further disputes Ms. Zhang's statement in her ¶26 that "[t]he evidentiary record is extensive that . . . Hefei Taize developed its own software."   Again, the *extent* of the evidentiary record is immaterial.   If the statement is meant to be simply that "Hefei Taize developed its own software" and the referenced "software" is the TurboTides Software, the statement is disputed. TurboTides, Inc. claimed on multiple occasions and signed a contract with Flexware, Inc. stating that *it* developed the TurboTides Software.   *See* Doc. 45-2 and its many exhibits and Doc. 145-2 at 2. A jury seeing that evidence in the light most favorable to Concepts could reasonably conclude that TurboTides, Inc. developed the TurboTides Software.

**Zhang's ¶27.** Concepts disputes Zhang's statement that "Dr. Qiu was not developing software code through TurboTides, LLC."

From the following evidence seen in the light most favorable to Concepts, the jury could reasonably conclude that Dr. Qiu was developing software code through TurboTides, LLC. The record evidence of that development is set forth in response to Zhang's ¶26.

**Zhang's ¶28.** Concepts disputes Zhang's statement that the referenced marketing materials are "puffery." By asserting that a witnesses' referenced statements were "puffery," Zhang has admitted that the witness is not credible. Thus, the witnesses' statements when seen in the light most favorable to Concepts should be viewed as supporting Concepts for purposes of her summary judgment motion.   Those referenced statements serve to suggest that TurboTides, Inc. and Hefei Taize are one and the same company, thus supporting Concepts' claim that they are alter egos of each other and Dr. Qui who founded both entities.   Doc. 52, ¶¶5-10.

**Zhang's ¶29.** Concepts disputes Zhang's statement as immaterial to her summary judgment motion.    Regardless of whatever Dr. Japikse says, it is to be construed in the light most favorable to Concepts.

**Zhang's ¶30.** Concepts disputes Zhang's statement as immaterial to her summary judgment motion.    Regardless of whatever Dr. Japikse says, it is to be construed in the light most favorable to Concepts.    To the extent that Ms. Zhang claims that Dr. Japikse was designated as a Rule 30(b)(6) corporate designee for Concepts, she is mistaken. No such designation was ever made or deposition of Concepts ever taken and, thus, Dr. Japikse's deposition testimony is based on his personal knowledge, or lack thereof.

**Zhang's ¶31.** Concepts disputes Zhang's statement as immaterial to her summary judgment motion.

**Zhang's ¶32.** Concepts disputes Zhang's statement that "Mr. Japikse testified that he had no knowledge of Dr. Qiu taking any trade secrets other than what his attorneys told him" as both immaterial to the claim of Civil Conspiracy against Ms. Zhang and untrue. *See* Japikse Deposition referenced by Zhang at pp. 102-107 describing the illegal acquisition of Concepts' Software. From this and seeing the evidence in the light most favorable to Concepts, a reasonable jury could conclude that Mr. Japikse did testify as to knowledge he had of Dr. Qiu taking trade secrets from Concepts. And, in the end, whether Mr. Japikse had personal knowledge of such takings, is immaterial to Concepts' claims of Civil Conspiracy against Ms. Zhang.

Concepts also disputes the materiality of Zhang's statement that "Mr. Japikse does not recall having any discussions with anyone prior to filing of the lawsuit that Dr. Qiu took any trade secrets" as immaterial. Not to put too fine a point on it, but – so what? The same is true of the

35

statement: "Nor was he aware of any record of Dr. Qiu taking any trade secrets from Concepts computers, . . . though Concepts was researching that possibility."   The extent of Mr. Japikse's personal recollection of "discussions with anyone prior to filing of the lawsuit" and whether he even had the referenced discussions or was aware of investigations is immaterial to the Zhang Summary Judgment Motion.

**Zhang's ¶33.**  Concepts disputes the materiality of Ms. Zhang's statement that "Mr. Japikse did not know of any business Concepts lost as a result of any interference by Dr. Qiu."   The extent of Mr. Japikse's personal recollection – "I'm not recalling any concrete pieces at this moment" and "I don't know at this moment" (Japikse Dep. cited by Zhang at p. 187) – has nothing to do with the claim of Civil Conspiracy.

**Zhang's ¶34.**  Concepts disputes the materiality of Ms. Zhang's statement that "[p]rior to filing the lawsuit, Mr. Japikse was not aware of anyone doing any investigations as to whether Dr. Qiu took any trade secrets." The extent of Mr. Japikse's personal awareness of those facts has nothing to do with the Civil Conspiracy Claim against Ms. Zhang.

**Zhang's ¶35.**  Concepts disputes the materiality of Ms. Zhang's statement that "Mr. Japikse was not aware of any efforts taken by Concepts to determine if Hefei Taize's software infringed on Concepts' software prior to filing the present lawsuit." Again, the extent of Mr. Japikse's awareness of pre-suit investigations is immaterial to any issues presented by the Zhang Summary Judgment Motion. Moreover, Concepts did conduct a proper Rule 11 investigation prior to filing suit. EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶3.

**Zhang's ¶36.**  Concepts disputes the materiality of Ms. Zhang's statement concerning Mr. Japikse's ability to "remember any investigations prior to the filing of the lawsuit." And, in any

event, Concepts did conduct a proper Rule 11 investigation prior to filing suit.  EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶3.

**Zhang's ¶37.**  Concepts disputes the materiality of Ms. Zhang's statement concerning "the evidence . . . [Dr. Japikse] is aware of."  The extent of the evidence of which Dr. Japikse is personally aware has nothing to do with any issues presented by the Zhang Summary Judgment Motion.

**Zhang's ¶38.**  Concepts disputes the materiality and truth of Ms. Zhang's statement that "Mr. Japikse acknowledged that his anger toward Dr. Qiu stemmed from someone telling him that Dr. Qiu was claiming that he had lots of money and could take work away from Concepts."  First the testimony cited by Ms. Zhang in supposed support says nothing about "anger."  Further, even if Dr. Japikse was personally "angry" with Dr. Qiu, whether and why he was angry based on what "someone" told him is immaterial to any issues presented by the Summary Judgment Motion.

**Zhang's ¶39.**  Concepts disputes Ms. Zhang's statement that Mr. Japikse said "equations are not Concepts trade secrets." The reference cited by Ms. Zhang does not say that.

**Zhang's ¶40.**  Concepts disputes Ms. Zhang's claim that Dr. Japikse testified that "Concepts does not own the copyright to Dr. Aungier's books and formulas." Rather, at Ms. Zhang's cited reference, Dr. Japikse said *he* did not own the copyright to *one* of Dr. Aungier's books and said *nothing* about copyrights to Dr. Aungier's "formulas."

**Zhang's ¶41.**  Concepts disputes Ms. Zhang's statement that "Mr. Japikse testified that Alternative Meanline for Axial And Radial Impellers was presented at a conference." The testimony referenced by Ms. Zhang in support says nothing about that paper.

**<u>Zhang's ¶42.</u>** Concepts disputes Ms. Zhang's statement that "the paper" <u>Alternative Meanline for</u> <u>Axial And Radial Impellers</u> "was made available to all members of ASME." The reference cited by Ms. Zhang says nothing about that paper and the statement is immaterial to the Civil Conspiracy Claim against her.

**<u>Zhang's ¶43.</u>** Concepts disputes the materiality of Ms. Zhang's vague statement that "[p]eople who attend conferences are allowed to take with them copies of papers" without at least a description or identification of the "conferences" or "papers" to which she refers.

**<u>Zhang's ¶44.</u>** Concepts disputes the materiality of Ms. Zhang's statement that "[t]he sources identified at the end of the [unidentified] paper were publicly available."

**<u>Zhang's ¶45.</u>** Concepts disputes the materiality of Ms. Zhang's statement "Mr. Japikse felt that Dr. Qiu had gone rogue in writing the paper." First, Mr. Japikse's feelings about Dr. Qiu are immaterial to any issue presented in the Summary Judgment Motion. Second, as the index to deposition shows, the word "rogue" was never uttered by Mr. Japikse in the deposition referenced by Ms. Zhang, much less on the page cited.

**<u>Zhang's ¶46.</u>** Concepts disputes the materiality of Ms. Zhang's statement that "[h]e did not see how the paper prepared by Dr. Qiu fit into the plans of Concepts." Assuming "he" is meant to refer to Dr. Japikse, and the "paper" is the one referenced in Zhang ¶45, the statement cannot "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**<u>Zhang's ¶47.</u>** Concepts disputes the materiality of Ms. Zhang's statement in Zhang ¶47. True or false the value, or lack thereof, of Dr. Qiu's proposal to Concepts cannot "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Zhang's ¶48.**  Concepts disputes the assertion that "Concepts has no specific knowledge of Dr. Qiu taking any code he developed while at Concepts."   From the evidence filed in response to Zhang ¶26 seen in the light most favorable to Concepts, the jury could reasonably conclude that Concepts has knowledge that the code taken from Concepts by Dr. Qiu is the TurboTides Software and/or critical portions of that Software developed by Dr. Qiu while employed by Concepts.

 **Zhang's ¶49.**   Concepts disputes Zhang's statement that "[a]ll that Concepts has to support its claims are puffery marketing pieces whereby Dr. Qiu and his head of sales were trying to make his reseller company, TurboTides, Inc., look more substantial than it was, while trying to disguise that the software was from China." This is hardly a concise statement of material fact. And, as detailed in response to Zhang ¶48, Concepts has much more "to support its claims" than "puffery marketing pieces."

**Zhang's ¶50.**    Concepts disputes Zhang's statement that "[o]ne of Concepts' trade secret claims has been that Dr. Qiu relied on information contained in a paper he published in 2010 titled An Integrated Design System For Turbomachinery [Docket 220-10], to create the Hefei Software." First, Zhang cites to no support for its claim of Concepts' purported "reliance" other than the paper itself. Local Rule 56(c) requires Zhang's statement to be supported "as required by Fed. R. Civ. P. 56(c)." The paper itself establishes nothing about Concepts "reliance" and thus does not support Zhang's "factual position."   Fed. R. Civ. P. 56(c). If Zhang's reference to the "Hefei Software" is mean to refer to the TurboTides Software, Concepts' citation to the referenced paper in its Second Amended Complaint was to demonstrate that at the same time Dr. Qiu was surreptitiously using TurboTides LLC to develop the TurboTides Software while working for Concepts, he derived the

"TurboTides" name from the paper's title - <u>I</u>ntegrated <u>De</u>sign <u>S</u>ystemn For **Turbo**machinery. Doc. 52, p. 11, ¶34. In response to interrogatories, Concepts only stated that the paper "describe[ed] some of the fundamental functions of the TurboTides software." Doc. 220-4 at 16.

**<u>Zhang's ¶51-52.</u>** Concepts disputes Zhang's statements as immaterial because it is not and never has been Concepts' claim that the referenced published paper itself disclosed trade secrets.

**<u>Zhang's ¶53.</u>** Concepts disputes Zhang's statement that "Concepts' argument shifted during the litigation" as immaterial and untrue. Zhang cites to no support for its claim of Concepts "shift" other than to a confidential internal Concepts paper itself. Local Rule 56(c) requires Zhang's statement to be supported "as required by Fed. R. Civ. P. 56(c)." The paper standing alone establishes nothing about Concepts' alleged "shift" and thus does not support Zhang's "factual position." Fed. R. Civ. P. 56(c).

Concepts also disputes that it claimed that Dr. Qiu's "use of Dr. Aungier's formulas for solving engineering papers in Qiu's 2007 internal Concepts memorandum titled "<u>Alternative Meanline Modeling for Axial and Radial Impellers</u> [Docket 220-11]" was "<u>the</u> trade secret." Concepts full contention of the trade secrets it claims have been misappropriated by Defendants is detailed in its response to Defendants' Interrogatory No. 1 at Doc. 220-4, pp. 12-19 and its Supplement at Doc. 220-5, p. 2-3.

**<u>Zhang's ¶54.</u>** Concepts disputes Zhang's statement. The quoted statement is a grossly misleading fraction of Concepts' response to Defendants' Interrogatory No. 1. The full response is found at Doc. 220-4, pp. 12-19 and its Supplement at Doc. 220-5, p. 2-3.

**Zhang's ¶55.**    Concepts disputes Zhang's statement.    The reference is a misleading statement concerning Concepts' supplemental response to Defendants' Interrogatory No. 1.    The full supplemental response is at Doc. 220-5, p. 2-3.

**Zhang's ¶56.**    Concepts disputes Zhang's statement as immaterial since whether "the paper sets forth a number of public formulas for solving engineering problems" is unrelated to Concepts' claims, especially the claim of Civil Conspiracy against her.

**Zhang's ¶57.**    Concepts disputes Zhang's statement that "Mr. Japikse testified that Dr. Qiu's paper was presented at an ASME conference and the information contained in the paper were from public sources. The paper is about designing a turbocharger not about the development of software."    "Dr. Qiu's paper" and "the paper" are undefined by Zhang, but if she means to refer to "the paper" referenced in her immediately prior statements at Zhang's ¶¶54, 55 and 56 entitled "Designing Turbochargers With An Integrated Design System," there is nothing in the pages of the Japikse deposition cited by Zhang for support that mentions that paper. Rather, the paper in the Japikse deposition pages cited by Zhang is entitled "A New Slip Factor Model for Axial and Radial Impellers" that *is* about the development of software and *not* about designing a turbocharger. Thus, a jury seeing the facts in the light most favorable to Concepts would conclude that Zhang's statement is false, if not purposefully misleading.

Concepts also disputes Ms. Zhang's statement that "Mr. Japikse testified that single-zone modeling for software is commonly known, so much so that it was taught to first year college students" as immaterial because, true or false it cannot "affect the outcome of the suit [especially the claim of Civil Conspiracy against her] under the governing law."    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

41

**Zhang's ¶58.**    Concepts disputes Zhang's statement. First, it is wholly unclear at this point which "Dr. Qiu paper" is being referenced. If the "paper" is one of the *three* papers referenced in the 18-page affidavit "Docket 220-1" cited by Zhang without pinpoint reference, its identity is unknown to Concepts. Regardless of which paper is meant to be referenced, Concepts' trade secret claims are not limited to any of them but rather are set forth in response to Defendants' Interrogatory No. 1 (Doc. 220-4, pp. 12-19 and its Supplement at Doc. 220-5, p. 2-3), thus Zhang's statement is immaterial because, true or false it cannot "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

**Zhang's ¶59.**    Concepts disputes Zhang's statement. Unlike the prior paragraph in Zhang ¶58, this one references "neither paper" which suggests it is referring to two of the three papers referenced without pinpoint citation in the 18 page "affidavit' that is "Docket 220-1."   But the identity of the two papers referenced in the statement remains a mystery. And, whether either or "neither" unidentified paper "discusses the structuring or writing of source code" is immaterial because, true or false it cannot "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Especially, with respect to the Civil Conspiracy Claim against Ms. Zhang.

**Zhang's ¶60.**    Concepts disputes Zhang's statement that "Mr. Japikse testified that there was no wrongful interference with business relations by Defendant. [Japikse, P. 187]."   Mr. Japikse never said this and Zhang's citation to his deposition proves it.

**Zhang's ¶61.**    Concepts disputes Zhang's statement that "Plaintiff alleges fraud, on information and belief, only against Dr. Qiu and TurboTides, Inc."   Of the 11 substantive paragraphs of Concepts' two fraud claims only one is alleged on "information and belief." Doc. 52 at 35-37,

¶160.  Further, the fraud claims are alleged against Ms. Zhang as part of the civil conspiracy

claim.  *Id.* at 37-38, ¶173. Thus, the Zhang statement is false.

Further, Concepts disputes Zhang's statement that "Concepts had no evidence of fraud

when filing its Complaint and no evidence was disclosed during discovery."   Whether Concepts

had evidence of fraud when it filed its Complaint is only material to whether Concepts had a Fed.

R. Civ. P. Rule 11 basis to file its claims, which is immaterial to Zhang's Summary Judgment

Motion. For what it is worth, Concepts counsel did conduct a full Rule 11 investigation prior to

filing suit. EXHIBIT 1, Fawley 9/3/2024 Declaration at ¶3. And, Ms. Zhang's implication that

Concepts withheld evidence of fraud during discovery is false, because no Defendant served *any*

discovery asking for such evidence – and of course, notably, Zhang's statement makes no

reference to such discovery because it does not exist. This renders the statement "no evidence [of

fraud] was disclosed during discovery" as purposefully misleading and immaterial.

**Zhang's ¶62.**    Concepts disputes Zhang's statement. Whether Ms. Zhang had

"knowledge of the existence and content of the employment agreement between Dr. Qiu and

Concepts" is not material to the Civil Conspiracy claim against Ms. Zhang. The claim against Ms.

Zhang is for Civil Conspiracy (Doc. 52 at 37-38) which does not require that Concepts prove that

Ms. Zhang was a party to or aware of the employment agreement.

This Court has already denied Ms. Zhang's motion to dismiss that claim, stating that "Ms.

Zhang "can still be liable if Concepts was damaged by *any* illegal acts by Mr. Qiu that furthered

the alleged conspiracy."   Doc. 90 at 15(emphasis added).   It is not necessary that conspirators be

involved in all stages of planning or be aware of all details. "The defendant need not know "all of

the details of the conspiracy," nor [even] the "identities of all of the other conspirators," so long as

they agreed on the essential nature of the plan. *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir.

2008). " *United States v. Lopez*, No. 20-3996, at *7 (2d Cir. Jan. 27, 2022).

> All we need to do, then, is to determine "whether it reasonably could be inferred that
> [Rooney] participated in the alleged enterprise with a consciousness of its general nature
> and extent." *United States v. Alessi,* 638 F.2d 466, 473 (2d Cir. 1980). There is no
> requirement that each member of a conspiracy conspire directly with every other member
> of it, *Friedman,* 854 F.2d at 562, or be aware of all acts committed in furtherance of the
> conspiracy, or even know every other member, *Alessi,* 638 F.2d at 473. The jury could
> decide that there was a single conspiracy even though the same people were not involved
> throughout the entire period, *United States v. Nersesian,* 824 F.2d 1294, 1303 (2d
> Cir.), *cert. denied,* ___ U.S. ___, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

*U.S. v. Rooney*, 866 F.2d 28, 32-33 (2d Cir. 1989).   Thus, whether Ms. Zhang knew or did not

know of Dr. Qiu's Employment Agreement with Concepts is immaterial to the Conspiracy Claim

against her.

**Zhang's ¶63.**    Concepts disputes the materiality Zhang's statement. *When* TurboTides, Inc. was

incorporated and *whether* Ms. Zhang's son ever used the TurboTides LLC website "as a school

project for the Hanover Highschool [sic]" is immaterial to the Summary Judgment Motion.

**Zhang's ¶64.**    Concepts disputes Zhang's attempted omnibus closing argument statement as

neither concise, undisputed nor material. In particular, Concepts disputes whether there is "an iota

of evidence" concerning the multiple assertions in the statement.

Ms. Zhang "participated in" the Defendants' enterprise with "a consciousness of its general

nature." *U.S. v. Rooney*, 866 F.2d 28, 32-33 (2d Cir. 1989). That is, seeing all of the evidence set

forth in response to Zhang ¶¶2, 4, 11 and 16 in the light most favorable to Concepts, a reasonable

jury could conclude that she participated in conspiracy to take and use Concepts' intellectual

property, and had a consciousness of that conspiracy's general nature based on her role over many

years as the proprietor, owner, registered agent, and manage of TurboTides LLC:

- Whose declared business purpose was software development,

- Whose declared headquarters was in her home,

- From which she declared joint income and expense deductions on her tax returns with her husband who was the President of TurboTides LLC, chief architect of the TurboTides Software, and who claimed to have begun developing the TurboTides Software in at least 2012 while working for Concepts; and

- which had a business office in China in the headquarters of Hefei Taize (Doc. 164-11), which is a business started by her husband and her brother (Doc. 170 at p. 46).

September 3, 2024                           FAWLEY PLLC

                                     By  */s/ R. Bradford Fawley*
                                         R. Bradford Fawley
                                         166 Sugar House Hill Road
                                         Guilford, VT 05301
                                         Telephone:   802-380-4735
                                         fawleybrad@gmail.com
                                         ATTORNEY FOR PLAINTIFF

CERTIFICATE OF SERVICE

    I hereby certify that on September 3, 2024, I electronically served the foregoing on all counsel of record via the ECF system.

September 3, 2024

By    */s/ R. Bradford Fawley*
      R. Bradford Fawley
      166 Sugar House Hill Road
      Guilford, VT 05301
      Telephone:   802-380-4735
      fawleybrad@gmail.com
      ATTORNEY FOR PLAINTIFF