UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Concepts NREC, LLC,

                    Plaintiff,

            v.                                          Civil Action No. 5:20–cv–133

Xuwen Qiu, TurboTides, Inc., and
Hong Ying Zhang,

                    Defendants.

**<u>OPINION AND ORDER</u>**
(Docs 274, 277)
**and**
**<u>REPORT AND RECOMMENDATION</u>**
(Docs. 240, 241)

Plaintiff Concepts NREC, LLC (Concepts)[1] brings twelve causes of action against

Defendants Dr. Xuwen Qiu, TurboTides, Inc., and Hong Ying Zhang. This case arises from

Defendant Qiu's former employment as a turbomachinery software engineer for Concepts, which

owns a complementary suite of software programs created to assist with the turbomachinery

design process. Plaintiff alleges that Dr. Qiu, with the assistance of his wife, Hong Ying Zhang,

violated the terms of his employment agreement by developing a competing software product—

the TurboTides software—while employed by Concepts. Plaintiff further alleges that the

TurboTides software incorporates confidential formulae and models from the Concepts software.

Plaintiff asserts claims for breach of contract; breach of software terms and conditions; copyright

infringement; misappropriation of trade secrets; common law conversion; unjust enrichment;

---

[1] Dr. Qiu worked for "Concepts ETI, Inc." (a.k.a. "CETI") until it was merged into "CN Holdings, Inc.," which owns Concepts. (Doc. 52 at 9–10, ¶ 26.) Employees of CN Holdings and former employees of CETI work for Concepts. (*Id.*) Plaintiff collectively refers to these entities as "Concepts."

unfair and deceptive trade practices under the Vermont Consumer Protection Act; tortious interference with business relations and prospective economic advantage; fraudulent concealment; constructive fraud; civil conspiracy; and breach of the duty of loyalty. (Doc. 52.)

Defendants move for summary judgment, asserting that Plaintiff has not demonstrated a genuine dispute of material fact because Dr. Qiu did not begin work on the TurboTides software until after he left Concepts and because the TurboTides software was developed using publicly available information. According to Plaintiff, the record evidence demonstrates that Dr. Qiu began work on the TurboTides software while employed by Concepts and that the TurboTides software incorporates formulae from Concepts, which when considered in conjunction with its expert testimony, raises disputed issues of material fact.

Also before the Court are Defendants' four Motions to Strike various filings by Plaintiff (Docs. 274, 275, 276, and 277). The Court addresses two Motions to Strike—Docs. 274 and 277—in this Report and Recommendation and two Motions to Strike—Docs. 275 and 276—in separate orders issued contemporaneously with this Report and Recommendation.

For the reasons explained below, Defendants' Motions to Strike (Docs. 274 and 277) are DENIED. I further recommend that Defendants' Motions for Summary Judgment (Docs. 240 and 241) be GRANTED on Count VII (unfair and deceptive trade practices under Vermont's Consumer Protection Act), Count VIII (tortious interference with business relations and prospective economic advantage), Count IX (fraudulent concealment), and Count X (constructive fraud); GRANTED as to Defendant Qiu and DENIED as to Defendant TurboTides Inc. on Count VI (unjust enrichment); and DENIED on Count I (breach of contract), Count II (breach of software terms and conditions), Count III (copyright infringement), Count IV

(misappropriation of trade secrets), Count V (common law conversion), Count XI (civil conspiracy), and Count XII (breach of common law duty of loyalty).

## Evidentiary Objections

Before discussing the merits of Defendants' Motions for Summary Judgment, the Court first addresses Defendants' Motions to Strike the Declarations of Concepts' in-house counsel Bradley Leiser and Plaintiff's two Statements of Disputed Material Facts. (*See* Docs. 274, 277.)

*Declarations of Bradley C. Leiser*

Defendants ask the Court to strike the entirety of Bradley C. Leiser's Declarations[2] in Support of Plaintiff's Oppositions to Defendants' Motions for Summary Judgment ("the Leiser Declarations") (Docs. 270-5, 271-5). (*See generally* Doc. 277.) Defendants primarily argue that the Court should strike the Leiser Declarations because Attorney Leiser works for Plaintiff as in-house counsel. (*Id.* at 1.) Defendants contend that Plaintiff withheld documents in discovery based on "the understanding that Plaintiff was claiming [attorney-client privilege] because the documents involved emails with [Attorney] Leiser, Concepts' in-house counsel." (*Id.*) Defendants assert that through the Leiser Declarations, "Concepts is having [Attorney] Leiser testify as a witness on the same matters that are contained in those documents it protected from disclosure as being privileged." (*Id.* at 1–2.) Therefore, the Leiser Declarations should be stricken "on the grounds that [Plaintiff] cannot use a privilege both as a sword and a shield." (*Id.* at 2.) In the alternative, Defendants ask the Court to find that Plaintiff waived the attorney-client privilege with respect to the withheld documents and order Plaintiff to produce them. (*Id.*)

---

[2] Plaintiff filed two Declarations of Bradley C. Leiser—one to oppose Defendant Zhang's Motion for Summary Judgment and one to oppose the Motion for Summary Judgment filed by Defendants Xuwen Qiu and TurboTides, Inc. (Docs. 270-5, 271-5.) However, the two Declarations are identical.

Defendants further object to paragraphs 4 and 15–17 of the Leiser Declarations. As to ¶ 4, Defendants seek to strike Attorney Leiser's statements as improper expert testimony and an ultimate finding of fact rather than a presentation of observed facts. (*Id.* at 2–3.) Defendants argue that ¶¶ 15–17 "should be stricken because they contain speculative statements and are not based on first-hand knowledge." (*Id.* at 3.) Finally, Defendants challenge the Leiser Declarations on the grounds that their contents are irrelevant under Federal Rules of Evidence 401 and 403. (*Id.*) Plaintiff opposes Defendants' motion. (*See generally* Doc. 280.)

Defendants have not satisfied their burden to strike the Declarations. "The party moving to strike bears a heavy burden, as courts generally disfavor motions to strike." *Schneidermesser v. NYU Grossman Sch. of Med.*, 21 Civ. 7179 (DEH), 2024 WL 4054372, at *1 (S.D.N.Y. Sep. 5, 2024) (citation modified). Defendants have not shown that Plaintiff withheld the documents at issue due to attorney-client privilege. Defendants attach an email from Plaintiff's attorney indicating that the documents were "privileged," but the email does not mention attorney-client privilege specifically. (*See* Doc. 285-1.) Defendants rely only on their "understanding" that attorney-client privilege shielded the documents without providing any evidence to substantiate this understanding. (Doc. 277 at 1.) Moreover, the Protective Order in this case—which was stipulated to by all parties—outlines a process for contesting a claim of attorney-client privilege. (Doc. 25 at 28–29, ¶ 14.3.) Defendants have not shown that they complied with the procedures mandated by the Protective Order, including filing a Disclosure Motion under seal within five business days of receipt of the notice of disclosure. (*See* Doc. 285-1 at 2) (notice of disclosure dated April 6, 2021).

Even if Defendants had properly contested the claim of privilege, they have not demonstrated that the emails "that Concepts designated as privileged concern the same matters

that [Attorney] Leiser is testifying upon by way of his declarations." (Doc. 285 at 1.) Defendants maintain that Plaintiff withheld documents responsive to discovery requests "regarding internal investigations Concepts conducted into whether Defendants misappropriated the company's software and the results therefrom." (Doc. 277 at 1.) But the Leiser Declarations do not mention these investigations. Instead, they describe steps Concepts took to preserve the confidentiality of its trade secrets, the 2007 confidential technical memorandum that Dr. Qiu wrote for Concepts, and the absence of any record of a "legitimate purchase of the Concepts software" by Hefei Taize, TurboTides, Inc., or TurboTides LLC." (Doc. 270-5 at 5, ¶ 14.) "Testimony of [an] attorney which does not relate to privileged communications between him and his client, does not constitute a waiver of the privileged communications." *Mullen v. United States*, 263 F.2d 275, 277 n.2 (D.C. Cir. 1958) (citation modified).

Defendants next ask the Court to strike ¶ 4 of the Leiser Declarations because: (1) Attorney Leiser cannot give expert opinion testimony as a lay witness; and (2) Paragraph 4 contains an ultimate finding of fact rather than a presentation of observed facts.[3] (Doc. 277 at 2–3.) After review of ¶ 4, the Court concludes that only one sentence could reasonably be interpreted as containing opinion or an ultimate finding of fact: "The Concepts Software contains copyrighted code (collectively "Concepts Copyrighted Trade Secrets") that derives independent

---

[3] Paragraph 4 of the Leiser Declarations reads:

The Concepts Software contains copyrighted code (collectively "Concepts Copyrighted Trade Secrets") that derives independent economic value from not being generally known to or readily available by proper means to anyone other than persons who agree to confidentiality agreements with Concepts. To preserve its confidentiality, Concepts and its predecessors in interest identified the Concepts Copyrighted Trade Secrets as trade secrets at the time of registration and, in doing so, deposited with the U.S. Copyright Office only one copy of no more than the first fifty pages of the code, blocking none of that code. The combined first and last fifty pages of the code comprise an approximate one ten thousandth (1/10,000) portion of the code. By this means and not publicly disclosing the remaining approximate nine thousand, nine hundred and ninety[-]nine ten-thousandth (9,999/10,000) portion of the code, the confidentiality of the Concepts Copyrighted Trade Secrets in the Concepts Software was preserved. (Doc. 270-5 at 2–3.)

economic value from not being generally known to or readily available by proper means to anyone other than persons who agree to confidentiality agreements with Concepts." (Doc. 270-5 at 2.) The Court need not strike ¶ 4 and will instead disregard any inadmissible content—to the extent that any portion of the paragraph is inadmissible—in its consideration of the summary judgment motions. *See, e.g.*, *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 434 n.3 (E.D.N.Y. 2013) (denying motion to strike on summary judgment and instead disregarding portions of affidavit that were not based on personal knowledge); *Flaherty v. Filardi*, No. 03 Civ. 2167(LTS)(HBP)., 2007 WL 163112, at *4 (S.D.N.Y. Jan. 24, 2007) (citation modified) (stating that, in response to a motion to strike, a court may instead "decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible"); *Ross Univ. Sch. of Med., Ltd. v. Brooklyn–Queens Health Care, Inc.*, No. 09–CV–1410(KAM), 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7, 2012) ("[C]ourts in this Circuit frequently deny motions to strike paragraphs in Rule 56.1 statements, and simply disregard any improper assertions."), *report and recommendation adopted in relevant part*, No. 09–cv–1410(KAM)(RLM)., 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013); *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999) ("[R]ather than scrutinizing each line . . . and discussing whether they contain conclusory allegations, legal arguments, or hearsay . . . , the Court, in its analysis of the motion for summary judgment, will only consider relevant evidence that is admissible. . . .").

The Court also declines to strike ¶¶ 15–17 of the Leiser Declarations.[4] Even if Attorney Leiser lacks first-hand knowledge that Dr. Qiu wrote a technical memorandum and wrote software code based on the memorandum—a conclusion Defendants have not proven—Dr. Qiu himself testified to these points at a hearing attended by Attorney Leiser. (*See* Doc. 171 at 104:18–105:8; *id.* at 109:12–112:5); (*see also* Doc. 280 at 5.) And as a director responsible for protection of Concepts' intellectual property, (*see* Doc. 270-5 at 2, ¶ 2), Attorney Leiser has personal knowledge that Concepts has maintained the memorandum Dr. Qiu wrote as a confidential trade secret. (*Id.* at 5, ¶ 16.)

Finally, the Court disagrees with Defendants' assertion that the Leiser Declarations do not contain information relevant under Rules 401 and 403 to Plaintiff's claim for misappropriation of trade secrets. (*See* Doc. 277 at 3.) Indeed, it is difficult to imagine how Attorney Leiser's testimony about the precautions Concepts took to preserve the confidentiality of its intellectual property could lack relevance given that a prima facie case for misappropriation of a trade secret requires a showing that the information "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 9 V.S.A. § 4601(3)(B).

For these reasons, Defendants' Motion to Strike the Declaration of Bradley C. Leiser (Doc. 277) is DENIED.

---

[4] Paragraphs 15–17 of the Leiser Declarations read:

15. In 2007, while at Concepts, Qiu wrote a technical memorandum for internal review entitled "Alternative Meanline Modeling for Axial and Radial Impellers." (the "2007 Memorandum") Doc. 171 at 28-29. Exh. 350 filed with the court at the July 6, 2022 Hearing, *see* Doc. 174-1.

16. That 2007 Memorandum has not been released to the public by Concepts and has been maintained as a confidential trade secret by Concepts.

17. Dr. Qiu wrote software code for Concepts based on the ideas and formulae in the 2007 Memorandum.

*Statements of Disputed Material Facts*

Defendants move to strike Plaintiff's two Statements of Disputed Material Facts ("the Statements") (Docs. 270-1 and 271-1) on the grounds that: (1) the Statements present no genuine dispute of material facts; (2) the Statements rely on argument and conjecture in violation of Local Rule 56(b); and (3) the Statements violate Federal Rule of Civil Procedure 56(c) and Local Rules 56(b) and (c) by citing cases and arguing points of law. (Doc. 274 at 1–3.) Plaintiff opposes the Motion. (*See generally* Doc. 278.)

As an initial matter, neither Defendants' Motion nor their Reply identifies a single specific paragraph of Plaintiff's Statements—which are 42 and 46 pages long—that allegedly violates the Federal or Local Rules. (*See generally* Docs. 274, 282.) The failure to do so plainly undermines Defendants' ability to meet their burden on a motion to strike. *See Schneidermesser*, 2024 WL 4054372, at *1; *cf. Chiarelli v. Nissan N. Am., Inc.*, No. 14-CV-4327 (NGG) (PK), 2017 WL 2982974, at *1 (E.D.N.Y. July 12, 2017) (citation modified) ("It is not the court's responsibility to hunt through voluminous records [on summary judgment] without guidance from the parties.").

As to the substance of Defendants' Motion, Defendants' argument that the Court should strike the Statements for presenting no genuine dispute of material fact is unpersuasive. Defendants are simply incorrect that the Statements offer no facts to dispute Defendants' summary judgment motions.[5] (Doc. 274 at 3.) For example:

---

[5] To support this position, Defendants argue that by filing a motion under Rule 56(d), "[p]laintiff represented that it does not have facts sufficient to defeat a motion for summary judgment." (Doc. 274 at 1.) But Plaintiff filed its Rule 56(d) motion while Plaintiff's motion for sanctions based on Hefei's failure to comply with this Court's discovery orders was still pending. As Plaintiff observes, "[o]nce the Court granted the requested sanction precluding evidence, there was no need for further fact discovery." (Doc. 278 at 3.) The Court does not interpret the Rule 56(d) motion as an admission that Plaintiff could not withstand summary judgment, particularly given that such a conclusion would effectively reward parties for sanctionable conduct during discovery.

- Doc. 270-1 at 2, ¶ 9 ("Concepts disputes the statement . . . that 'Dr. Qiu did not enter a non-compete agreement with Concepts.' Indeed, the very document referenced by Defendants . . . states that Dr. Qiu agreed that he 'will not' 'at any[]time' . . . 'disclose *or use*' 'nor solicit nor assist another *to use* or disclose' any 'Confidential Technology and Information' of Concepts . . . .");

- *Id.* at 22, ¶ 12 ("Concepts disputes Defendants' statement that 'Concepts did no investigations prior to [] filing suit as to whether Dr. Qiu took any trade secrets.' . . . Concepts performed a Fed. R. Civ. P. 11 investigation prior to filing suit as to whether Dr. Qiu took any trade secrets from Concepts.");

- *Id.* at 27, ¶ 46 ("Concepts disputes Defendants' statement that 'Dr. Qiu is not a software developer' . . . . [B]oth the TurboTides LLC tax returns and registration with the NH Secretary of State and the TurboTides, Inc. tax returns state that TurboTides LLC's and TurboTides, Inc.'s business is and was 'software development.'");

- Doc. 271-1 at 5, ¶ 10 ("Concepts disputes Zhang's statement that 'Ms. Zhang had no knowledge that her husband, Dr. Qiu, was using TurboTides LLC.' . . . Dr. Qiu served as President of her TurboTides LLC business.");

- *Id.* at 10, ¶ 17 ("Concepts disputes Zhang's statement that 'the NDA does not grant Concepts the ownership over the knowledge, skills, methodologies or ideas that Dr. Qiu or any of Concepts' employees acquire during the [course] of their employment.' . . . '[A]ny computer software and documentation made by' Dr. Qiu 'during the period of his employment' was considered 'works for hire' and vested ownership in Concepts.") (citation modified);

- *Id.* at 37, ¶ 39 ("Concepts disputes Ms. Zhang's statement that Mr. Japikse said 'equations are not Concepts trade secrets.' The reference cited by Ms. Zhang does not say that.").

These are only several illustrative examples.

Additionally, Defendants offer no legal authority to support their Motion to Strike. As

Plaintiff notes, "whether or not a genuine dispute has been presented is the very decision the

---

Defendants also contend that Plaintiff knew "from the date of the filing of the present action, as admitted to by Mr. Japikse during his deposition, that Dr. Qiu never misappropriated any of Concepts' trade secrets." (Doc. 274 at 2 n.3.) Defendants deposed Mr. Japikse in his individual capacity, not as a designated organizational witness under Rule 30(b)(6). (Doc. 270-1 at 36, ¶ 79.) Therefore, the Court does not find Mr. Japikse's testimony that he personally was not aware of Dr. Qiu taking any trade secrets from Plaintiff, (*see* Doc. 220-8 at 49, 129:6–12), representative of Plaintiff as an organization. *Cf. Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 99 (S.D.N.Y. 2014) (citation modified) ("The testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation, not of the individual deponents. . . . The duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.").

Court must make in reviewing Defendants' motions for summary judgment." (Doc. 278 at 1.) If accepted, Defendants' position would permit a court to strike the Local Rule 56 statements of any party that opposed summary judgment and lost. The Court declines to adopt such a severe interpretation.

Defendants also object that "in response to many of the undisputed facts, Concepts offers argument and conjecture," including legal argument and case law. (Doc. 274 at 2.) Defendants again do not cite any specific paragraphs or pages. "Rather than scrutinizing each line" of the 88 pages at issue "and discussing whether they contain conclusory allegations, legal arguments, or hearsay," the Court will only consider on summary judgment "facts that have been properly set-forth in accordance with the Federal Rules of Civil Procedure as well as the Local Rules." *See Morris*, 37 F. Supp. at 569 (citation modified) (denying motion to strike affidavits and Local Rule 56 statement). "Accordingly, to the extent any paragraph" of the Statements contains legal argument or speculation, "the offending portions should and will be disregarded by the court, and need not be stricken from the record." *Schneidermesser*, 2024 WL 4054372, at *2 (citation modified).

For these reasons, Defendants' Motion to Strike Plaintiff's Statements of Disputed Material Facts (Doc. 274) is DENIED.

## Threshold Legal Issues

*Objections Under Rule 26 and Rule 11*

As part of their request for summary judgment, Defendants assert that "Plaintiff has failed to disclose documents that support its claims" and that Plaintiff "did not and has not set forth what its damages are as a result of any of its twelve (12) causes of action," in violation of Rule 26. (Doc. 241-1 at 24–25); (*see also* Doc. 240-1 at 22.) Rule 26 "does not provide for a

remedy in the form of summary judgment." *Jones v. United States*, Civ. No. 14-139 (NLH), 2016 WL 5403086, at *2 (D.N.J. Sep. 27, 2016). And to the extent that Defendants move for an order compelling discovery, Defendants have not demonstrated compliance with Rule 37 by filing a certification showing that they have attempted to meet and confer with Plaintiff. (*See* Doc. 270 at 25.) Defendants are not entitled to summary judgment or an order compelling discovery under Rule 26.

In the same section, Defendants describe conduct that, if true, would raise Rule 11 concerns: "[T]he documents Plaintiff identified and disclosed [in discovery] establish that Plaintiff knew that the TurboTides software was not derived from Concepts software, and its claims are composed of innuendo and speculation." (Doc. 241-1 at 24–25.) As evidence, Defendants cite Plaintiff's Initial Disclosures and Plaintiff's First Amended and Supplemental Initial Disclosures—a 12-page document and a 30-page document, respectively—without citation to the specific disclosures supporting the alleged Rule 11 violations. (*See generally* Docs. 220-2, 220-3). After reviewing both filings, the Court finds no support for Defendants' allegation that Plaintiff filed this lawsuit knowing that it was baseless.

*Defendants' Compliance with Local Rule 56*

Plaintiff asks the Court to deny Defendants' motions for summary judgment for "failing to submit a concise statement of undisputed material facts supported by specific citations" to the record. (Doc. 270 at 2) (capitalization omitted).

The Court agrees that Defendants' repeated lack of citation to specific pages in the record or, in several instances, identification of the documents they reference, has unnecessarily increased the time required to review the summary judgment record. (*See, e.g.*, Doc. 241-1 at 20 (citing an 18-page document and a 37-page document without pincites)); (Doc. 241-3 at 5, ¶ 47

(identifying document only as "Qiu")); (*id.* at 2, ¶ 13 (citing deposition transcript as "Japikse, PP. 101-102")).) Defendants' approach is inconsistent with Local Rule 56, whose purpose is "to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Nevertheless, "while a Court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Id.* at 73 (citation modified). In this case, the Court has elected to conduct an independent review of the summary judgment record.

*Impact of the Order Precluding Use of Certain Evidence on Summary Judgment*

After Hefei failed to abide by the Court's order requiring compliance with Plaintiff's Rule 45 document subpoenas, the Court granted in part Plaintiff's motion to hold Hefei in contempt and precluded Defendants Dr. Qiu and TurboTides, Inc. "from using evidence that neither Defendants nor Hefei produced in response to the Rule 45 Subpoena."[6] (Doc. 258 at 16.)

Plaintiff asks this Court to deny Defendants' motion for summary judgment because "given the Court's evidentiary preclusion order . . . the vast majority of Defendants' version of the facts could never be presented to the jury." (Doc. 270 at 8) (citation modified). Plaintiff contends that "Defendants are precluded from introducing evidence to support their defense that Dr. Qiu did not take trade secrets from Concepts' computers because they failed to produce [certain] discovery materials sought by Concepts . . . ." (Doc. 270-1 at 19.) Defendants respond

---

[6] Defendant Zhang was not named in the motion for contempt and is not subject to the preclusive order.

that none of their evidence on summary judgment is precluded by the order because it is "drawn from the record before the court." (Doc. 273 at 6–7.)

In its Statement of Disputed Material Facts, Plaintiff opposes Defendants' use of four documents[7] on summary judgment: (1) the testimony of Concepts CEO David Japikse (Docs. 220-8, 241-2); (2) Dr. Qiu's testimony at a hearing on Plaintiff's motions for contempt and to impose discovery sanctions (Doc. 170); (3) Dr. Qiu's affidavit submitted in opposition to Plaintiff's Emergency Motion for Writ of Attachment (Doc. 220-1); and (4) Plaintiff's responses to TurboTides, Inc.'s first set of interrogatories (Doc. 220-4). (*See generally* Docs. 270-1 and 271-1.) After reviewing the challenged documents, it appears unlikely that the preclusion order bars Defendants from relying on them at summary judgment. All of the filings predate the preclusive order and do not seem to fall into any category of documents Defendants or Hefei failed to produce in response to Plaintiff's subpoena. (*See* Doc. 270 at 9) (Plaintiff's opposition noting the Court's finding that the preclusion order should prohibit Defendants from introducing evidence related to software source code or software versions that have not been produced).

Questions remain regarding the scope of the preclusion order. For example, the order does not address whether the jury may consider Defendants' testimony on subjects about which Plaintiff sought and was denied discovery, such as the TurboTides software code. Plaintiff also requests that the Court draw adverse inferences from Defendants' failures to follow the Court's discovery order. (*See, e.g.*, *id.* at 11.) The Court need not decide either issue at this stage because even if the Court considers the complete record and draws no adverse inferences, Defendants have not met their burden on summary judgment on, or Plaintiff has not adequately pleaded, several claims for the reasons explained below.

---

[7] The Court was unable to locate one additional document, which was identified in Defendants' Statement of Undisputed Facts only as "Qiu." (Doc. 241-3 at 5, ¶ 47.)

**Factual Background**

The following facts are taken from Defendants' Statements of Undisputed Facts (Docs. 240-4 and 241-3); Plaintiff's Statements of Disputed Material Facts (Docs. 270-1 and 271-1), the Second Amended Complaint (Doc. 52), and the record. This factual recitation "resolve[s] all ambiguities and draw[s] all factual inferences" in Plaintiff's favor. *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015). Certain records have been filed under seal. Any such records are unsealed to the limited extent that this Report and Recommendation quotes from or otherwise describes the record.

*Dr. Qiu works for Plaintiff*

Dr. Qiu is a mechanical engineer who primarily works with turbomachinery software. (Doc. 41-2 at 1, ¶¶ 1–2); (Doc. 241-3 at 1.) He earned his PhD in Mechanical and Aerospace Engineering from Syracuse University in 1999. (Doc. 241-3 at 1, ¶ 1.)

From 1999 to 2001, Dr. Qiu worked for General Electric Power Systems (GE) as a lead turbomachinery design engineer in its gas turbine compressor aero group. (*Id.*) While at GE, Dr. Qiu designed turbomachinery for compressors using various turbo design software tools. (*Id.*) Dr. Qiu found GE's software design tools cumbersome and unnecessarily time-consuming to use. (*Id.*)

After concluding his work at GE, Dr. Qiu worked for Plaintiff as a turbomachinery software engineer for more than 14 years (from July 2, 2001–December 7, 2015). (Doc. 215-2 at 2, ¶ 6.) Plaintiff is a limited liability corporation with its principal place of business located at 217 Billings Farm Rd., White River Junction, VT 05001. (Doc. 52 at 1, ¶ 1.) Plaintiff owns various copyrights for Concepts' Agile Engineering Design System® ("the Concepts software"), a complementary suite of programs created to assist with the turbomachinery design process. (*Id.*

at 4, ¶¶ 13, 16.) Plaintiff licenses the Concepts software for a fee to users around the world. (*Id.* ¶ 14.)

When Dr. Qiu started at Concepts, he signed an Employment Agreement (Agreement). (Doc. 52-21.) The Agreement provides in part that Dr. Qiu would promptly disclose and assign to Plaintiff all interests in "any and all ideas, inventions, discoveries, developments, or improvements conceived or made by [him] during the period of employment and related to the business or activities of" Plaintiff. (*Id.* at 3, ¶ 3.) The Agreement also prohibited Dr. Qiu from making claim to, using, or disclosing Plaintiff's Confidential Technology and Information except as provided by the Agreement. (*Id.* at 2–3.)

Dr. Qiu's special area of expertise while working for Plaintiff was meanline modeling. (Doc. 171 at 103:25–104:4.) The meanline is the first step in the design of turbomachinery. (*Id.* at 104:5–9.) Software engineers develop mathematical formulae to try to predict (that is, to model) the meanline that will result from a turbomachinery design. (*Id.* at 104:13–17.) Dr. Qiu was responsible for and very familiar with Plaintiff's meanline modeling program. (Doc. 170 at 62:15–24.)

In 2007, while working for Plaintiff, Dr. Qiu wrote a technical memorandum regarding meanline modeling for internal review ("the Internal Memo").[8] (Doc. 270-5 at 5, ¶¶ 15–18.) The Internal Memo described a new approach to meanline modeling called "alternative meanline modeling." (Doc. 171 at 105:5–106:6.) Dr. Qiu developed this model while working for Plaintiff and developed it for Plaintiff. (*Id.*)

---

[8] The full name of this memorandum is "Alternative Meanline Modeling for Axial and Radial Impellers." (Doc. 171 at 104:18–21); (Doc. 220-11.) This document is sometimes identified in the record as "the 2007 Memo." Because the record suggests that Dr. Qiu wrote multiple papers in 2007, the Court refers to this memo as the "Internal Memo."

The "alternative meanline modeling" approach included a "slip factor" calculation based on a "new unified slip model" developed at Concepts. (*Id.*) Slip factor is an important part of the meanline. (*Id.* at 106:16–107:3.) In the Internal Memo, Dr. Qiu presented the new slip factor model in its final form as a formula. (*Id.* at 106:7–9.) Dr. Qiu proposed to Plaintiff in the Internal Memo that the new slip factor model would be beneficial to Plaintiff's customers. (*Id.* at 107:4–6.) However, Plaintiff expressed no interest in developing Dr. Qiu's new model into a product. (Doc. 220-8 at 180:1–16.)

Dr. Qiu also wrote software code for Plaintiff based on the ideas and formulae in the Internal Memo. (Doc. 270-5 at 5, ¶ 17.) Neither the Internal Memo nor the software code that Dr. Qiu wrote based on the Internal Memo have ever been published or disseminated to the public. (*Id.* at 6, ¶ 18.)

In the same year that Dr. Qiu wrote the Internal Memo, Dr. Qiu and two other employees published a paper called "A New Slip Factor Model for Axial and Radial Impellers" ("the Published Paper"). (Doc. 171 at 101:1–21.) The Published Paper included more formulae related to the slip factor model and the meanline. (*Id.* at 110:1–111:17.) While Dr. Qiu was working for Plaintiff, he wrote turbomachinery computer code for use by Plaintiff that incorporated these formulae. (*Id.* at 111:17–112:5.)

*Ms. Zhang starts TurboTides LLC*

Dr. Qiu's wife, Ms. Zhang, is a computer software engineer with a master's degree. (Doc. 215-1 at 34, 10:6–18, 39, 15:2–18, 81:2–4, 85:15–86:3.) She works as an engineer and builds and releases computer software by compiling and writing source code and building it into an executable program. (*Id.* at 39–40, 15:6–16:21.)

On November 3, 2011—while Dr. Qiu was still working for Plaintiff—Ms. Zhang formed "Turbotides LLC" as a New Hampshire Corporation with its offices in the couple's home. (Doc. 270-7.) "TIDES" is an acronym for "turbomachinery integrated design system." (Doc. 220-4 at 15.) Dr. Qiu presented a paper on TIDES titled "An integrated design system for turbomachinery" at a conference in China with Concepts employee Mark Anderson and CEO David Japikse in October 2010. (Doc. 220-10 at 2.)

TurboTides LLC's primary purpose was listed as "Software Development" at all times relevant to this lawsuit. (Doc. 270-7); (Doc. 215-1 at 3, ¶ 9.)

From 2011–2017, Dr. Qiu or Ms. Zhang named themselves as proprietors of TurboTides LLC on their joint tax returns. (Doc. 215-1 at 3, ¶ 9.) They also declared that TurboTides LLC had gross sales and expenses during this time:

| Year | Expenses | Sales | Claims | Proprietor |
|------|----------|-------|--------|------------|
| 2011 | $1202[9] | | | Qiu[10] |
| 2012 | $3490[11] | | | Zhang (2012–2017)[12] |
| 2013 | $11,628[13] | $10,000[14] | Computer for TurboTides[15] | |
| 2014 | $24,846[16] | $28,000[17] | | |
| 2015 | $14,037[18] | | | |

---

[9] (Doc. 270-3 at 3–4, ¶ 5(f)); (Doc. 124-8 at 39:18–24.)

[10] (Doc. 124-8 at 39:12–33); (Doc. 215-1 at 3, ¶ 9.)

[11] (Doc. 270-3 at 4, ¶ 5(g)).

[12] (Doc. 215-1 at 3, ¶ 9.)

[13] (Doc. 270-3 at 4, ¶ 5(h)).

[14] (*Id.*)

[15] (Doc. 124-8 at 36:3–37:3.)

[16] (Doc. 270-3 at 4, ¶ 5(i)).

[17] (*Id.*)

[18] (*Id.* ¶ 5(j)).

Although Ms. Zhang was listed as proprietor of TurboTides LLC from 2012–2017, Dr. Qiu maintained connections to the TurboTides brand during this time period. Dr. Qiu has stated that he began to develop the TurboTides software in 2012 with a team of international experts in the field. (Doc. 93-2 at 4.) In June 2013, Dr. Qiu published a paper titled "Designing Turbochargers with an Integrated Design System" under the name "Xuwen Qiu TurboTides LLC." (Doc. 270-3 at 4, ¶ 7; Doc. 270-9 at 2.) Nick Dorsi of TurboSolutions, Inc. averred that Dr. Qiu told him that while Dr. Qiu was in the United States he was doing some of the software development for the TurboTides software by "developing algorithms" and "some coding." (Doc. 270-12 at 4, 22:9–23.)

Ms. Zhang dissolved the TurboTides LLC corporation in May 2018. (Doc. 240-3 at 2.)

*Dr. Qiu leaves Concepts, starts Hefei Taize, and copyrights TurboTides software*

At the end of 2015, Dr. Qiu left Concepts to care for his ill mother in China. (*Id.*) Dr. Qiu left the United States for China at the end of December 2015. (Doc. 171 at 40, 116:4–25.) Dr. Qiu cared for his mother for three months until her passing in March 2016. (*Id.* at 41, 117:3–10.) Dr. Qiu did no work on the TurboTides software while he was with his mother. (*Id.*)

On April 22, 2016, Dr. Qiu started Hefei Taize. (*Id.*, 117:11–13.) Dr. Qiu was one of Hefei's founders, and the other three founders were Dr. Qiu's high school and college classmates—one of whom is also Ms. Zhang's brother. (Doc. 170 at 46:1–8.)

Dr. Qiu played a significant role in the founding of Hefei Taize. When Hefei Taize was founded, Dr. Qiu owned 97% of its stock. (Doc. 171 at 17, 93:10–15.) Dr. Qui has also stated that he was the "overall designer of [the] TurboTides system and led an international team of experts in the development of the CAE design system for integrated turbomachinery." (Doc. 93-3 at 5.)

On May 25, 2016, Hefei Taize registered the copyright to the code for Version 1.0 of the TurboTides software. (Doc. 171 at 42, 118:16–18.) Dr. Qiu was heavily involved in the first copyright filing for the TurboTides software. (*Id.* at 76, 152:19–20.)

The principal area of disagreement between the parties concerns the timing of Dr. Qiu's development of the TurboTides software. (Doc. 223 at 3.) According to the Hefei Taize website, Dr. Qiu registered the TurboTides copyright in China "with complete source code" in 2016. (Doc. 215-1 at 3, ¶ 10; *id.* at 18.) Therefore, resolving all ambiguities and drawing all inferences in favor of Plaintiff, there were only thirty-three days between Dr. Qiu starting Hefei Taize in China (April 22, 2016) and the TurboTides software copyright filing in China "with complete source code." (May 25, 2016).

*TurboTides Inc. and the TurboTides Software*

Dr. Qiu formed TurboTides, Inc. in 2018. (Doc. 170 at 59:14–18.) Defendants assert that TurboTides, Inc. is only a reseller of the TurboTides software owned by Hefei Taize. (Doc. 241-3 at 6, ¶¶ 52–57); (*see also* Doc. 159-2.) However, at least one contract identifies TurboTides, Inc. as the owner of the TurboTides software. (Doc. 145-2 at 2, ¶ 2(a).) The true owner of the TurboTides software is therefore disputed.

Despite numerous discovery requests and orders, Plaintiff did not receive a copy of the copyrighted TurboTides software code for V. 1.0 or any of the other twenty-seven versions that have been copyrighted. (Doc. 258 at 7–10.) As a result, the record contains limited information about what exactly is *in* the TurboTides software.

Dr. Qiu knows the overall structure of the Concepts software and does not dispute that "in terms of functionality," the TurboTides software and the Concepts software are "trying to solve the same issue." (Doc. 170 at 62:18–24); (Doc. 171 at 102:21–23.) The Concepts software

has four or five functionalities, which are comparable to the TurboTides software. (Doc. 170 at 63:6–13.)

The TurboTides User Manual is a guide that licensees of the TurboTides software use to learn how to operate the software. (Doc. 171 at 32, 107:23–108:4.) The User Guide contains information about the meanline module (not to be confused with the "meanline model") of the TurboTides software and introduces the models used in the TurboTides meanline. (*Id.*, 108:11–18.) Meanline comprises about 10% of the TurboTides software. (*Id.* at 27, 103:15–24.)

The User Guide lists several formulae under the category "QiuDev." (*Id.* at 32–33, 108:19–21.) "QiuDev" identifies "who came up with the model." (*Id.*, 108:22–109:1.)

The slip factor formula that Dr. Qiu first reported in Plaintiff's Internal Memo appears in the TurboTides software as formula 3.3 in the User's Manual. (*Id.* at 31–33, 105:21–109:21.) The 2007 Internal Memo has never been published or disseminated to the public. (Doc. 270-5 at 5–6, ¶¶ 15–18.)

Two additional formulae that Dr. Qiu developed at Concepts and included in the Published Paper are also implemented in the TurboTides software. (Doc. 171 at 35, 109:22–111:16.) Unlike the slip factor formula, these formulae were previously published.

Dr. Qiu has testified that to make these three formulae work in the TurboTides software, they had to be written into computer code. (*Id.*, 111:17–19.) Dr. Qiu wrote turbomachinery code while he was at Concepts for use by Concepts that incorporated the three formulae listed above. (*Id.*, 111:23–112:1.) As a result, when Dr. Qiu worked on the meanline portion of the TurboTides software, he already knew how to convert these three formulae into code. (*Id.*, 112:2–5.)

**Analysis**

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

If the moving party on a motion for summary judgment demonstrates that there are no genuine issues of material fact, the burden shifts to the nonmoving party, who must present "significantly probative supporting evidence of a disputed fact." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (quoting *Anderson*, 477 U.S. at 249). Where the nonmoving party "fail[s] to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim on which the [nonmoving party] bears the burden of proof," the moving party is entitled to summary judgment. *In re Omnicom Grp., Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (citation modified).

In considering a motion for summary judgment, the court is "required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant." *Robinson*, 781 F.3d at 44 (citation modified); *see SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) ("[A] party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments."). But the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation modified). The non-moving party "cannot defeat summary judgment by relying on the allegations in his complaint, conclusory statements, or mere assertions that

21

affidavits supporting the motion are not credible." *Hamlett*, 496 F. Supp. 2d at 328 (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see Dasher v. N.Y.C. Police Dep't*, No. 94 CV 3847(SJ)., 1999 WL 184118, at *1 (E.D.N.Y. Mar. 18, 1999) ("[T]he court should grant summary judgment where the nonmoving party's evidence is merely colorable, conclusory, speculative, or not significantly probative.").

The court's role in adjudicating a motion for summary judgment "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation modified).

## I.    Summary judgment should be denied on Plaintiff's claims for breach of contract (Count I).

"In defining the elements of a breach of contract claim, the Vermont Supreme Court has stated, in the obligation assumed by a party to a contract is found his duty, and his failure to comply with the duty constitutes a breach." *Ben & Jerry's Homemade, Inc. v. Coronet Priscilla Ice Cream Corp.*, 921 F. Supp. 1206, 1212 (D. Vt. 1996) (citation modified).

Plaintiff claims that Dr. Qiu breached the Employment Agreement by using Concepts' confidential information—information disclosed to Dr. Qiu and several other former Concepts employees—to develop and sell the TurboTides software in direct competition with Concepts.

(Doc. 52 at 23–24, ¶¶ 82–89.)[19] In addition, Plaintiff alleges that Dr. Qiu failed to promptly disclose and assign his interests in the TurboTides software to Concepts in violation of the Employment Agreement. (Doc. 52 at 24–26, ¶¶ 91–98.)[20] Plaintiff seeks to hold Dr. Qiu personally liable and to hold TurboTides, Inc., liable for Dr. Qiu's alleged breaches as an alter ego/agent of Dr. Qiu. (*Id.* at 22, ¶ 83.)

Defendants do not dispute that the Employment Agreement is an enforceable contract, but argue that Plaintiff fails to show that Dr. Qiu did not comply with its terms. (*See* Doc. 241-1 at 13–14) ("Concepts claims that Dr. Qiu violated his employment agreement . . . [Dr. Qiu was not] subject to any agreement prohibiting him from competing with Concepts . . . The [Employment Agreement] is an NDA in an employment context."); (*see also* Doc. 65 at 6, ¶ 30).

Defendants argue that they are entitled to summary judgment on this claim for three reasons: (1) Dr. Qiu only used "public formulas in configuring a portion of the TurboTides software," (Doc. 241-1 at 13), not confidential information from Concepts; (2) Vermont law

---

[19] The Employment Agreement reads in relevant part:

> [A]ny and all Confidential Technology and Information, whether now known by you or [Concepts], including any ideas, inventions, discoveries, developments, or improvements made or discovered by you . . . during your . . . employment at [Concepts], was and will be obtained at the expense and for the benefit of [Concepts]. . . . Except as may be required by your employment by [Concepts], you will not, without [Concepts'] written consent, disclose or use, nor solicit nor assist another to use or disclose, at any time either during or subsequent to your employment by [Concepts], any Confidential Technology and Information of [Concepts].

(Doc. 52-21 at 3, ¶ 2.)

[20] The Employment Agreement reads in relevant part:

> You will promptly disclose to [Concepts] any and all ideas, inventions, discoveries, developments, or improvements conceived or made by you during the period of employment and related to the business or activities of [Concepts]. You will assign and hereby agree to assign all your interests therein to [Concepts] or its nominee. . . . These obligations shall continue beyond the termination of your employment with respect to inventions, discoveries, and improvements conceived or made by you during the period of employment. . . ."

(*Id.* ¶ 3.)

allows Dr. Qiu to use general knowledge and skills acquired at Concepts for future employment; and (3) the Employment Agreement does not contain a "non-compete" provision that would bar Dr. Qiu from creating and selling software similar to the Concepts software. (*Id.* at 13–15.)[21]

Defendants trace the origin of Plaintiff's breach of contract claims to several papers that Dr. Qiu wrote while at Concepts. (Doc. 241-1 at 13.) Dr. Qiu wrote the first paper about "publicly and well-known single-zone, model, mathematical equations formulated by" an individual named Ron Aungier. (Doc. 241-3 at 3, ¶ 19.) Dr. Qiu converted this first paper into a second paper that he later published and presented at a conference. (*Id.* ¶¶ 20, 23.) According to Defendants, the published paper included a "slip factor model" composed of Aungier's equations. (*Id.* ¶ 21.) Concepts did not own these equations. (*Id.* at 4, ¶¶ 33–24.) And Dr. Qiu's second paper was not confidential—all sources referenced in the paper could be read by the public, all attendees of the conference had access to the paper after it was published, and there is no indication that those attendees were required to sign non-disclosure agreements. (*Id.* at 3–4, ¶¶ 23, 31–32.) Defendants contend that Dr. Qiu developed a portion of the TurboTides software

---

[21] Defendants also briefly reference the Court's prior finding during writ of attachment proceedings that Plaintiff does not have a reasonable likelihood of success at trial. (Doc. 272 at 1, n.1); (Doc. 273 at 1 n.1); (*see also* Doc. 223.) This finding does not compel summary judgment for three reasons. First, the Court employs a different standard on summary judgment than at the motion for a pre-judgment writ of attachment stage, and the standard on summary judgment warrants denial of Defendants' motions on several counts. *Compare Ruggieri-Lam v. Oliver Block, LLC*, 120 F. Supp. 3d 400, 405 (D. Vt. 2015) (Crawford, J.) (citation modified) ("Consistent with the view that prejudgment writs of attachment are extraordinary remedies, the court also considers defenses and modifying evidence presented by the defendant.") *with Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 147 (2d Cir. 2024) (citation modified) ("While the Court [on summary judgment] is required to review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."). The Court properly considered disputed evidence in favor of Defendants on Plaintiff's motion for a pre-judgment writ of attachment. Here, the Court may not consider disputed evidence in favor of Defendants on summary judgment. Second, Plaintiff has introduced new evidence supporting its claims on summary judgment in the form of an expert affidavit. (*See generally* Doc. 270-4.) Third, in ruling on Plaintiff's motion for pre-judgment attachment, the Court noted its assessment of the evidence was "necessarily incomplete" and that Plaintiff had a pending motion to compel that could potentially resolve the difficulties Plaintiff experienced obtaining discovery responses from Defendants and Hefei Taize. (Doc. 223 at 5, 7.) After Plaintiff's motion for a pre-judgment writ of attachment was denied, the Court precluded Defendants from introducing any new evidence that they did not properly disclose in discovery. (*See generally* Doc. 258.) The Court's analysis of whether Plaintiff had a "reasonable likelihood" of success at trial may have been different if the preclusive sanction against Defendants applied at that time.

using the ideas in his second, published paper—ideas that were in the public domain. (Doc. 241-1 at 13–14.) Therefore, in Defendants' view, summary judgment is appropriate because Plaintiff has not shown that Dr. Qiu breached the Employment Agreement by stealing confidential information from Concepts.

Defendants offer additional allegedly undisputed facts to support their arguments, including that Dr. Qiu did not take any of the lines of code he wrote at Concepts with him when he left (Doc. 241-3 at 4, ¶ 36); Dr. Qiu did not bring any software with him to Hefei Taize, including any software that he developed while at Concepts, (*id.* at 5, ¶ 45); and Hefei Taize did not use any code developed at or belonging to Concepts, (*id.* at 6, ¶ 49).

Drawing all factual inferences and resolving all ambiguities in Plaintiff's favor, Defendants are not entitled to summary judgment on this claim. Plaintiff has presented sufficient evidence to dispute Defendants' contention that Dr. Qiu did not take any confidential information from Concepts. Critically, Plaintiff has produced evidence that Dr. Qiu took at least one confidential formula owned by Concepts and incorporated it into the TurboTides software. According to Concepts, the "first paper" Defendants discuss in their motions for summary judgment was the Internal Memo Dr. Qiu wrote for Concepts that was never published or disseminated to the public. (Doc. 270-5 at 4–5, ¶¶ 15–18.) Dr. Qiu testified that the Internal Memo described a new unified slip factor model that Dr. Qiu developed for Concepts. (Doc. 171 at 28–30, 104:18–106:6.) The Internal Memo presented the model in its final form as a calculation. (*Id.* at 30, 106:7–9.) Dr. Qiu believed that the slip factor model he developed for Concepts could be beneficial to Concepts' customers. (*Id.* at 30–31, 106:25–107:6.)

Contrary to Defendants' assertions, Plaintiff has produced evidence—in the form of testimony from Dr. Qiu himself—that Dr. Qiu took the confidential slip factor model calculation and incorporated it in the TurboTides software:

> ATTORNEY FAWLEY: Let's look at Exhibit 165, if we could. And just keep in mind this formula that you developed at Concepts. Do you see there the first page of a TurboTides user guide, 5.2.1?
> DR. QIU: Yes.
> ATTORNEY FAWLEY: And this is the guide that purchasers or licensees of TurboTides software used to learn how to operate the software, correct?
> DR. QIU: Yeah.
>
> . . . .
>
> ATTORNEY FAWLEY: I've gone to page 110 of the exhibit. It's 109 of—of the user's manual, as you can see in the upper right-hand corner, and this concerns Chapter 3 or the mean line module of the TurboTides software, correct, Dr. Qiu?
> DR. QIU: Correct.
> ATTORNEY FAWLEY: And if we go down to Section 3.11, we see an introduction of the models used in mean line, correct?
> DR. QIU: Yes.
> ATTORNEY FAWLEY: And under "QiuDev," there are some formulas that are listed there, correct?
> DR. QIU: Correct.
>
> . . . .
>
> ATTORNEY FAWLEY: **Now, this slip factor formula that you developed in the internal memo for Concepts, this shows up here [in the TurboTides user manual] as formula 3.3, correct?**
> DR. QIU: It is not developed in an internal memo. It is—
> ATTORNEY FAWLEY: Dr. Qiu.
> DR. QIU: —published paper.
> ATTORNEY FAWLEY: **Dr. Qiu, Dr. Qiu, is the formula at 3.3 exactly the same formula that we just looked at in the internal memo, calculation number 30, you created at Concepts? Yes or no?**
> DR. QIU: **Yes**.

(*Id.* at 31–32, 107:21–108:4, 108:11–15; 33, 109:12–21) (emphasis added).

This evidence undermines Defendants' summary judgment argument in two ways. First, it disputes one of Defendants' key foundations for summary judgment: that the only ideas from

26

Concepts that Dr. Qiu used to develop the TurboTides software came from his published—and, therefore, not confidential—paper. Second, a rational juror could rely on the contradiction between Dr. Qiu's sworn testimony at a prior hearing and his affidavit at summary judgment to conclude that Dr. Qiu's representations here are not credible. *See Porter*, 92 F.4th at 167–68 (holding that a rational juror is not required to credit self-serving testimony offered to support summary judgment when record contains evidence in favor of other inferences); *see also Demopoulos v. United Metro Energy Corp.*, Case No. 1:19-cv-05289(FB)(RLM), 2022 WL 2390986, at *2 n.1 (E.D.N.Y. July 1, 2022) ("Without making a specific finding, the Court notes that using affidavits to conveniently contradict prior testimony at summary judgment may not be sufficient to support granting the motion.").

Additional evidence in the record would permit a rational juror to conclude that Dr. Qiu breached the Employment Agreement. The Second Amended Complaint provides another basis for Plaintiff's breach of contract claim: that Dr. Qiu developed the TurboTides software, in whole or in part, at Concepts' expense in violation of the Employment Agreement. The Employment Agreement provides that Dr. Qiu would promptly disclose any ideas or inventions related to Concepts' business—including any software—during his period of employment and assign his interests in them to Concepts. (*See* Doc. 52-21 at 3, ¶ 3.)

Dr. Qiu finished working at Concepts in December 2015 and moved from the United States to China in late December 2015. (Doc. 215-2 at 2, ¶ 6); (Doc. 171 at 40, 116:4–25.) Approximately six months passed between Dr. Qiu's last day at Concepts and the date that Hefei Taize registered the copyright for Version 1.0 of the TurboTides software. (Doc. 171 at 42, 118:5–18) (testimony by Dr. Qiu that the copyright to the first version of TurboTides was registered in China on May 25, 2016). Dr. Qiu was heavily involved in the first copyright filing

of the TurboTides software. (*Id.* at 75–76, 151:23–152:20.) Importantly, the copyright was registered *with complete source code* in 2016. (Doc. 215-1 at 18.)[22]

Plaintiff has presented evidence tending to show that it would have been impossible for Dr. Qiu and Hefei Taize to complete the first version of a turbomachinery software such as TurboTides with complete source code in the months after Dr. Qiu left Concepts—and therefore Dr. Qiu must have either taken software code from Concepts or written or directed others to write the TurboTides software while he was still at Concepts. This evidence includes:

- An affidavit from Plaintiff's expert expressing his opinion, to a reasonable degree of professional certainty, that writing even the most rudimentary turbomachinery software with complete source code using a team of 30 code writers would require at least two to five years (Doc. 270-4 at 12, ¶ 90);

- Testimony from Dr. Qiu that the TurboTides software was written by "20 or so full-time talented developers," (Doc. 220-1 at 14, ¶ 3.2), and that the first version of the software took "probably two years" to write from start to finish (Doc. 171 at 39–40, 115:12–116:3);

- Testimony from Dr. Qiu that he did not work on TurboTides while he was caring for his mother from December 2015—March 2016 (*id.* at 41, 116:11–117:10);

- A portion of the TurboTides software version 5.2.1 user manual with a screenshot from TurboTides software version 1.7.3 with a build date of June 26, 2016, suggesting that the TurboTides software must have been very mature in June 2016 to have generated a screenshot that was still in use several versions later (Doc. 270-4 at 11, ¶¶ 84–85; *id.* at 15, ¶ 96);

- An email from Dr. Qiu stating that he began to develop TurboTides in 2012—while he was still at Concepts—with a team of international experts in the field (Doc. 93-2 at 4);

---

[22] Defendants dispute that the TurboTides software copyright was registered "with complete source code"—they rely on Dr. Qiu's affidavit to assert that the TurboTides software at the time of the copyright registration "barely had a skeleton code . . . that consisted of a few thousand lines of code" and "the copyright registration in China only requires 60 pages of non-consequential code in its application." (Doc. 220-1 at 15.) While required to view the record as a whole, at this stage the Court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Porter*, 92 F.4th at 147 (citation modified). Dr. Qiu's Affidavit on this point is inconsistent with the information represented on the Turbo Tides website, which creates a disputed factual issue.

- Language from the Hefei Taize website stating that "[t]he key technology and basic source code of TurboTides originated from the accumulation of decades of core team [sic] in the United States" (Doc. 215-1 at 18); and

- Testimony from a third-party witness that while Dr. Qiu was in the United States he was developing algorithms and potentially doing some coding for the TurboTides software (Doc. 270-12 at 3–4, 21:13–22:23).

In summary, a rational juror drawing all factual inferences in Plaintiff's favor could find that: (1) Dr. Qiu began work on the TurboTides software while he still lived in the United States, potentially as early as 2012; (2) the first version of the TurboTides software took at least two years to complete; (3) in May 2014, two years before the TurboTides software copyright was registered with complete source code, Dr. Qiu was employed at Concepts and would work at Concepts for another year and a half; (4) Dr. Qiu left the United States in December 2015 shortly after his last day at Concepts, significantly limiting the amount of work he could have done on the TurboTides software in the United States after his employment at Concepts ended; (5) Dr. Qiu did no work on TurboTides software from December 2015—March 2016; (6) the TurboTides software was relatively developed by June 2016; and (7) it would have been logistically impossible for Dr. Qiu and Hefei Taize to have created the first version of the TurboTides software in the time between December 2015—when Dr. Qiu left Concepts—and May 25, 2016—when the TurboTides software copyright was registered with complete source code.

Based on the above evidence, a reasonable jury could conclude that Dr. Qiu breached the Employment Agreement by failing to disclose his work on the TurboTides software and by failing to assign his interests in the software to Concepts while he was working at Concepts. Defendants have not met their burden of showing no genuine dispute of material fact entitling them to summary judgment on the breach of contract claims.

The record does contain evidence in favor of Defendants' timeline as well—for example, Dr. Qiu's affidavit averring that the TurboTides software code was *not* complete and was actually quite rudimentary when the copyright was registered in May 2016. (*See* Doc. 220-1 at 15.) Dr. Qiu also states that the first version of the TurboTides software was not complete until the end of 2017. (*Id.* at 14.) But Defendants are not entitled to summary judgment on this record because the Court must consider Plaintiff's contradictory evidence and resolve all ambiguities in favor of Plaintiff as the nonmoving party, including the heavily contested timeline. *See Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 515 (2d Cir. 2023). When factual questions "may reasonably be resolved in favor of either party," summary judgment is not warranted. *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 232 (2d Cir. 2023) (citation modified).

Defendants' remaining arguments for summary judgment on the breach of contract claims are unpersuasive. Defendants argue that Vermont law gives Dr. Qiu the right to use general knowledge and skills acquired at Concepts in his future employment. But this argument does not dispose of the allegation that Dr. Qiu breached the Employment Agreement by failing to disclose his work on the TurboTides software while still at Concepts. Moreover, the Court is not convinced that the confidential "slip factor model" formula—written to perform a specific, highly technical function in the specialized field of turbomachinery—qualifies as "general knowledge and skills" gained during the ordinary course of employment. *See* Restatement (Third) of Unfair Competition § 42 cmt. d (Am. L. Inst. 1995) (suggesting that courts are more likely to recognize "specialized information unique to the employer's business" as protectable trade secrets than "information more widely known in the industry or derived from skills generally possessed by persons employed in the industry.").

Defendants' final argument—that the Employment Agreement does not prohibit Dr. Qiu from creating and selling software similar to the Concepts software after his employment ended—is equally unavailing. Plaintiff alleges that Dr. Qiu did not disclose his ideas or inventions related to Concepts' business while still employed by Concepts and shared at least one confidential formula owned by Concepts with Hefei Taize in violation of the Employment Agreement, not that Dr. Qiu violated a non-compete clause that does not exist. "Employees, whether current or former, have a duty not to use or disclose confidential information imparted to them by their employer." *Omega Optical, Inc. v. Chroma Tech. Corp.*, 800 A.2d 1064, 1066 (Vt. 2002). Defendants have not shown that they are entitled to judgment as a matter of law on Plaintiff's breach of contract claim.

For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's breach of contract claim (Count I) be DENIED.

## II.     Summary judgment should be denied on Plaintiff's claims for breach of software terms and conditions (Count II).

Terms and conditions of software use are agreements subject to contract law. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017); *Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 591 (S.D.N.Y. 2001), *aff'd,* 306 F.3d 17 (2d Cir. 2002); *cf. Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.").

Plaintiffs allege that Defendants breached the terms and conditions of the Concepts software by accessing and using the Concepts software without paying the required licensing fee and in order to obtain information to compete with Concepts. (Doc. 52 at 26, ¶ 102.)

Defendants contend that they are entitled to summary judgment because Plaintiff has provided no evidence that Defendants or Hefei Taize ever actually acquired the Concepts software. (Doc. 241-1 at 16.) Defendants may satisfy their burden on summary judgment by demonstrating that Plaintiff's "evidence is insufficient to establish an essential element" of Plaintiff's claim. *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988). But under Rule 56(a), Defendants must also show that Plaintiff "was obligated by discovery demand or court order to produce the evidence or that [it] voluntarily undertook to make the showing." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017). "If the plaintiff has made an admission in the record of the limited extent of its evidence, the moving defendant can satisfy the showing required by Rule 56(a) by pointing to the plaintiff's admission." *Id.* (citation modified).

Defendants' summary judgment papers are silent as to whether a discovery demand or court order required Plaintiff to produce evidence that Defendants acquired the Concepts software. But Defendants do appear to argue that Plaintiff admitted it lacks evidence that Defendants wrongfully acquired the Concepts software. Defendants' Statements of Material Facts contain only four paragraphs related to the breach of software terms and conditions claim: ¶¶ 13–16. Each paragraph relies on deposition testimony by David Japikse, founder and CEO of Concepts, LLC. According to Defendants, Mr. Japikse testified that:

- "The only perceived wrongdoing by Dr. Qiu that Concepts is aware of" was speculation that Defendants purchased a pirated copy of the Concepts software in China that was publicly available online (Doc. 241-3 at 2, ¶ 13);

- Defendants accessed the "publicly available" Concepts software in Hefei after Hefei Taize had already completed the development of the TurboTides software (*id.* ¶ 14);

- When Defendants allegedly accessed the Concepts software, it was readily available on the internet (*id.* ¶ 15); and

- A "standard supplier," not Defendants, stole the Concepts software (*id.* ¶ 16).

32

In short, Defendants seem to contend that Plaintiff's witness admitted that Defendants did not breach the terms and conditions of the Concepts software because Defendants allegedly purchased a pirated copy of the software that was "publicly available" online; did not steal the software; had already completed the TurboTides software at the time of purchase; and because Plaintiff was aware of no other perceived wrongdoing by Dr. Qiu.

Defendants' argument is unpersuasive for two reasons. First, Defendants' evidence, even if it were undisputed, does not address the basis of Plaintiff's claim. Plaintiffs allege that Defendants breached the terms and conditions of the Concepts software by "surreptitiously and wrongfully accessing and using the Concepts software without paying the required licensing fee and for the purpose of obtaining information with which to compete with Concepts." (Doc. 52 at 26, ¶ 102); (*see also* Doc. 52-20 at 2–3, ¶¶ 1–3). Whether Defendants themselves "stole" the Concepts software or the software Defendants accessed was publicly available online is irrelevant to Plaintiff's claim that Defendants did not pay Plaintiff to use the Concepts software and used the software to directly compete with Concepts in violation of the terms of service.

Second, Defendants' cited record evidence does not substantiate their positions. The Court again notes that Defendants' Statements of Material Facts in multiple paragraphs does not comply with Local Rule 56(c) by neglecting to cite the specific document in the record where the Court could find Mr. Japikse's deposition. (*See, e.g.*, Doc. 241-3 at 2, ¶ 13 (citing deposition transcript as "Japikse, PP. 101-102")). Nevertheless, Mr. Japikse's deposition testimony does not support Defendants' assertions. For example, Mr. Japikse did not testify that "the only perceived wrongdoing by Dr. Qiu that Concepts is aware of [is] speculation that Defendants had purchased a pirated copy of the Concepts software in China that was publicly available on the internet." (*Id.*) Mr. Japikse only testified that he was not aware of anyone investigating Dr. Qiu for theft of

trade secrets from Concepts before this lawsuit was filed. (Doc. 220-8 at 27, 102:3–18.) And as Plaintiff observes, Mr. Japikse was deposed in his individual capacity, not as a designated corporate witness under Rule 30(b)(6). (*See, e.g.*, Doc. 270-1 at 36, ¶ 79.) Therefore, his personal lack of knowledge will not be imputed to the organization for summary judgment purposes. Nor does Mr. Japikse testify that Defendants accessed the Concepts software only after completing work on the TurboTides software or that Plaintiff's perception of Dr. Qiu's wrongdoing was limited to a purchase of a pirated copy of the Concepts software. (Doc. 220-8 at 27, 102:3–18.)

For these reasons, I recommend that Defendants' Motion for Summary Judgment on Plaintiff's breach of software terms and conditions claim (Count II) be DENIED.

## III.    Summary judgment should be denied on Plaintiff's claims for copyright infringement (Count III).

Plaintiff brings claims for copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 101 *et seq*. (Doc. 52 at 27, ¶¶ 104–114.) A copyright infringement claim requires a plaintiff to show: (1) which specific original works are the subject of the copyright claim; (2) that plaintiff owns the copyrights in those works; (3) that the copyrights have been registered in accordance with the statute; and (4) by what acts during what time the defendant infringed the copyright. *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992), *aff'd*, 23 F.3d 398 (2d Cir. 1994).

On this claim, Defendants first assert that Concepts "pivoted from" claiming that Defendants misappropriated all of Concepts' copyrighted source code to claiming that Dr. Qiu only took "a small piece of demonstrative single-zone code" (the "demonstrative code") that he wrote "to implement Dr. Aungier's engineering formulas." (Doc. 241-1 at 16–17.) According to Defendants, Concepts did not plead this claim, and even if it had, the undisputed evidence shows that Dr. Qiu did not take Concepts' software code. (*Id.* at 17.) Defendants also assert that

34

Concepts did not identify the "demonstrative code" in its discovery responses. (*Id.*) Defendants further argue that Concepts did not show that it copyrighted the "demonstrative code" because it saw no value in the code. (*Id.*) Defendants also argue that Plaintiff does not allege that Defendants infringed Plaintiff's copyright because Plaintiff contends that Defendants, at most, showed Hefei Taize the "demonstrative code" rather than using the code. (*Id.*) Finally, even if Plaintiff had shown that it copyrighted the "demonstrative code," Defendants' alleged use of the code is lawful under the "fair use" doctrine. (*Id.* at 17–18.)

## A.    Whether Plaintiff Narrowed the Scope of its Copyright Infringement Claim

Defendants misconstrue Plaintiff's copyright infringement claim. The Second Amended Complaint explicitly sets out the basis for the claim: that Defendants "copied and distributed copies of all or parts of the Concepts software, prepared one or more derivative works based upon the Concepts software, distributed copies of such derivative works, and/or otherwise used all or parts of the Concepts software in violation of" the Copyright Act. (Doc. 52 at 27, ¶ 109.) At no point does the Second Amended Complaint limit the scope of the copyright infringement claim to "a small piece" of demonstrative code.

Defendants' argument that Plaintiff "pivoted from" its framing of the claim in the Second Amended Complaint relies on a short conversation between Plaintiff's counsel and the Court at a status conference in 2022:

> THE COURT: Right. So, if you had that software, you could, not to simplify it too much, you could compare their product with your product, and the expert could say there's substantial overlap or, no, one is from Mars, and one is from Jupiter?

> ATTORNEY FAWLEY: It actually is, it's a little different than that. I, I agree with Your Honor, but what happened was Mr. Qiu was developing a software while he was at Concepts, and he shared it with the folks at Concepts and said, Gee whiz, wouldn't this be nice to have? Look what I developed at work. Here's an improvement on the Concepts software. And he was, it was respected, but set aside as not something they wanted to, to, to develop at that point.

. . . .

THE COURT: All right. I think I understand what you're saying. So, from your perspective, Mr. Qiu came up with a good idea, but his bosses at Concepts said, No, no, no, that's very interesting, but we have a better idea or we're going in a different direction, and he left the company and has promoted his good idea, and you're upset because it was developed on Concepts's nickel?

ATTORNEY FAWLEY: Yeah. He signed a contract with us that said anything he created while he was at Concepts was our property.

(Doc. 241-3 at 9, ¶¶ 77–78.)

The Court interprets this exchange differently. In context, it appears that counsel for Plaintiff was clarifying that Plaintiff sought to hold Defendants liable under two different theories: (1) copying all or part of Concepts' software code; and (2) developing a competing software while employed by Concepts:

ATTORNEY FAWLEY: [Dr. Qiu] took that, he took that what he had developed at Concepts, and it now shows up in the TurboTides software. So looking at the current Concepts software and comparing it to the TurboTides software may not show—

THE COURT: I get it.

ATTORNEY FAWLEY: —a match. I don't know. **But we know that** from the owner's manuals and other documents that TurboTides released to its customers which we now have copies of that **some of the formulas and other information within the TurboTides software are precisely the same information and formulas that he had, Mr. Qiu, had developed while he was at Concepts**. . . .

. . . .

THE COURT: All right, so it isn't that, that the two, that he stole and that he's running the same program that you're running. It's, it's a different program that he developed, from your perspective, while he was with you?

ATTORNEY FAWLEY: That's true. **But we don't know whether or not their current software actually does have other features that are the same as our current software, because we don't have the code, and we don't have the software.**

(Doc. 159-1 at 32, 31:8–20; *id.* at 33, 32:6–13 (emphasis added).)

In any event, the Second Amended Complaint sets the boundaries of Plaintiff's claims—not comments by counsel in a non-evidentiary proceeding. *Cf. United Prob. Officers Ass'n v. City of New York*, No. 21-cv-0218 (RA), 2022 WL 875864, at *8 n.9 (S.D.N.Y. Mar. 24, 2022) ("Plaintiffs may not amend their pleading through statements made at argument.") Plaintiff has pleaded that Defendants used all or some of the Concepts software code in violation of the Copyright Act. Defendants' repeated insistence to the contrary has no merit.[23]

### B. Whether a Dispute of Fact Exists Regarding Defendants' Alleged Use of the Copyrighted Concepts Software Code

Defendants contend that the undisputed record evidence shows Dr. Qiu did not take any software code from Concepts. (*See* Doc. 241-3 ¶¶ 36, 45, 49, 61.) Defendants allege that Dr. Qiu did not take any code he wrote at Concepts with him when he left; that he did not bring any software or code at all to Hefei Taize; and that Hefei Taize did not use any code owned by Concepts. Most, if not all, of Defendants' evidence on these points consists of sworn statements from Dr. Qiu himself.

As discussed in detail in Section I above, Plaintiff has presented evidence that Hefei Taize could not have created the TurboTides software from scratch in the few months between Dr. Qiu leaving Concepts and Hefei Taize copyrighting the first version of the TurboTides software "with complete source code." And Plaintiff also presented evidence that the TurboTides software uses at least one formula owned by Plaintiff—the slip factor model Dr. Qiu presented in Concepts' confidential Internal Memo. Moreover, a jury would not be required to believe Dr. Qiu's testimony. *See Porter*, 92 F.4th at 167. A reasonable juror drawing all factual inferences in Plaintiff's favor could infer that Hefei Taize completed the TurboTides software so quickly

---

[23] This is not the first time Defendants have made this argument without success. (*See, e.g.*, Doc. 159 at 2); (Doc. 220 at 3.)

because Dr. Qiu took code from the Concepts software and gave it to Hefei Taize to incorporate into the TurboTides software.

Defendants also argue that they are entitled to summary judgment on Plaintiff's copyright infringement claim because Plaintiff has not alleged that it holds the copyright to the "demonstrative code" and because Plaintiff did not identify the "demonstrative code" in its discovery responses. (Doc. 241-1 at 17); (Doc. 241-3 at 10, ¶ 84.) But Plaintiff's copyright infringement claim is not merely based on a string of "demonstrative code." The Second Amended Complaint alleges that Defendants unlawfully used "all or parts of the Concepts Software." (Doc. 52 at 27, ¶ 109.) Defendants do not contend that Plaintiff does not own the copyright to the Concepts software. Nor do they challenge Plaintiff's responses to any discovery requests about the Concepts software. In other words, even if Defendants succeed on their arguments regarding the "demonstrative code," they still have not shown that they are entitled to judgment on Plaintiff's copyright infringement claim.

### C. Whether Defendants' Alleged Use of Plaintiff's Software Code Is Protected Under the Fair Use Doctrine

The fair use doctrine "seeks to strike a balance" between a creator's "intellectual property rights to the fruits of [its] own creative labor . . . and the ability of other authors, artists, and the rest of us to express them- or ourselves by reference to the works of others." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 36 (2d Cir. 2021) (citation modified), *aff'd sub nom. Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023). Fair use is an affirmative defense to copyright infringement. 17 U.S.C. § 107; *see also Goldsmith*, 11 F.4th at 49. Thus, "the ultimate burden of proving" fair use "is appropriately borne by the party asserting the defense." *Goldsmith*, 11 F.4th at 49.

A court evaluating the fair-use defense shall consider a non-exclusive list of four factors:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Defendants contend that, assuming that the code at issue was copyrighted and Defendants' actions as pleaded rise to the level of an "infringement," Defendants are entitled to judgment based on fair use. (Doc. 241-1 at 17.) According to Defendants, Hefei Taize's use of Plaintiff's code was "transformative" because it created an "entirely new software program" in "an entirely different software language" and "add[ed] something new, with a further purpose." (*Id.* at 18.) Defendants further assert that the demonstrative code was not used in the TurboTides software and that the demonstrative code is "very small" relative to the overall body of code in the TurboTides software. (*Id.*) Defendants also argue that the "market effect" factor favors summary judgment because Concepts "saw no market value in the code and confirmed with its clients that they had no interest in such software solution." (*Id.*)

Defendants have not met their burden of showing fair use. Defendants incorrectly maintain that the only relevant code at issue is the so-called "demonstrative code"—Plaintiff has pleaded that Defendants unlawfully used "all or parts of the Concepts software." (Doc. 52 at 52, ¶ 109.) And every allegation Defendants rely on to argue fair use is either disputed or absent from the record. Plaintiff strenuously disagrees that Defendants created "an entirely new software program." (*See* Doc. 270-1 at 8–9.) Plaintiff also argues that the fact that the Concepts software and the TurboTides software are written in different coding languages does not mean

that Defendants could not have "copied" Plaintiff's code. (*Id.* at 26, ¶ 37); (Doc. 222-1 at 2, ¶¶ 6–8.)

Defendants do not provide a record citation for their assertions that the TurboTides software did not use the "demonstrative code" owned by Concepts or that the TurboTides software is significantly larger than the "demonstrative code." If Defendants are relying on Dr. Qiu's sworn statements that he did not take any of Plaintiff's code to Hefei Taize, Plaintiff has raised a disputed issue of material fact on this issue, as discussed in Section I above. Further, the lack of record evidence comparing the extent of the similarities and differences between the Concepts software code and the TurboTides software code stems in large part from Defendants' refusal to provide that information in discovery.

Finally, Defendants point to no evidence that their alleged use of part or all of the Concepts software code did not impact the market for or value of the Concepts software. Defendants do allege that Plaintiff saw little market value in the "demonstrative code." But again, the "demonstrative code" is not the basis of Plaintiff's copyright infringement claim. And even if it were, Plaintiff's subjective assessment of the code's value at the time that Dr. Qiu worked for Concepts does not establish the actual market value of the code or provide insight into the market value of the code when Hefei Taize allegedly unlawfully incorporated it into the TurboTides software several years later. Therefore, Defendants have not shown that their alleged infringement was fair use as a matter of law.

For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's copyright infringement claims (Count III) be DENIED.

IV.    **Summary judgment should be denied on Plaintiff's claims for misappropriation of trade secrets (Count IV).**

Vermont's Uniform Trade Secrets Act protects against actual or threatened

misappropriation of trade secrets and allows a successful plaintiff to recover damages. 9 V.S.A.

§§ 4601–09. A plaintiff must show misappropriation of a trade secret through improper means.

The Act defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>     (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>     (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 4601(3).

Misappropriation includes "acquisition" or "use . . . without express or implied consent"

of a trade secret "by a person who knows or has reason to know that the trade secret was

acquired by improper means." *Id.* § 4601(2). "Improper means" can include "misrepresentation"

or "breach or inducement of a breach of a duty to maintain secrecy." *Id.* § 4601(1).

Defendants request summary judgment on these claims for several reasons. First,

Defendants argue that Plaintiff has no "specific knowledge of Dr. Qiu taking any code he

developed while at Concepts." (Doc. 241-1 at 19.) Defendants next contend that Plaintiff's trade

secrets claim relies in part on Dr. Qiu's 2010 paper regarding the "use of Dr. Aungier's formulas

for solving engineering problems"—a paper that included "public formulas," was presented at a

conference, and is currently available online. (*Id.* at 19–20.) Finally, Defendants argue that they

could not have misappropriated any trade secrets by allegedly accessing a pirated copy of the

Concepts software online because: (1) the alleged review of the pirated Concepts software

occurred two years after Hefei Taize completed the TurboTides software; (2) viewing the

Concepts software could not have given Defendants access to the Concepts software source code; (3) Concepts concedes that its software was available on the internet; and (4) Concepts acknowledges that Hefei Taize did not copy its code. (*Id.* at 20–21.)

Defendants have not met their burden to show an absence of a genuine dispute of material fact on Plaintiff's trade secrets claim. First, as discussed in more detail in section I, Plaintiff does dispute Defendants' assertion that Plaintiff lacks "specific knowledge of Dr. Qiu taking any code he developed while at Concepts." Moreover, Defendants have not cited record evidence to substantiate this assertion. To the extent Defendants rely on the deposition testimony of Mr. Japikse, it is inadequate to warrant summary judgment. As discussed in section II above, Mr. Japikse (the founder, CEO, and Chairman of the Board of Concepts) testified in his individual capacity, not as a designated corporate witness under Rule 30(b)(6). (*See, e.g.*, Doc. 270-1 at 36, ¶ 79.) Therefore, even if Mr. Japikse himself did not personally know of Dr. Qiu taking any code, Defendants have not shown that Plaintiff as an organization also lacked that knowledge.

As to Defendants' second argument, Defendants have not shown that Plaintiff's trade secrets claim fails because it is based in part on a published, widely available paper—a paper that, presumably, cannot contain trade secrets by virtue of its public accessibility.[24] Defendants mischaracterize Plaintiff's claim in several important ways. Defendants name three different papers drafted by Dr. Qiu but, for reasons that are unclear, treat the papers interchangeably in

---

[24] In support of this argument, Defendants cite several lengthy documents in the record without pincites, including an 18-page document (Doc. 220-1) and a 37-page document (Doc. 220-4). (Doc. 241-1 at 20.) The Court has made every effort to identify the specific portions of the record on which Defendants rely.

their analysis—even though several papers are publicly available and one is not.[25] Because Defendants do not distinguish among the papers, they mistakenly assert that Mr. Japikse testified that a confidential internal memo—one that Defendants state has been "designated 'Highly Confidential-Attorney's Eyes Only" and filed under seal in this case—was presented at a conference and contained information from public sources. (Doc. 241-1 at 20.) But Mr. Japikse actually testified that a different paper titled "A New Slip Factor Model for Axial and Radial Impellers"—not the confidential Internal Memo—was presented at an ASME conference and made available to all members of the ASME. (Doc. 220-8 at 38, 147:5–148:10.) As discussed above in section I, Plaintiff has offered evidence that the confidential Internal Memo was never published or distributed to the public. (Doc. 270-5 at 5–6, ¶¶ 15–18.) In short, Defendants have not defeated Plaintiff's trade secrets claim based on Dr. Qiu's papers because at least one of the papers contains information that, according to Plaintiff, has never been made public.

Finally, Defendants have not defeated the portion of Plaintiff's trade secrets claim based on Defendants allegedly misappropriating the Concepts software. (Doc. 52 at 22, ¶¶ 77–81; *id.* at 29, ¶ 120.) Defendants' first argument on this point—that Plaintiffs only allege Defendants accessed the Concepts software two years after Hefei Taize completed the TurboTides software and began selling it in the United States—falls to the plain language of Vermont's trade secrets law. The statute prohibits the wrongful "acquisition [of a trade secret] . . . by a person who knows or has reason to know that the trade secret was acquired by improper means," not merely

---

[25] Defendants also suggest that there are only two relevant papers, (*id.* ("Neither paper discusses the structuring or writing [of] source code.")), but in the same section they name three different papers. The three named papers are: (1) *An Integrated Design System For TurboMachinery* (published in 2010, presented at the 9th International Conference on Hydrodynamics, and available online) (Doc. 220-10 at 2); (2) *Designing Turbochargers With An Integrated Design System* (published June 2013 and available online) (*see generally* Doc. 270-9); and (3) *Alternative Meanline Modeling for Axial and Radial Impellers* (filed under seal, confidential technical memo prepared by Dr. Qiu for internal review at Concepts in August 2007) (Doc. 220-11). The Court at times refers to the paper titled *Alternative Meanline Modeling for Axial and Radial Impellers* as the "Internal Memo" in this Report and Recommendation.

its use. 9 V.S.A. § 4601(2). And even if, as Defendants argue, reviewing a pirated copy of the Concepts software would not expose its underlying source code, source code is not the only potential trade secret contained within the Concepts software. (Doc. 52 at 8, ¶ 18 (stating the Concepts software contains "information, designs, and processes" that qualify as trade secrets); *id.* at 23, ¶ 81 (alleging that Defendants accessed a pirated copy of the Concepts software "for the purpose of surreptitiously obtaining confidential Trade Secret information about the Concepts Software and/or reverse engineering the Concepts Software for a wrongful commercial purpose, profit, and competitive advantage")); *see also* 9 V.S.A. § 4601(3) (defining "trade secret" to include "a formula, pattern, compilation, program, device, method, technique, or process"). Defendants have also failed to support their assertion that the Concepts software was "available on the internet (publicly known)." (Doc. 241-1 at 21.) Their citation only shows that Mr. Japikse testified that *stolen* copies of the Concepts software are available for purchase online. (Doc. 220-8 at 27, 103:12–24); *see also* 9 V.S.A. § 4601(3) (defining trade secrets in part as information not "readily ascertainable *by proper means*" (emphasis added)). Finally, as discussed above, Plaintiff does dispute, based on reasonable inferences from the record evidence, Defendants' allegation that Hefei Taize did not copy Plaintiff's code.[26]

For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's misappropriation of trade secrets claims (Count IV) be DENIED.[27]

---

[26] Defendants generally cite a 40-page document to support this argument. (*See generally* Doc. 159-1.) Based on arguments that Defendants have raised previously, the Court gathers that Defendants refer to a portion of an exchange between Plaintiff's counsel and the Court at a status conference on May 17, 2022. (*Id.* at 31–33.) As discussed in more detail in section III.A., the Court disagrees with Defendants' conclusion that Attorney Fawley's comments concede that Hefei Taize did not copy any of Plaintiff's code. (*See, e.g.*, Doc. 271-1 at 15, ¶ 24.)

[27] Defendants also renew their argument about the "demonstrative code" to request summary judgment on the trade secrets claim. This argument is without merit for the reasons discussed in section III.C.

V.    **Summary judgment should be denied on Plaintiff's claims for common law conversion (Count V).**

Defendants contend that there are "<u>no</u> allegations or facts presented that Defendants appropriated and exercised domain over any trade secret in defiance of Plaintiff's rights." (Doc. 241-1 at 21). As the common law of conversion Defendants cite refers to appropriation and the exercise of dominion over *property*, it is not clear why Defendants argue the conversion issue in terms of a "trade secret." In any event, Defendants are not entitled to summary judgment on the conversion claims.

To establish a claim for conversion, a plaintiff "must show only that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title." *Montgomery v. Devoid*, 2006 VT 127, ¶ 12, 181 Vt. 154, 915 A.2d 270. "The key element of conversion, therefore, is the wrongful exercise of dominion over property of another." *Id.* Conversion under Vermont law is consistent with the Restatement (Second) of Torts § 222A(1), which defines conversion as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."[28] *Montgomery*, 2006 VT at ¶ 12.

---

[28]    The tort of conversion "traditionally applied only to tangible goods but has since expanded to include intangibles merged in documents such as bonds, stock certificates, bills of exchange, money, and negotiable instruments." *Id.* n.1 (citation modified). "Although the Vermont Supreme Court has not addressed the issue in any depth, it has permitted a conversion claim that seeks to recover only money." *Gaffney v. Thandi*, Case No. 2:20-CV-00173, 2023 WL 4685750, at *8 (D. Vt. July 21, 2023) (citation modified). However, although "all jurisdictions have gone beyond the most rigid limitations to recognize conversion of some intangible property rights, only a few states have fully recognized conversion of electronic data such as domain names and computer-stored data." Deborah F. Buckman, Annotation, *Conversion of Electronic Data, Including Domain Names*, 40 A.L.R.6th 295 (originally published in 2008). The Vermont Supreme Court has not yet addressed whether electronic data such as source code can be the subject of a conversion claim. The Court need not consider that question here because Defendants have not argued that software source code does not constitute property subject to a conversion claim. Instead, Defendants contend that "[n]o facts have been presented by Concepts that Dr. Qiu's ideas were merged into

45

As discussed above, Plaintiff maintains that Dr. Qiu created portions of the TurboTides software and code while employed at Concepts. By signing the Employment Agreement, Dr. Qiu agreed to "promptly disclose to [Concepts] any and all ideas, inventions, discoveries, developments, or improvements conceived or made by [him] during the period of employment and related to the business or activities of [Concepts]" and that he "will assign and hereby agree[s] to assign all [his] interests therein" to Plaintiff. (Doc. 52-21 at 3, ¶ 3.) In other words, Plaintiff alleges that Dr. Qiu authored some of the software code that became the TurboTides software while employed by Concepts; that the Employment Agreement entitles Plaintiff to all property interest in that code; that Defendants possess that code on physical media; and that these acts have unlawfully deprived Plaintiff of possession of the code. (Doc. 52 at 15–20, ¶¶ 49–66.) Plaintiff further alleges that Dr. Qiu took some or all of the Concepts software code with him after he left Concepts. (*Id.* at 15, ¶¶ 51–52.) Plaintiff also posits that Defendants' alleged purchase of pirated Concepts software qualifies as conversion. (*Id.* at 30, ¶¶ 128–130.)

To the extent Defendants argue that Plaintiff lacks evidence of unlawful conversion sufficient to survive summary judgment, the argument is not persuasive. As discussed in section II, Defendants must show Plaintiff "was obligated by discovery demand or court order to produce the evidence or that [it] voluntarily undertook to make the showing." *Nick's Garage, Inc.*, 875 F.3d at 115. Defendants' motions and statements of undisputed facts do neither.

For these reasons, I recommend that Defendants' Motion for Summary Judgment on Plaintiff's claims of conversion (Count V) be DENIED.

---

[Concepts'] software or that Defendants took possession of the piece of demonstrative code and denied Concepts possession of the code. Concepts has made no contention or offered any evidence that it has not been able to use its code or utilize the ideas of Dr. Qiu or that Dr. Qiu or Hefei integrated the demonstrative code into the TurboTides software." (Doc. 292 at 3.)

VI.    **Summary judgment should be granted on Plaintiff's claim of unjust enrichment (Count VI) with respect to Dr. Qiu.**

The doctrine of unjust enrichment "rests upon the principle that one should not be allowed to enrich oneself unjustly at the expense of another." *Pettersen v. Monaghan Safar Ducham PLLC*, 2021 VT 16, ¶ 16, 214 Vt. 269, 256 A.3d 604 (citation modified). To succeed on a claim of unjust enrichment, a plaintiff must show: "(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." *Dewdney v. Duncan*, 2025 VT 26, ¶ 29, __ Vt. __, __ A.2d __.

In *Beldock v. VWSD, LLC*, the Vermont Supreme Court adopted the rule that "an unjust-enrichment claim cannot be maintained where a valid, enforceable contract between the parties exists." 2023 VT 35, ¶¶ 75, 78, 218 Vt. 144, 307 A.3d 209. However, the Court noted that "the rule is not absolute"—a valid contract only displaces inquiry into a claim of unjust enrichment "as to matters within its scope." *Id.* at ¶ 75 (citation modified). "Consequently, unjust enrichment applies in the contract context only when a party renders a valuable performance or confers a benefit upon another under a contract that is invalid, voidable, or otherwise ineffective to regulate the parties' obligations." *Id.* at ¶ 77 (citation modified).

Plaintiff brings unjust enrichment claims against Defendants Qiu and TurboTides, Inc. The parties do not appear to dispute that Plaintiff and Dr. Qiu entered into a valid and enforceable contract in the form of the Employment Agreement. (*See generally* Doc. 52-21.) Plaintiff implicitly acknowledges the enforceability of the Employment Agreement by pursuing a breach of contract claim against Defendants under the Agreement. (Doc. 52 at 23–26, ¶¶ 82–98.) Defendants contest the interpretation of the Agreement and whether Dr. Qiu breached the Agreement, not the validity of the Agreement itself. (*See, e.g.*, Doc. 241-1 at 13–14) ("Concepts

claims that Dr. Qiu violated his employment agreement . . . [Dr. Qiu was not] subject to any agreement prohibiting him from competing with Concepts . . . The [Employment Agreement] is an NDA in the employment context."). And no party has identified evidence in the record that the Employment Agreement is invalid or unenforceable. Therefore, Plaintiff may not maintain an unjust enrichment claim as to any matters within the scope of the Employment Agreement.

The Second Amended Complaint alleges that "Defendants Qiu and TurboTides knowingly obtained business-related benefits from Concepts to which they were not entitled in the form of Concepts Non-Software Trade Secrets and Software Trade Secrets." (Doc. 52 at 31, ¶ 138.) The Second Amended Complaint defines "Concepts Software Trade Secrets" as "information, designs, and processes" contained in the Concepts Software, (*id.* at 8, ¶ 18), and "The Non-Software Concepts Trade Secrets" as "confidential information about [Concepts'] business, its customers, its potential customers, its pricing models, its long[-]term objectives, its operations, and its pricing," (*id.* at 9, ¶ 23).

The allegations supporting Plaintiff's unjust enrichment claim against Dr. Qiu fall squarely within the scope of the Employment Agreement. The Agreement's purpose is to "recognize [Plaintiff's] legitimate interest in protecting Confidential Technology and Information" its employees "may learn and make use of," including "sensitive and commercially valuable business and technical information which is confidential in nature and in some cases constitutes trade secrets and practices" of Plaintiff or Plaintiff's clients. (Doc. 52-21 at 2.) The Agreement lists examples of confidential information protected by the Agreement, including in part:

- Computer programs (source code, object code, and code portions);
- Computer program and system
- documentation;
- Program capabilities;
- Algorithms;
- Methods;

- Inventions;
- Trade secrets and practices;

- Business, marketing, and advertising information and plans;
- Customer, vendor, or consultant

- identifications;
- Development plans;
- Product information; and
- Information concerning the nature or direction of research and development activities.

(*Id.*) By signing the Agreement, the employee agrees not to "disclose or use, nor solicit nor assist another to use or disclose, at any time . . . any Confidential Technology and Information of [Plaintiff], or [Plaintiff's] clients or business parties" without consent. (*Id.* at 3.) The Agreement also provides remedies in case of a breach:

> 10. Violation of this Agreement shall be grounds for immediate termination of employment by [Plaintiff]. The undersigned employee understands that money damages may not adequately compensate [Plaintiff] for any violation of this Agreement, or that money damages may not be readily calculable, and [Plaintiff] therefore also reserves, in addition to all rights it has and may have in law or in equity, the right to enjoin, or seek damages or other remedies for, [the employee's] actions violating this Agreement.

(*Id.* ¶ 10.)

In short, the Employment Agreement governs the dispute underlying Plaintiff's unjust enrichment claim—whether Defendants wrongfully used and profited from the use of certain confidential information about the Concepts software and Plaintiff's business operations. Accordingly, Plaintiff's unjust enrichment claim against Dr. Qiu is precluded by the Employment Agreement.[29]

However, at this stage the Court cannot find that the Employment Agreement precludes Plaintiff's unjust enrichment claim against Defendant TurboTides, Inc. As Plaintiff's counsel noted at oral argument on March 12, 2025, Defendant TurboTides, Inc., is not a party to the Employment Agreement. If TurboTides, Inc. is found to be Dr. Qiu's alter ego at trial, the

---

[29] Plaintiff acknowledges that "the scope of Defendant Qiu's Employment Contract with Concepts (Doc. 52-21) does displace Concepts' unjust enrichment claim against him individually." (Doc. 293 at 4.)

Employment Agreement may preclude Plaintiff's unjust enrichment claim against TurboTides, Inc. But if there is no finding that TurboTides, Inc. is Dr. Qiu's alter ego, there would be no "valid, enforceable contract" between TurboTides, Inc. and Plaintiff that would preclude the unjust enrichment claim. *See Beldock*, 2023 VT at ¶ 75.

For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's claims of unjust enrichment (Count VI) be GRANTED as to Defendant Qiu and DENIED as to Defendant TurboTides, Inc.

**VII.     Summary judgment should be granted on Plaintiff's claims of unfair and deceptive trade practices under the Vermont Consumer Protection Act, 9 V.S.A. § 2453 (Count VII).**

Defendants request summary judgment on Plaintiff's claim for unfair and deceptive trade practices under the Vermont Consumer Protection Act ("VCPA") because "the matters pled by Plaintiff are not within the context of a consumer transaction and thus are not covered by the Act." (Doc. 241-1 at 22–23.) The Court agrees.

As a threshold matter, Plaintiff argues that Defendants' argument "is improperly made and untimely" under Rule 12(h)(2). (Doc. 270 at 21.) However, "a motion for summary judgment may be made solely on the pleadings; when it is so made it is functionally the same as a motion to dismiss or a motion for judgment on the pleadings." *Muntaqim v. Coombe*, 366 F.3d 102, 106 (2d Cir. 2004) (citation modified), *rev'd on other grounds*, 449 F.3d 371 (2d Cir. 2006). Thus, the Court will consider Defendants' argument that Plaintiff has not adequately pleaded its claim under the VCPA.

The VCPA only addresses transactions that take place "in commerce." *MyWebGrocer, Inc. v. Adlife Mktg. & Commc'ns Co.*, 383 F. Supp. 3d 307, 314 (D. Vt. 2019) (Crawford, J.). Vermont courts consider two factors in assessing whether transactions occur "in commerce." First, "the transaction must take place in the context of an ongoing business in which the

defendant holds himself out to the public." *Id.* (citation modified). Second, "the practice must have a potential harmful effect on the consuming public, and thus constitute a breach of a duty owed to consumers in general." *Id.*

However, "transactions resulting not from the conduct of any trade or business but rather from private negotiations between two individual parties who have countervailing rights and liberties established under common law principles of contract, tort and property law remain beyond the purview" of the VCPA. *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 21, 195 Vt. 524, 90 A.3d 885 (2013) (citation modified).

Plaintiff has not adequately pleaded that Defendants' unlawful acts took place "in commerce." Nothing in the Second Amended Complaint suggests that Defendants' "wrongful access to and use of the Concepts Non-Software Trade Secrets and Software Trade Secrets in order to establish and operate their business and to compete with Concepts" had any potentially harmful effect on consumers or breached a duty owed to consumers. (*See* Doc. 52 at 32, ¶ 142.) On the contrary, Plaintiff's Second Amended Complaint squarely describes a conflict between individual parties with rights established under contracts—the Employment Agreement and the Concepts software terms of service. In other words, Plaintiff has alleged that Defendants' unlawful use of Plaintiff's trade secrets breached a duty owed to Plaintiff, but it does not explain how Defendants breached any duty owed to consumers.

Moreover, neither of these transactions took place in the context of an ongoing business in which Defendants held themselves out to the public. Dr. Qiu signed the Employment Agreement as an individual, not a business. And if Defendants "obtained or purchased an illegally pirated copy of the Concepts Software" to use for "surreptitiously obtaining confidential Trade Secret information about the Concepts Software and/or reverse engineering the Concepts

software," as Plaintiff alleges, such a use could only damage Plaintiff, not any consumers in the marketplace. (*See id.* at 22–23, ¶¶ 77–81); *see also MyWebGrocer, Inc.*, 383 F. Supp. 3d at 314 (finding that allegations that defendant tracked the use by third parties of images it allegedly owns and sought to recover money from those third parties who may actually owe it little or nothing adequately supported claim that defendant was engaged "in commerce" for purposes of the VCPA).

Plaintiff accurately recites the two requirements for a transaction to be "in commerce" but only addresses one of the two in its briefing. While Plaintiff maintains that Defendants "have an ongoing business that is in direct competition with Concepts for the sale and licensing of turbomachinery software to consumers everywhere," it does not argue that Defendants' business has a potentially harmful effect on the consuming public or breaches a duty to consumers. (Doc. 293 at 5) (citation modified). But any claim under the VCPA must include some form of breach or harm to consumers because of the VCPA's "underlying purpose of consumer protection." *See Foti Fuels, Inc.*, 2013 VT at ¶ 22 (noting that Vermont case law requires plaintiffs to prove that they are consumers to recover under consumer protection scheme, articulates test for "deceptive" acts or practices that emphasizes effects on consumers, and adopts formulation of factors emphasizing public policy and injury to consumers); *see also id. at* ¶ 20 (relying on Nebraska case holding that state consumer fraud statute prohibits acts or practices that affect public interest).

During oral argument, Plaintiff cited *Lafayette v. Blueprint Basketball*, No. 24-AP-127, 2024 WL 4471988 (Vt. Oct. 11, 2024) (unpublished entry order), to support the argument that Defendants' alleged conduct comes within the scope of the VCPA, specifically quoting the case's holding that "a private plaintiff need not meet the statutory definition of 'consumer' to

challenge anticompetitive conduct under the VCPA. . . ." *Id.* at *2; *see also* 9 V.S.A. § 2451a(1) (defining "consumer" under the VCPA). Plaintiff thus contends that it adequately pleaded all the elements of a VCPA claim challenging anticompetitive conduct under *Lafayette*.

*Lafayette* upheld the trial court's dismissal of a private plaintiff's claim challenging anti-competitive behavior under the VCPA because he "failed to plead unfair methods of competition <u>in commerce</u>"—that is, he did not "allege any of the various forms of unfair competition in commerce prohibited by the statute, such as predatory pricing, price-fixing, or monopolization." *Id.* at *2–3 (emphasis in original) (citation modified). Even if Plaintiff meets the statutory definition of a "consumer" under the VCPA, Plaintiff has not pleaded that Defendants' alleged conduct took place "in commerce." Therefore, Plaintiff has not adequately stated a claim under the VCPA.

"In purely private transactions, remedies available through well-established principles of contract, tort, and property law are adequate to redress wrongs." *Foti*, 2013 VT at ¶ 24. Such is the case here. For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's claims of unfair and deceptive trade practices under the VCPA (Count VII) be GRANTED.

## VIII. Summary judgment should be granted on Plaintiff's claims of tortious interference with business relations and prospective economic advantage (Count VIII).

Defendants argue that Plaintiff has not adequately pleaded any elements of tortious interference with prospective economic advantage. (Doc. 241-1 at 23.) Plaintiff responds that Defendants' argument "is improperly made and untimely" under Rule 12(h)(2). (Doc. 270 at 22.) As noted, however, "a motion for summary judgment may be made solely on the pleadings; when it is so made it is functionally the same as a motion to dismiss or a motion for judgment on the pleadings." *Muntaqim*, 366 F.3d at 106 (citation modified).

Under Vermont law, a plaintiff claiming tortious interference with business relations and prospective economic advantage[30] must show:

> (1) the existence of a valid business relationship or expectancy; (2) knowledge by the defendant of the relationship or expectancy; (3) an intentional act of interference on the part of the defendant; (4) that the defendant interfered either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or improper; (5) damage to the party whose relationship or expectancy was disrupted; and (6) proof that the interference caused the harm sustained.

*Bowles v. O'Connell*, Case No. 5:14-cv-174, 2018 WL 3827141, at *8 (D. Vt. Aug. 10, 2018) (citation modified). A competitor has "a broader range of privilege to interfere . . . when the relationship or economic advantage interfered with is only prospective." *Gifford*, 686 A.2d at 474.

Plaintiff's Second Amended Complaint does not meet the pleading requirements of a tortious interference claim. At its most detailed, the Second Amended Complaint alleges that Defendants used confidential information obtained from former Concepts employees to try to lure away Plaintiff's current and potential customers. (Doc. 52 at 33–34, ¶¶ 150–151.) It does not explain why Plaintiff expected to form business relationships with any alleged potential customers or exactly what Defendants did to thwart that expectancy. *See J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 22, 188 Vt. 245, 6 A.3d 701 (holding that tortious interference with prospective economic advantage requires "a reasonable probability that a business or contractual relationship would have arisen but for the conduct of the defendant; a mere hope or wish for such a relationship to arise is insufficient"); *see also William Ives Consulting, Inc. v. Guardian IT*

---

[30] While the Second Amended Complaint characterizes this claim as "tortious interference with business relations and prospective economic advantage," (Doc. 52 at 33), Vermont courts have termed this tort "interference with prospective contractual relations," *see, e.g.*, *Gifford v. Sun Data, Inc.*, 686 A.2d 472, 474 (Vt. 1996). These torts are the same in all relevant respects. *See* Dan B. Dobbs et al., *The Law of Torts* § 616 (2d ed. 2011) (describing various forms of tortious interference—interference with economic opportunities, business relationships, prospects, prospective advantage, or prospective contractual relations—without an enforceable contract as all "essentially the same tort.").

*Sys., LLC,* CIVIL ACTION NO. 3:19-CV-00336-GCM, 2020 WL 6495542, at *4 (W.D.N.C. Nov. 4, 2020) (granting motion to dismiss when plaintiff failed to plead allegations to support expectancy of business such as "the pattern and practice the parties previously followed to re-execute contracts regarding [their] services, the length of relationships with customers, that [the plaintiff] had been engaged in ongoing negotiations with prospective clients for a length of time, that contracts had already been drafted, that parties were drafting contracts, that there were dates set for contracts to be signed, *et cetera*"). The Second Amended Complaint also does not allege facts tending to show that Defendants actually disrupted or interfered with Plaintiff's relationships with its current customers or caused any resulting damages beyond "threadbare recitals" and "mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); (*see also* Doc. 52 at 33–34, ¶ 151) (alleging that Defendants used Plaintiff's wrongfully obtained confidential information to "approach, advertise to, and *attempt to induce*" Plaintiff's customers to do business with Defendants) (emphasis added).

For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's claims of tortious interference with business relations and prospective economic advantage (Count VIII) be GRANTED.

## IX. Summary judgment should be granted on Plaintiff's claims for fraudulent concealment (Count IX).

Under Vermont law, "fraudulent misrepresentation can be accomplished affirmatively by false statement or by the concealment of facts by one who has a duty to disclose those facts." *Est. of Alden v. Dee*, 2011 VT 64, ¶ 32, 190 Vt. 401, 35 A.3d 950 (citation modified). When concealment or silence functions as the "misrepresentation" in the fraudulent transaction, Vermont terms the resulting tort "fraudulent concealment." *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 13 Reporter's Note, cmt. a (Am. L. Inst. 2020).

To state a claim for fraudulent concealment, a plaintiff must allege: (1) concealment of facts, (2) affecting the essence of the transaction, (3) not open to the defrauded party's knowledge, (4) by one with knowledge and a duty to disclose, (5) with the intent to mislead, and (6) detrimental reliance by the defrauded party. *Fuller v. Banknorth Mortg. Co.*, 173 Vt. 488, 490, 788 A.2d 14, 16 (2001) (citation modified). "In order to establish a claim for fraud, a plaintiff must meet a higher burden of proof: that of clear and convincing evidence." *Id.* (citation modified).

Defendants contend that Plaintiff has not adequately pleaded fraudulent concealment and, therefore Defendants are entitled to judgment as a matter of law. (Doc. 241-1 at 23–24; Doc. 273 at 10–11.)

Vermont courts traditionally adhered to "the minority view that fraud cannot be predicated upon a promise to do a thing in the future, even though there may have been an intent not to perform when the promise was made." Annotation, *Promises and Statements as to Future Events as Fraud*, 125 A.L.R. 879 (1940); *see also Woods v. Scott*, 178 A. 886, 887 (Vt. 1935) (citing cases that "clearly establish the rule that neither representations of fact that will exist in the future nor mere promises, though false and intended to deceive, afford the basis of actionable fraud"); *but see Comstock v. Shannon*, 73 A.2d 111, 114 (Vt. 1950) (drawing a distinction between the intention contained in a promise, which is not actionable for fraud, and the collateral intent contained in false representations made in support of the promise, which came within "a well recognized exception to the rule regarding broken promises [when] an action can be maintained").

However, in later cases the Vermont Supreme Court appears to have adopted the majority rule that a promise to do something in the future, made with a present intent not to perform, gives

rise to an action in fraud. In this situation, the fraud lies not in the subsequent failure to perform but in the misrepresentation of present state of mind. *See, e.g.*, *Union Bank v. Jones*, 411 A.2d 1338, 1342 (Vt. 1980) (citation modified) ("Mere promises to act in the future cannot constitute the requisite misrepresentation of existing fact that is essential to fraud. The reason is that in the case of a negligent or innocent future promise, there is no present intention to act contrary to the promise, and therefore there can be no misrepresentation of existing fact."); *Silva v. Stevens*, 589 A.2d 852, 857 (Vt. 1991) (emphasis added) ("An action for fraud and deceit will lie upon an intentional misrepresentation of *existing fact*, affecting the essence of the transaction, *so long as the misrepresentation was false when made. . . .*"); *Winey v. William E. Dailey, Inc.*, 636 A.2d 744, 747 (Vt. 1993) (emphasis added) ("With respect to promises to perform, we have held that misrepresentations about future actions can be fraudulent if [the] defendant, *at the time of the statement*, intends to act differently from the promise.").

Although Vermont courts seem not to have explicitly addressed this question, these cases strongly suggest that the "concealment" of a fraudulent concealment claim must occur at the time that the challenged transaction took place. *See also Pearson v. Simmonds Precision Prods., Inc.*, 624 A.2d 1134, 1136 (Vt. 1993) ("A party to a business transaction has a duty to exercise reasonable care to disclose to the other party [essential information] before the transaction is consummated. . . . We need not reach the issue of whether [liability for nondisclosure] requires a continuing duty to disclose after the transaction was completed."); *Retail Pipeline, LLC v. Blue Yonder Grp., Inc.*, 557 F. Supp. 3d 535, 555 (D. Vt. 2021) (citation modified), *aff'd sub nom. Retail Pipeline, LLC v. Blue Yonder, Inc.*, No. 21-2401-CV, 2022 WL 17660545 (2d Cir. Dec. 14, 2022) (approving state court rule that "misrepresentations about future actions can be fraudulent if [the] defendant, at the time of the statement, intends to act differently from the

promise"). Put another way, a promise to act or not to act can only be fraudulent if the promisor intends not to follow their promise at the time the parties made the transaction—not afterwards.

Plaintiff alleges that Defendants committed the tort of fraudulent concealment by setting up a competing business, TurboTides, while Dr. Qiu was still employed by Plaintiff. (*See* Doc. 52 at 35–37, ¶¶ 158–167.) Defendants' plan to compete with Plaintiff "was material to and affected the essence of the Employment Agreement." (*Id.* at 36, ¶ 162.) Thus, the Employment Agreement is the relevant "transaction." But Plaintiff and Dr. Qiu entered into the Employment Agreement in 2001. (*Id.* at 10–11, ¶ 30.) The Second Amended Complaint alleges that Dr. Qiu's earliest potentially fraudulent act was telling former classmates on February 24, 2009, that he was thinking about starting a company in China—eight years after the parties signed the Employment Agreement. (*Id.* at 11, ¶ 31.)

Plaintiff does not contend that Dr. Qiu intended to violate the Employment Agreement at the time of signing. (Doc. 293 at 6.) And Plaintiff has made no allegations tending to show that Dr. Qiu considered violating the Employment Agreement before 2009. Therefore, Plaintiff has not adequately pleaded that Defendant entered into the Employment Agreement with the intent to mislead Plaintiff or with knowledge that he might develop a competing software product and company years later.

Plaintiff's cited authorities do not compel a different conclusion. Quoting *Fayette v. Ford Motor Credit Co.*, 282 A.2d 840, 845 (Vt. 1971), Plaintiff proposes that "for fraud, it is sufficient to find that 'the combination of promises, one as to the present, and one as to the future that induced the plaintiff to act as he did' caused injury." (Doc. 293 at 7) (citation modified). But that is not what *Fayette* holds. Plaintiff appears to suggest that *Fayette* lowered the threshold to establish a fraud claim, although the case does not purport to do so. *See Fayette*, 282 A.2d at 843

(quoting common law elements of fraud claim). Moreover, *Fayette* considered whether a promise to act in the future could be the basis of a fraud action *at all*, not whether the promise must be false at the time it was made. *Id.* at 843–44. To the contrary, *Fayette* approvingly cites several authorities explaining that the statement at issue must be false at the time it was made, *see id.*, and explicitly considered the representations "*which existed at the time* that the plaintiff . . . and the defendant" entered into their agreement, *id.* at 844 (emphasis added).

*Comstock* is distinguishable for the same reason. (*See* Doc. 293 at 7–8.) *Comstock* only acknowledged "a well recognized exception to the rule" at the time—a rule that has since changed, as discussed above—that "false representations or broken promises referring merely to the future do not afford the basis of actionable fraud." 73 A.2d at 113–14. *Comstock* does not speak to whether a plaintiff can sue for fraud or fraudulent concealment when a defendant makes a promise with no intent to break it but reneges later.

Plaintiff's final case, *Summits 7, Inc. v. Kelly*, 886 A.2d 365 (Vt. 2005) is not a case about fraud at all. (Doc. 293 at 8–9.) *Kelly* considered whether an employment agreement with a non-compete clause has adequate consideration if the employee signs the agreement after they have already started their at-will employment. 886 A.2d at 367. But that issue is not present here—all parties agree that the Employment Agreement is enforceable.

For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's claim of fraudulent concealment (Count IX) be GRANTED.

## X.     Summary judgment should be granted on Plaintiff's claims for constructive fraud (Count X).

"The Vermont Supreme Court has held that where there is no intent to mislead or defraud, but the other elements of fraud are met, a defendant may be liable for constructive fraud." *Retail Pipeline, LLC* 557 F. Supp. at 555 (citation modified). "Constructive fraud may be

found in cases involving misrepresentations that do not rise to the level of deceit, or actual fraud, and in cases where a party in a position of superior knowledge or influence intentionally gains an unfair advantage at the expense of another person." *Id.* (citation modified).

As discussed in Section IX above, Plaintiff has not pleaded all the elements of fraud except intent because it does not contend that Defendants knew that they would invent a competing software product and create a corporation to compete with Plaintiff when they entered into the Employment Agreement. *See id.* at 555–56 (citation modified) ("In a constructive fraud claim mere promises to act in the future cannot constitute the requisite misrepresentation of existing fact that is essential to fraud because in the case of a negligent or innocent future promise, there is no present intention to act contrary to the promise, and therefore there can be no misrepresentation of existing fact.")

For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's claims of constructive fraud (Count X) be GRANTED.

## XI.    Summary judgment should be denied on Plaintiff's claim for civil conspiracy (Count XI).[31]

Defendant Zhang requests summary judgment on Plaintiff's claim for civil conspiracy. Defendants Qiu and TurboTides, Inc. do not appear to request summary judgment on this claim.

Ms. Zhang bases this request on several grounds: (1) there is no evidence that Ms. Zhang committed any illegal act to further any conspiracy with Defendants to harm Plaintiff; (2) with respect to all counts, Plaintiff has not alleged any wrongdoing by Ms. Zhang; (3) Plaintiff has not presented evidence that Ms. Zhang had any connections to Defendants or to Hefei Taize apart from being Dr. Qiu's wife; (4) Ms. Zhang had no agreement with Defendants to engage in any of

---

[31] The Second Amended Complaint lists two consecutive counts as "X: Tenth Claim for Relief." (Doc. 52 at 37.) The Court refers to the second "Count X" as "Count XI."

the alleged wrongdoing; and (5) Plaintiff has not presented any evidence or calculations of damages as required by Rule 26. (Doc. 240-1 at 20–21).

Ms. Zhang's first two points repeat legal arguments previously rejected by this Court in its Order denying Ms. Zhang's Motion to Dismiss. (*See* Doc. 90 at 14–15) (alteration in original) (citation modified) ("Ms. Zhang argues that all of her alleged conduct was facially legal and that there was no damage resulting from these acts. That is not a basis to conclude that Concepts' conspiracy claim against Ms. Zhang is implausible. Even if all of *her* acts were facially legal, she can be liable for conspiracy so long as one conspirator causes the plaintiff damage by committing an unlawful act to further the conspiracy. . . . Ms. Zhang asserts that Concepts' claim for conspiracy fails insofar as it is related to the underlying causes of action . . . because Concepts has not alleged in those counts any wrongdoing by Ms. Zhang. . . . The court views Ms. Zhang's argument on this point as a repackaged version of her argument that the conspiracy claim against her fails because there are no allegations that she herself performed any facially illegal acts. The court rejects that argument for the reasons stated above.") Accordingly, the Court declines to recommend summary judgment on these grounds.

Ms. Zhang's argument that Plaintiff has not presented any evidence connecting her to Defendants or Hefei Taize (apart from her marriage to Dr. Qiu) is also without merit. First, as discussed in detail in Section I above, Ms. Zhang has not shown that Plaintiff "was obligated by discovery demand or court order to produce the evidence or that [it] voluntarily undertook to make the showing." *Nick's Garage, Inc.*, 875 F.3d at 115 (2d Cir. 2017).

Second, Plaintiff has presented evidence that connects Ms. Zhang to Defendants' alleged plan to take and use Plaintiff's intellectual property, including that Ms. Zhang:

- Is a software engineer with a master's degree who builds and releases computer software by compiling and writing source code and building it to an executable program (Doc. 215-1 at 34, 39, 40, 81, 86);

- Formed "TurboTides LLC" as a corporation with the primary business or purpose listed as "Software Development" (Doc. 270-7); and

- Listed herself as proprietor of "TurboTides LLC" from 2012–2017 on her tax returns and reported that "TurboTides LLC" had up to tens of thousands of dollars of expenses (Doc. 270-3, ¶ 5).

Critically, as discussed in Section I above, Plaintiff has also produced evidence that would allow a rational juror to find that Dr. Qiu breached his Employment Agreement because he began working on the TurboTides software while he lived in the United States and was employed by Concepts—potentially as early as 2012. Because Ms. Zhang was proprietor of "TurboTides LLC"—a "software development" business—from 2012–2017, when "TurboTides LLC" reported thousands of dollars of business expenses and sales, a rational juror could conclude that Ms. Zhang collaborated with Defendants to develop and sell the TurboTides software using TurboTides LLC.

In a similar vein, Ms. Zhang cannot obtain summary judgment on the grounds that she had no agreement with Defendants to engage in any alleged wrongdoing. Ms. Zhang identifies her sworn affidavit as undisputed evidence that she "entered into no agreement or understanding with Dr. Qiu or anyone else to assist or facilitate any wrongdoing alleged by Plaintiff." (Doc. 240-1 at 20 n.19); (Doc. 240-2 at 2, ¶¶ 4–8.) However, Plaintiff's evidence described above disputes Ms. Zhang's assertion that she was not party to any agreement with Dr. Qiu. A reasonable juror could find that Ms. Zhang's conduct as proprietor of TurboTides LLC, rises to the level of an implied agreement to cooperate with Dr. Qiu to accomplish Defendants' alleged unlawful use of Plaintiff's intellectual property. *See Wei Wang v. Shen Jianming*, No. 2:17-CV-00153, 2019 WL 3254613, at *7 (D. Vt. July 19, 2019) (citation modified) ("Parties are acting in

concert [for purposes of tort liability] when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself.").

Finally, as discussed above, Ms. Zhang is not entitled to summary judgment under Rule 26 because Rule 26 does not provide a remedy in the form of summary judgment and because Defendants have not demonstrated compliance with the requirements of Rule 37.

For these reasons, I recommend that Defendant's Motion for Summary Judgment on Plaintiff's claim of civil conspiracy (Count XI) be DENIED.

## XII. Summary judgment should be denied on Plaintiff's claim for breach of common law duty of loyalty (Count XII).

Plaintiff has brought a claim of breach of common law duty of loyalty against Dr. Qiu on the grounds that he wrongfully solicited customers or potential customers of Plaintiff for his competing business and that he misappropriated Plaintiff's trade secrets and/or confidential information. (Doc. 52 at 38–39, ¶¶ 176–186.)

Defendants request summary judgment on this claim because the claim is based on information contained in articles that were made public by Concepts and, thus, Dr. Qiu had no duty to keep the information secret. (Doc. 241-1 at 24.) This argument is unpersuasive for two reasons. First, as discussed in section IV, Plaintiff has identified confidential information taken by Dr. Qiu that was not published or otherwise disseminated to the public. Second, Plaintiff's claim for breach of loyalty alleges that Dr. Qiu breached the duty of loyalty by taking actions completely unrelated to published or unpublished papers, including by soliciting current and/or potential customers of Plaintiff for his competing business. (Doc. 52 at 39, ¶¶ 178–180.)

However, Vermont has adopted the 1985 revision of the Uniform Trade Secrets Act (UTSA), which, apart from several enumerated exceptions not at issue here, "displaces

*conflicting* tort, restitutionary, and any other law of this State *providing civil remedies for misappropriation of a trade secret.*" 9 V.S.A. § 4607 (emphasis added). Therefore, Plaintiff's claim for breach of the common law duty of loyalty may be barred by the Act if it falls within the scope of this provision.

The language of the Act is ambiguous regarding the scope of the law displaced by this provision. Under one interpretation, displacement only occurs if the state law provides a remedy for information that meets the definition of a trade secret as defined in the Act. *See* 9 V.S.A. § 4601(3) (defining trade secret). In other words, displacement will not occur when the information at issue in the particular case does not qualify as a trade secret under the Act. *See, e.g.*, *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 16, 294 Wis. 2d 274, 717 N.W.2d 781; *Custom Teleconnect v. Int'l Tele-Services*, 254 F. Supp. 2d 1173, 1182 (D. Nev. 2003); *Powell Prods., Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996).

But under another interpretation, displacement is possible if the state law would provide relief for misappropriation of a trade secret even if the information involved in that case does not qualify as a trade secret. In other words, if the state law in question would protect a trade secret (as defined in the Act) from misappropriation (as defined in the Act), displacement of other remedies is possible regardless whether the particular case involves trade secrets. *See, e.g.*, *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 788–89 (W.D. Ky. 2001); *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 985 (M.D. Tenn. 2008); *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 948–49 (W.D. Mich. 2003). The Vermont Supreme Court has not specifically interpreted the language of 9 V.S.A. § 4607.

The Commissioners on Uniform State Laws promulgated several official comments to the UTSA. The comment on the corresponding provision of the UTSA regarding displacement

provides in part that the UTSA "does not apply to a duty imposed by law that is not dependent upon the existence of competitively significant secret information, like an agent's duty of loyalty to his or her principal." Unif. Trade Secrets Act § 7 cmt. (amended 1985), 14 U.L.A. 529 (2005).

Because the history of the Act clarifies that it does not displace remedies based on duty of loyalty, the Vermont Trade Secrets Act does not displace Plaintiff's claim for breach of the common law duty of loyalty. For these reasons, I recommend that Defendants' Motions for Summary Judgment on Plaintiff's claim of breach of common law duty of loyalty (Count XII) be DENIED.

## Conclusion

For the reasons explained above, I recommend that Defendants' Motions for Summary Judgment (Docs. 240 and 241) be GRANTED on Count VII (unfair and deceptive practices under the Vermont Consumer Protection Act), Count VIII (tortious interference with business relations and prospective economic advantage), Count IX (fraudulent concealment), and Count X (constructive fraud); GRANTED as to Defendant Qiu and DENIED as to Defendant TurboTides, Inc. on Count VI (unjust enrichment); and DENIED on Count I (breach of contract), Count II (breach of software terms and conditions), Count III (copyright infringement), Count IV (misappropriation of trade secrets), Count V (common law conversion), Count XI (civil conspiracy), and Count XII (breach of common law duty of loyalty).

Defendants' Motions to Strike (Docs. 274 and 277) are DENIED.

Dated at Burlington, in the District of Vermont, this 21st day of July 2025.

/s/ Kevin J. Doyle
Kevin J. Doyle
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections that shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)).